Frank J. Dyevoich, Esq. (ID# 166002017)
**RAINONE COUGHLIN MINCHELLO, LLC**
515 U.S. Highway One South, Suite 440
Iselin, New Jersey 08830
Tel.: 732-709-4182
Fax: 732-791-1555
fdyevoich@njrcmlaw.com
*Attorneys for Defendants, City of Long Branch and Brian O'Gibney*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KYHALLISTA JOHNSON as Administrator of the Estate of DION HARRELL, <br><br> Plaintiff, <br><br> v. <br><br> STATE OF NEW JERSEY, NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF STATE POLICE, JOHN T. NICHOLS, BRIAN O'GIBNEY, AND CITY OF LONG BRANCH, <br><br> Defendants | Civil Action No. 3:18-cv-11299-FLW-ZNG <br><br><br> **DECLARATION OF FRANK J. DYEVOICH** |

**FRANK J. DYEVOICH**, an attorney duly admitted to practice law before the Courts of the State of New Jersey, and attorney for Defendants City of Long Branch and Brian O'Gibney (hereinafter "City Defendants"), affirms the following to b true under penalty of perjury:

1.   I am an attorney with Rainone Coughlin Minchello, LLC, and our office represents the City Defendants in this matter, and as such, I am familiar with the facts and circumstances surrounding the issues of this case. I make this affirmation in support of the

1

City Defendants' opposition to Plaintiff's motion to amend the Complaint to assert <u>Brady</u> allegations.

2.   From May 13, 1992 through May 19, 1992, the trial took place for the criminal charge of sexual assault against Plaintiff, Dion Harrell.

3.   Attached hereto as **Exhibit A** is a true and accurate copy of the trial testimony of Co-Defendant John T. Nichols ("Nichols"), the New Jersey State lab technician who tested the samples provided by the victim and Plaintiff, Dion Harrell.

4.   Nichols testified that both the victim and the Defendant (Harrell) were both possessors of Substance H belonging to Blood Group O and were both secretors. He testified that the Defendant could be within the 16% of the male population that could have caused the seminal stain on the victim's clothing.

5.   Defendant Harrell's counsel did not attempt to impeach the credibility of the test results on cross-examination of Nichols.

6.   Attached hereto as **Exhibit B** is a true and accurate copy of the closing argument made by Plaintiff's defense attorney during his criminal trial.

7.   Plaintiff's defense attorney made the argument that because the victim and Defendant were both possessors of substance H, belonged to the blood group O, and were both secretors, that

2

the lab's test results were inconclusive and provided no information beyond their genetic makeups.

8. Attached hereto as **Exhibit C** is a true and accurate copy of the victim's testimony during the criminal trial of Plaintiff, Dion Harrell.

9. The victim testified that she had seen Plaintiff's face before the attack, saw his face up close during the attack, and recognized his face as the man who raped her after the fact when she was working in McDonald's and he walked into the restaurant.

10. On August 21, 2020, Plaintiff took the deposition of Nichols, who performed the forensic testing at issue.

11. Attached hereto as **Exhibit D** is a true and accurate excerpt from the deposition of John T. Nichols.

12. Nichols testified that he was not required to write a conclusion that the samples were inconclusive in his report.

13. On June 2, 2022, Henry Swordsma's deposition was taken, who was the supervisor to Nichols during the testing at issue.

14. Attached hereto as **Exhibit E** is a true and accurate excerpt from the deposition of Henry Swordsma.

15. Swordsma testified that the testing results, namely that both he victim and Defendant were both substance H blood group O secretors, and that the information was included in the testing reports. He further testified that it was not required to write in the report that because of this, the testing was inconclusive.

3

277920v1

16.   The fact that Swordsma testified that he told Officer Crumrine that the testing was inconclusive is insubstantial evidence to suggest that Crumrine never told this information to Prosecutor Michael K. Cunningham.

17.   The facts are that no one knows what was spoken about between Crumrine and Prosecutor Cunningham, and it is impossible to find out since both Crumrine and Prosecutor Cunningham are deceased.

18.   Officer Gregory Crumrine passed away in 1998.

19.   Assistant Prosecutor Michael K. Cunningham passed away in 2011.

20.   Plaintiff's counsel has no evidence suggesting Officer Crumrine committed a <u>Brady</u> violation and cannot obtain any evidence regarding same due to the deaths of Crumrine and Prosecutor Cunningham.

21.   Counsel for Plaintiff and Defendants have met and conferred regarding Plaintiff's proposed amendments. Defendants oppose the amendments.

4

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**RAINONE COUGHLIN MINCHELLO, LLC**
*Defendants, City of Long Branch and
Brian O'Gibney*

By: _____

Dated: March 20, 2023                          Frank J. Dyevoich, Esq.

5

277920v1

# EXHIBIT A

Mozer - Redirect                                    68

1  REDIRECT EXAMINATION BY MR. CUNNINGHAM:

2      Q    I'm going to hand you what's been marked S-16 and

3  S-17. I ask you to look at these two items, sir, you recognize

4  them?

5  A    Yes, these are the contents of the material I brushed down

6  from the clothing of the victim.

7      Q    Okay.  So that's not something that was submitted to

8  you as a separate specimen?

9  A    No, these, this contains the material that I removed from

10  the clothing.

11     Q    Okay.  Why are there two packages?

12  A    One is 18 -- okay, 18 would be samples of the suspect's

13  head hair, and 14 and 15 would have been from the clothing.

14         MR. CUNNINGHAM:  Thank you.  I have nothing else.

15         MRS. SAUTER:  Nothing further, Judge.

16         THE COURT:  All right.  Thank you, Mr. Mozer.  You may

17  step down.

18         (Whereupon Mr. Mozer steps down.)

19         MR. CUNNINGHAM:  Can I have one second, your Honor?

20         State calls John Nichols.

21         COURT OFFICER:  Please state your name for the record,

22  and spell your last name.

23         THE WITNESS:  John T. Nichols, N-i-c-h-o-l-s.

24  J O H N   T.   N I C H O L S, having been duly sworn, was

25  examined and testified as follows:

Nichols - Direct                                                 69

1   DIRECT EXAMINATION BY MR. CUNNINGHAM:

2       Q    Good afternoon, sir.  Can you tell me where you're

3   employed, sir?

4   A    The New Jersey State Police Laboratory, Sea Girt, New

5   Jersey.

6       Q    In what capacity?

7   A    I'm a principal forensic chemist.

8       Q    What does that mean?

9   A    I'm the bench level supervisor of the Biochemistry Unit.

10      Q    Okay.  What are your duties and responsibilities?

11  A    I supervise a group of approximately five people, and we

12  analyze any specimens submitted by any law enforcement agency

13  under the counties that we service for various types of

14  evidence relating to biochemistry.

15      Q    How long have you done that for?

16  A    I've worked for the State Police Laboratory for a little

17  over twenty-one years.

18      Q    Can you tell me what formal training and what

19  education you've had that qualifies you for that position?

20  A    I have a Bachelor's Degree in physiology from Hunter

21  College, City University of New York, 1965.  And I've had

22  extensive on-the-job training.

23      Q    Have you ever been qualified previously as an expert

24  in forensic science in the State Courts of New Jersey?

25  A    Yes, I have.

Nichols - Direct                                    70

1      Q     Can you tell me on approximately how many occasions?

2   A   I've qualified as an expert witness in forensic science

3   three hundred and sixty-seven times in Municipal Courts,

4   Superior Court in all twenty-one Counties in the State of New

5   Jersey, and also in Federal Court.

6           MR. CUNNINGHAM:  Your Honor, I'm going to be offering

7   this expert, this witness also as an expert for forensic

8   science.

9           THE COURT:  Any questions concerning his expertise?

10          MRS. SAUTER:  No, Judge, no objection.

11          THE COURT:  Proceed.

12     Q     Sir, are you familiar with a request for examination

13  which was assigned laboratory number 36967 E?

14  A   Yes, I am.

15     Q     How did you become involved with that request?

16  A   This request was submitted by the Long Branch Police

17  Department in September, I believe it's 21, 1988.  It was

18  assigned to the Biochemistry Unit on that day.

19     Q     And when did you become involved with it?

20  A.  Shortly thereafter.

21.    Q     What did you do in connection with that request?

22  A   The first item that was submitted to the laboratory on

23  9/21/88 was a tube of whole blood from the victim, which was

24  _____.  The blood was typed and a report was sent out.

25     Q     What, when you say the blood was typed, can you tell

HARRELL 00629

5   Q    There are four types of blood type?

6   A   Correct.

7   Q    What determination was made with respect to ████

8   ████████   blood type?

9   A ████████████   is a blood group O, and her Lewis type is A

10  negative B positive.  That is the essence of the report.

11  Q    What is a Lewis type, what does that mean?

12  A   A Lewis type in conjunction with testing with saliva can

13  determine whether a person is a secretor or not.

14  Q    What is a secretor?

15  A   A secretor is a person, approximately 80 percent of the

16  population are known as secretors, these are people that will

17  secrete their blood group substances, in essence their blood

18  type in saliva, seminal fluid, vaginal secretions, any fluid

19  coming out of the body will contain these blood group

20  substances, if they are a secretor.  And consequently to that,

21  20 percent of the population are classified as non-secretors.

22  Q    Your determination was that ████████   was type O and

23  a secretor?

24  A   Correct.

25  Q   What did do you next in connection with this

Nichols - Direct                                   72

1   laboratory number of request for examination?

2   A   The report was then filed with a note stating that the

3   whole blood specimen number one will be analyzed further upon

4   the submission of additional specimens.

5       Q    And were additional specimens later submitted?

6   A   Yes, they were.

7       Q    When?

8   A   Additional specimens were submitted to the laboratory and

9   given the same laboratory case number on December 9, 1988.

10      Q    And what was submitted at that time?

11  A    There were approximately fifteen items submitted.  The

12  first group of items is contained in a Sirchie rape kit, and

13  four articles of clothing.

14      Q    Let me show you what's been marked as S-13 for

15  identification; can you tell me if you recognize this exhibit?

16  A    Yes, I do.

17      Q    What is that?

18  A    This is a copy of our request for examination of evidence

19  submitted by the Long Branch Police Department.

20      Q    And is that the specific request that you're

21  testifying about at this moment?

22  A   Yes, I am.

23      Q    What did you do in connection with the evidence that

24  was submitted at that time?

25  A    The standard testing that was performed on the sexual

Nichols - Direct                                    73

1    assault kit and on the clothing was conducted to determine the

2    presence or absence of male seminal fluid, any genetic markers,

3    and any blood group substances.

4         Q    How did you conduct that testing, how was that

5    performed?

6    A    Which, all of them you want me to go through?

7         Q    Well, is it easier to do it by specimen?

8    A    I can give you a general overall view of what is done.

9         Q    That would be best.

10   A    Okay.  Under the Sirchie Sex Crimes Kit, there are three

11   specimens known as slide specimens, they are taken from three

12   cavities, oral, anal and vaginal.

13        Q    Sir, I'm going to hand you what's been marked as S-1.

14   Do you recognize this?

15   A    Yes, that's standard Sirchie kit.

16        Q    And are you able to tell if this is the same kit that

17   was used in this case, or if it's a different one?

18   A    It's the same one, based on the same laboratory case number

19   36967 E.

20        Q    Okay.  The slides that you're talking about, are they

21   contained in that exhibit?

22   A    Yes.

23        Q    Could you show them to us?

24   A    Slides are contained in these three cardboard containers.

25        Q    Okay.

Nichols - Direct                                                            74

1   A    The slides are processed through a six stage staining

2   technique to emphasize a color of the spermatozoa that we are

3   looking for.  The six slides are looked at under a compound

4   microscope at approximately the hundredth power.

5        The results of the testing of the three sets of slides are

6   as follows:  The oral smears there were no spermatozoa

7   detected, the two anal smears there was no spermatozoa

8   detected.  However, on the vaginal smears which are my

9   specimens 10 C, spermatozoa was detected.

10       Q    What is spermatozoa?

11  A    Spermatozoa is the male sperm that is contained in the

12  seminal fluid.

13       Q    Is it produced in the female body?

14  A    No.

15       Q    What observations were you able to make of the

16  spermatozoa that you found on that slide?

17  A    Just that they were present.

18       Q    What else did you examine?

19  A    There was a series of items that were examined by myself,

20  the genital swabbings, dried secretions, saliva sample,

21  fingernail scrapings, oral and anal, vaginal swabs, a nasal

22  mucous sample, slacks, a shirt, a pair of underpants and a

23  sweater.  The method of testing is to determine whether a

24  chemical which is known as acid phosphatase is present on any

25  of the items that we test.

1       It is a color indicative test, a piece of white filter

2  paper approximately nine centimeters across, which is about

3  four and a half inches, is wet with distilled water, and the

4  material that we're testing is just gently rubbed.  The piece

5  of filter paper is then inverted and a chemical known as acid

6  phosphotasis agent is placed on the inverted filter paper.  If

7  a purple color generates or is seen, a good indication of acid

8  phosphotase is noted.  Acid phosphotase is contained in a very

9  large quantity in seminal fluid.

10      If there is a positive test here then the next series of

11  test are sequential.  If we have a positive acid phosphotase

12  test, the next thing we have to look for is the presence or

13  absence of spermatozoa.  If we do not find spermatozoa on the

14  slide where we have the first positive test, then we test for

15  a protein which is known as P30.  This is indigenous to the

16  prostate gland, again, male characteristics.

17      Q     That means it would not appear in the female?

18  A     Correct.  The next test, once we have at least an initial

19  test for acid phosphotase and either a positive sperm result

20  or a positive P30 result, in many cases where we cannot find

21  spermatozoa either through a lack of spermatozoa or medical

22  problem with the potential suspect, or low sperm count or

23  degraded spermatozoa we back it up with the P30 test.  So,

24  again, test number one with combination of either test number

25  two for spermatozoa plus a test for the P30 will give us a

1  positive for the male presence of seminal fluid.

2      If we get two positive tests here, then we have a gamut of

3  tests that go through numbers four through nine to try to

4  delineate whoever caused that seminal fluid.

5      Q    And did you get two positive responses as part of your

6  testing in this case?

7  A    Yes, we have positive responses on the vaginal swab and on

8  the underpants.

9      Q    Okay.  With respect to the vaginal swab, you found

10  presence of spermatozoa?

11  A    Correct.

12      Q    Were you able to make any observations or further

13  analysis with respect to that spermatozoa or its origin?

14  A    Not to the origin of the spermatozoa per se, but to the

15  seminal fluid.  The testing that was done was a test known as

16  absorption inhibition.  This test will determine whether a

17  secretor deposited the seminal fluid or not.

18      In this case, the blood group substance detected was a H

19  factor, which is characteristic of somebody who is an O

20  secretor.  However, three of the genetic markers that we tested

21  for, we did not receive any other reaction.  This is on

22  specimen 10 of the vaginal swab.  So, the only testing that was

23  performed, or the only positive tests on the vaginal swab was

24  for the presence of spermatozoa and blood group substance H,

25  which is characteristic of an O secretor.

1     Q     You say an O secretor, as opposed to an O

2   non-secreting person?

3   A     Correct.  As I explained initially, this person who

4   deposited the spermatozoa if you can link the H factor to the

5   spermatozoa, he would fall in that group of people which

6   approximate 80 percent of the population.

7     Q     Eighty?

8   A     Correct.

9     Q     And also the H would indicate an O secretor, as

10   opposed to an A secretor or B secretor?

11   A     Correct.

12     Q     Or AB secretor?

13   A     It would delineate to such that it is an O secretor.

14     Q     Okay.

15   A     On the underpants, which is my specimen number 14, the

16   results for spermatozoa were negative.  No spermatozoa was

17   found on the slide that was made up by myself.  However, the

18   results for P30 were positive.

19     So, we have the preliminary test, which is the acid

20   phosphatase was positive, a negative spermatozoa, but a

21   positive P30 test.  Therefore, we continue the analysis on, to

22   attempt to obtain a blood group substance and any other genetic

23   markers.

24     The results of that testing was that the underpants also

25   reacted for a blood group substance H, which is indicative of

Nichols - Direct                                    78

1   an O secretor; however, the genetic markers of PGM and

2   Peptidase A, there was no reaction to those two tests.

3       Q   And were you able to tell the blood type with respect

4   to the seminal material?

5   A   Yes, the seminal material reacted for a group O secretor.

6       Q   Did there also come a point in time when you made an

7   analysis of blood known to come from a Dion Harrell?

8   A   I don't seem to have that report with me.  I have two

9   copies of the first report, do you have a copy of the -- I'm

10  sorry, here it is.  The date of the submission is obliterated,

11  this paperwork came off microfilm, but the report is dated

12  4/28/1989.

13      Q   Let me show you what's been marked S-14, can you tell

14  me what that is?

15  A   Yes, this is a copy of the identical request for

16  examination of evidence that I have.  The date of the receipt

17  is March 23, 1989.

18      Q   And the date of your analysis?

19  A   The date of the final report is 4/28/1989, five days later.

20      Q   Okay.  And what did your analysis determine with

21  respect to Mr. Harrell's blood?

22  A   The whole blood of Dion Harrell, which is my specimen

23  number 16, is a blood group O.  Lewis type is A negative B

24  positive, which is indicative of a secretor.  His saliva, which

25  is my specimen number 17, reaction for blood group substance H,

1  which is consistent with a person who is an O secretor.

2      Q     So, would he and ▆▆▆▆▆▆▆ have the same blood

3  type?

4  A    They have the same blood type, and they are both secretors.

5      Q     Would Mr. Harrell's blood type be consistent with both

6  the spermatozoa and the seminal fluid that you found in

7  connection with this analysis?

8  A    Mr. Harrell is a male. He is capable of generating

9  spermatozoa. So there is a link there. He is an O secretor.

10  The two stains found on the vaginal swab and on the panties

11  reacted also for a group O secretor. He is consistent with

12  those two characteristics.

13      Q     You indicated earlier that 80 percent of the

14  population are secretors?

15  A     Correct.

16      Q     Can you break that 80 percent down further by way of

17  blood type?

18  A    Yes. If you like, I can use the board.

19      Q     If it would help you.

20  A,   There's four basic blood types, as I mentioned before, ——

21  group O, group A, B, AB. Population wise, 40 to 45 percent are

22  O's, 40 to 45 percent A's, 15 to 20 percent are B's and then 3

23  to 5 percent AB's. In this situation, both the victim and the

24  suspect are O's, so they would fall in line with approximately

25  40 to 45 percent of the population.

1        In this room here we would have, there's twenty people, 40

2   percent or 8 people would be O secretors, 8 people would be A

3   secretors, two people would be B and 1 percent would be AB.

4        And we take the secretor factor, which is 80 percent, we

5   multiply that by the lower numbers to make the numbers easier,

6   it would be 32 percent of the population, 32, is that 20 -- no,

7   that's 12 percent, and then approximately 1 -- 2.4 percent.

8        So, 32 percent of the population will fall into a group O

9   secretor, 32 percent of the population would be a group A

10  secretor, 12 percent would be a B secretor and 2.4 percent

11  would be a B secretor.

12       Q     Beyond that, if we're dealing with a male, would that

13  affect the percentage?

14  A    All right.  If you're dealing with males, various females,

15  then based upon the population structure of the United States

16  or New Jersey, 51 percent I believe are females, 49 percent are

17  males.  You make the numbers easier if you just divide them by

18  two.  You have approximately 16 percent of the males would be O

19  secretors, 16 percent of the females would be O secretors.

20       Q     Would there be any further limitations on the

21  population of, the percentage of the population capable of

22  being responsible for this spermatozoa?

23  A    If you're talking about specifically spermatozoa then you

24  would have to exclude any prepubescent males probably under

25  the age of 11 or 12, which would be, I don't know, I can't

Nichols - Cross                                  81

1   give you any numbers on that, and any males who cannot

2   generate sperm or have a very low sperm count, and anybody who

3   is impotent.

4        So that would reduce that 16 percent maybe by a factor of

5   one or two, possibly down to maybe 13 percent.

6        Q    Any further limitations that you can tell us?

7   A    Not based on this.

8        Q    Thank you.

9        So it would be fair to say then, that the source of

10  the seminal material and the spermatozoa that you found in

11  connection with this investigation is capable of coming from

12  only 16 percent or less of the population?

13  A    You have to factor in you will also that the person is an O

14  secretor.  If you combine spermatozoa or seminal fluid, plus

15  the person is an O secretor, then those numbers would be valid.

16       Q    And that would be consistent with Mr. Harrell's blood

17  type?

18  A    Yes.

19            MR. CUNNINGHAM:  I have no other questions.

20            THE COURT:  Cross-examine.

21            MRS. SAUTER:  Thank you, Judge.

22  CROSS-EXAMINATION BY MRS. SAUTER:

23       Q    Mr. Nichols, you also combined fingernail scrapings,

24  did you not?

25  A    Correct.

Nichols - Cross                                          82

1      Q      Can you tell me what evidential value of examining

2   fingernail scrapings would have?

3   A    Would you like the theoretical, or what we found?

4      Q      Well, in this case you found nothing of evidential

5   value, correct?

6   A      Correct.

7      Q      But if you could explain to us for what purpose these

8   fingernail scrapings are taken specifically in the Sirchie Sex

9   Kit?

10  A    The purpose there is a theoretical point for every item

11  that is utilized in the Sirchie Sex Crimes Kit.  The people who

12  manufacture the kit, based on consulting with various types of

13  forensic people, feel that in a sexual assault there is a good

14  chance that the victim, whether it's male or female, under the

15  fingernails will either take skin or possibly hair or fibers

16  from the assailant.

17     Q      And in this case, samples were actually taken from the

18  victim, correct?

19  A      Correct.

20     Q      And you did, in fact, examine them, correct?

21  A      Correct.

22     Q      And you did make a determination that there was

23  nothing of any evidential value there?

24  A      Correct.

25     Q      If you did find something there, whether it be hair or

Nichols - Cross                                                    83

1   skin or whatever, would it be fair to say that that would leave

2   another avenue open to a scientist such as yourself to conduct

3   a further examination and compare things to a possible suspect?

4   A   Yes.

5       Q   Now, in your testimony this afternoon, you mentioned

6   genetic markers.  Can you explain to the ladies and gentlemen

7   of the jury what you mean by genetic markers?

8   A   Okay.  A genetic marker is that aspect of our biochemical

9   nature.  Everybody is unique, except for identical twins, and

10  everybody has a number of genetic markers that distinguish you

11  from someone else.  The genetic markers that we test for are

12  found in blood as well as in seminal fluid.

13  Q   Now, is there not a test, that may be pretty bold of me

14  to say state of the art with respect to scientific analysis at

15  this point, but that's how I'm going to characterize it, a DNA

16  test?

17  A   Yes.

18      Q   And is a DNA test not -- isn't it more specific then

19  the type of testing that was done in this case?

20  A   If the testing itself theoretically can, probably depending

21  upon which book you read or which newspaper report you read,

22  generates statistics much bigger than the ones that I just put

23  on the board.  It's fairly sophisticated, you need -- in some

24  cases when it first started, you needed a lot of sample, but

25  the technology is so rapidly advanced that now you just need a

HARRELL 00642

1    minute sample.

2        Q      And would it be fair to say that if DNA testing was

3    done in this case on the samples taken from Mr. Harrell, taken

4    from the victim and taken from the victim's clothing and

5    everything else that you obtained from the hospital, that more

6    specific information could have been obtained in this case?

7    A    If the test came out, more specific information could have

8    been detailed.

9        Q      And with that more detailed information, you would

10   then be able to possibly conclude with a strong degree of

11   scientific certainty that a particular suspect was the person

12   who committed the crime, or was not the person who committed

13   the crime, correct?

14   A    That's correct.

15       Q      And this DNA testing was in existence back in 1988,

16   was it not?

17   A    As far as I know, the FBI went on line in January of '89, I

18   believe, and I believe some private industry was involved with

19   DNA testing.

20       Q      And if the FBI went on line in 1989, that was still

21   prior to your examination of the exemplars in this case,

22   correct?

23   A    I think this, the initial report is dated September '88,

24   the final report is 1/23/89, and then the whole blood from the

25   suspect, I believe which is subsequent to that.  So this report

Nichols - Cross                                                    85

1  was generated approximately the same time the FBI went on line.

2      Q     And when you examined specimens that are submitted to

3  you, there's procedures that you follow in your laboratory with

4  respect to preserving those samples, correct?

5  A     Correct.

6      Q     And would it be fair to say that in light of the way

7  you preserve your samples and refrigerated the blood and things

8  like that, that there was available to the State of New Jersey,

9  a procedure whereby more accurate and thorough and detailed

10 testing could have been done sometime between January of 1989

11 and May 14 of 1992, correct?

12 A     If there was enough sample left over.

13     Q     And that would have to determine, would have to have

14 been made by a scientist such as yourself?

15 A     Correct.

16     Q     Is the New Jersey State Police Lab in Sea Girt where

17 you're located currently, equipped to do such a DNA test as you

18 described?

19 A     No, we're not.

20     Q     In light of your experience in these matters, would

21 you agree that should a submitting agency in the State of New

22 Jersey, whether it be a local municipality or a Prosecutor's

23 Office or the Attorney General's Office, when they need such a

24 test done the FBI Lab is available to them, is it not?

25 A     We have been used as a screening laboratory for cases that

Nichols - Cross                                86

1    have either gone to a private agency or to the FBI, we will

2    just give them, say you do have a positive spermatozoa, because

3    with testing for DNA, you have to have a large quantity of

4    spermatozoa.  So it's usually us that screens the case for a

5    specific submitting agency, and then we will say, well, it's up

6    to you if you want to submit it to somebody else.

7        Q    Would it be fair to say that no one involved in this

8    case asked you to do that?

9    A    Correct.

10       Q    And these statistics that you've been so gracious to

11   explain for all of us are basically statistical probabilities

12   only, correct?

13   A    Correct.

14       Q    And would it be fair to say that these are

15   generalities that are only as good as the current state of

16   statistics?

17   A    Correct.  That's why I gave sort of a caption 40 to 45

18   percent, that they vary in different studies, but not by

19   usually more than 4 or 5 percentage points.

20   .  Q    And based on the statistical probabilities that you

21   placed on the board today, Mr. Harrell is basically in the

22   majority of the population, is he not?

23   A    What do you mean by majority?

24       Q    Well, he's an O type secretor, correct?

25   A    Correct.

Nichols - Cross                                    87

1    Q     So that places him in that general population 40 to 45

2    percent secretor population of about 32 percent male secretor

3    population of about 16 percent?

4    A    All right.  Those numbers would also correspond to somebody

5    who's a group A secretor also.

6    Q     But he's not, I mean --

7    A    He's not unique.

8    Q     By any stretch of the imagination?

9    A    I'm an O secretor, so I would fall right within the same

10   statistical representation.

11   Q     And it would be fair to say that if, when only dealing

12   in statistical probabilities, that if you found Mr. Harrell to

13   be a type AB secretor, and that that's the type of material you

14   found on the samples from the victim, that he would be in a

15   very, very minute percentage of the population, correct?

16   A    Correct.

17   Q     And would it also be fair to say that in no way, shape

18   or form are you trying to give the jury the impression that

19   because Mr. Harrell is an O secretor that there is a good

20   chance that he is the one who actually committed this assault?

21   A    I'm saying that Mr. Harrell would fit the statistical

22   representation of those people who could contribute to that

23   stain.  I'm not, in other words, I'm not excluding him.  If

24   Mr. Harrell was a group B or a group A, I would be here saying

25   he could not have caused that stain.  I'm only including him in

Nichols - Redirect                                                88

1    that number of people who could have caused that stain.

2        Q    And that is a wide range of the population, correct?

3    A    Yes, it's 16 percent of the male population.

4            MRS. SAUTER:  I have nothing further, Judge.  Thank

5    you very much, Mr. Nichols.

6    REDIRECT EXAMINATION BY MR. CUNNINGHAM:

7        Q    You're somewhat familiar with DNA?

8    A    Somewhat.

9        Q    If we're dealing with DNA, would we also, or would we

10   still be talking about statistics?

11   A    Yes.

12       Q    We'd be using numbers?

13   A    Yes.

14       Q    Smaller numbers?

15   A    Much smaller.

16       Q    But numbers?

17   A    Yes.

18       Q    That 16 percent of the population, what you've done is

19   you've excluded 84 percent of the population; is that correct?

20   A    It's 16 percent of the male population who are O secretors.

21       Q    Is that across the board male population, regardless

22   of race?

23   A    The difference between white and black are within

24   statistics over there.

25       Q    So that 16 percent includes whites and blacks?

1  A    Yes.

2       Q     And Hispanics?

3  A    Across the board.

4       Q     Everybody.  If I were to tell you that the source of

5  the seminal material and the spermatozoa that you detected in

6  this case was from a black male, would you be able to refine

7  that number any further?

8  A    I have no way of knowing that, based on my testing, that it

9  is from a black or a white.

10      Q     I understand that, but if I were to tell you that it

11 was a black male, even though you can't determine that from

12 your testing, would you be able to break that number down

13 further?

14 A    Then you would have to take that 16 percent of the male O

15 secretor population and multiply it by the number of blacks

16 percentage wise in the country, which is approximately 12

17 percent.

18      Q     Which would tell us what?

19 A    Well you'd have to multiply 12 percent times 16 and come up

20 with --

21      Q     So it would be 12 of 16?

22 A    Well, it would be 12 percent, not --

23      Q     12 hundredths of 16?

24 A    We're dealing with maybe --

25      Q     I can't do the numbers, can you?

HARRELL 00648

Nichols - Redirect                                    90

1   A   Well, I used to be able to do them.

2       Q    I'll give you a pen and piece of paper.

3   A   If somebody has a calculator, maybe we get this over with.

4       Q    The Judge is ahead of us.

5   A   Probably about two percent, I would say.

6           THE COURT:   .193.

7           THE WITNESS:  Two percent.

8           THE COURT:   Two percent.

9       Q    And let's say, if in addition to telling you that the

10  donor was black, if I were to give you a physical description

11  in terms of height, weight, age and build, would you be further

12  able to limit that 1.97 percent of the population?

13          MRS. SAUTER:   Objection, Judge, I don't think

14  secretor --

15          THE COURT:   We're in expertise, and we're talking math

16  now, which is better an argument made to the jury in summation.

17          MR. CUNNINGHAM:   I have no other questions.

18          MRS. SAUTER:   I have nothing further, Judge, thank

19  you.

20          THE COURT:   All right.  Thank you very much,

21  Mr. Nichols.

22          THE WITNESS:   Thank you.

23          (Whereupon Mr. Nichols steps down.)

24          MR. CUNNINGHAM:   Judge, subject to offering certain

25  exhibits and physical evidence, the State will rest at this

# EXHIBIT B

6

1        THE COURT:  All right.  You can step down.  Thank

2   you.

3        (Mr. Hendrix steps down from the witness stand.)

4        MRS. SAUTER:  Defense rests, Judge.

5        THE COURT:  All right.  Is there any rebuttal?

6        MR. CUNNINGHAM:  No, sir.

7        THE COURT:  Are were we ready for summations?

8        MR. CUNNINGHAM:  State's ready.

9        MRS. SAUTER:  Yes, Judge.

10        THE COURT:  All right.

11        MRS. SAUTER:  Thank you.  Judge Labrecque,

12   Mr. Cunningham, Mr. Harrell, good morning, ladies and

13   gentlemen.

14        Now is basically the time when Mr. Cunningham and I

15   are permitted to speak with you and basically argue our

16   respective positions to you based on the testimony that you

17   heard over the last couple of days.

18        I will point out from the beginning it's not a

19   debate.  Once I sit down, that's it.  And I did make some

20   notes.  And as you were told by Judge Labrecque in the

21   beginning, if anything I say does not match up with your

22   recollection of what the testimony was, you must go with your

23   own recollection.  And I expect you to do nothing less.

24        However, I made notes because, like I said, when I

25   sit down I can't stand back up and speak with you again.  And

1  I can't rebut anything that Mr. Cunningham is going to say to

2  you.  So I'm going to try and get it all into one issue now.

3          You heard talk before you heard the standard of proof

4  beyond a reasonable doubt.  And you were told both by

5  Mr. Cunningham and myself that the State doesn't have to have

6  a perfect case.  It's not a puzzle where you have to have each

7  interlocking piece match exactly.  That's not what the

8  standard of beyond a reasonable doubt means.

9          However, on another hand, although proof beyond a

10 reasonable doubt is not an insurmountable standard, there has

11 to be sufficient proof before you where you can take the

12 evidence that you heard, apply your common sense, your very

13 different backgrounds and logically come to a conclusion.  And

14 the conclusion that the State is going to ask you to draw in

15 this case is that Mr. Harrell is guilty of committing a sexual

16 assault upon ▓▓▓▓▓▓▓▓▓▓ back on September 18th of 1988.

17 And basically Judge Labrecque is going to tell you what the

18 elements of the offense are.  What the law is.  And in this

19 case, in order to convict Mr. Harrell, you're going to have to

20 find certain things.  You're going to have to find, one, that

21 there was a sexual assault upon ▓▓▓▓▓▓▓▓ on the day in

22 question.  You're also going to have to find that that assault

23 upon her was committed with some sort of force or coercion.

24 And lastly, you're going to have to find that Dion Harrell is

25 the person who actually did assault her on that day.

1            And the main thing that I am going to argue to you

2  this morning is it's Mr. Harrell's position that it was not he

3  who committed this assault.

4            He testified.  He has no requirement to testify.  But

5  he did testify.  And he told you that from about five until --

6  between eight or nine or so he was playing basketball at

7  Van Court Park.  And he remembers being there with

8  Detective King and with a number of other individuals.

9            He advised you that after the game was over he stayed

10  at Van Court Park, spoke with a number of the individuals and

11  one of them gave him a ride home.  He said he arrived home

12  somewhere in the vicinity of ten or 10:30, went right into his

13  home, proceeded to take a shower, change his clothes.  He

14  wanted to go see some people in another area of Long Branch

15  and that his mom and his sister implored him to take his

16  three-year-old nephew with him because it was a hot, muggy

17  night and he couldn't sleep too well.  And he was also

18  somewhat excited about Dion having promised to take him on a

19  bicycle ride earlier in the day.

20            And then he tells you that he took his nephew on his

21  bicycle over to the other area of Long Branch where he stayed

22  with Reginald Hendrix and a couple of other people and then he

23  came home.  And as he was driving home he saw Rebecca Durant,

24  who also testified.  And she made a comment to him Dion or

25  Dobie, whatever words she used, get that little boy home.

Souter-summation                                    9

1   It's late.  That is the crux of what he's telling you he

2   remembers happening that day.

3            His sister testified, his mom testified, Reginald

4   Hendrix testified and Detective King testified.  And I think

5   Detective King was quite honest with you.  He said I don't

6   specifically recall that day.  He said I remember playing

7   basketball.  I remember playing basketbal with Dion during

8   that time.  Played with him a lot.  Game's normally over at

9   dusk if it's a nice day.

10           But he had brought before yout do testify to more or

11  less start the corroboration of Mr. Harrell's version of where

12  he was that night.  Not that he could pinpoint specifically

13  where he was specifically on the date but to lend credence to

14  the fact that Dion was telling you the truth that he did play

15  basketball then, because he is corroborating during the time.

16  That's exactly what's happening.

17           Now, I think you can draw a little bit further

18  inference from Detective King's testimony because you heard

19  other police officers' testify.  And even though this is

20  almost four years ago, those other officers were able to

21  refresh their recollection of what happened due to the fact

22  that they write police reports.  And they do it for a specific

23  purpose.  To be able to recall and to accurately reflect what

24  transpired on a given date because whether it's a criminal

25  trial or an auto accident or any of the other calls that they

1  happen to take in the course of their duties.  Things do get
2  aged before they come to a jury in many circumstances.  And
3  you can see that the other officer's testimony was more -- I
4  know I did this, I know I did this, I know I did this.
5  Detective King, acting in his personal capacity, not on duty
6  when he was playing basketball.  And he said to you, I believe
7  from the witness stand, I didn't take any notes.  You know.
8  He tries to keep work over there and I was having fun.  This
9  is my recreation.  I didn't take notes.  So I can't go before
10 fourteen people on a jury and say, yeah, I know for sure that
11 that's what happened that day.
12        In light of that, I think you can see how
13 Mrs. Harrell, Dion's mother, and his sister, LaChristie, could
14 have some inconsistencies in what they were telling you.  They
15 didn't write this down, either.  They're going from their
16 recollection.  I think if you use your common sense and your
17 background you realize that, if anybody said to you where were
18 you, say, March 19th of 1992, you'd have to sit there for a
19 moment and think and try and reconstruct.
20        If they asked you today where you were in September
21 of '88, unless something major happened in your life, you'd
22 have to sit back and think.  And if you were with family
23 members, maybe their recollection of specific times would not
24 be one hundred percent in accordance with your own.
25        That doesn't even mean either you or your family

HARRELL 00786

1   remember would be lying and not telling the truth.  It's just

2   this is what happens when you get further and further away

3   from an incident.  On the other hand, if something happened to

4   you, it would be more likely to stick in your memory.

5           In that type of a common sense kind of a vein, it's

6   almost ironic when you're talking about three and-a-half,

7   almost four years ago, that if somebody said to you where were

8   you on September 18, 1988, I could specifically tell them.

9   The reason I could is I happened to get married the day

10  before.  I know exactly where I was.  I don't have to write it

11  down.

12          But if you asked, say, one of the guests at the

13  reception where were you, they'd have to go back and think.

14  And they might have to make a few phone calls to figure out

15  where they were.  It doesn't mean that they're lying.  And I

16  ask you to take their testimony in that vein.

17          Now, for LaChristie, Dion's sister, she's saying,

18  well, I think Dion was playing basketball on a Wednesday and I

19  think he got arrested on a Sunday.  And you probably don't

20  know from all the other testimony you've heard she's got the

21  date -- not the date but the days backwards.  He was playing

22  basketball on a Sunday when he got arrested on a Wednesday.

23          Does that make her a liar?  No.  She also said -- and

24  I think you can realize from being able to observe her

25  testimony -- she got a little confused, because on

Sauter summation                                    12

1  cross-examination she's saying, well, no, he was playing

2  basketball the day he got arrested.  That doesn't even make

3  any type of logical sense to anybody.  And that's what I was

4  trying to bring out with her.  That if she is testifying

5  before you ladies and gentlemen that she knows her brother got

6  home -- is it 10:30, something to eleven, I think she said,

7  and then he took her nephew (sic) and came back at 12:30, one

8  o'clock the following morning, it's logically impossible for

9  Dion to have been arrested that day.  Okay?  So I don't think

10  you should look at her in a very technical type of sense.  You

11  have to make allowance for the fact that she does get

12  confused.  That's about all I could say.

13         Again, the mother, Diane Harrell, she basically says

14  I know Dion was in the house from 10:30 'til about ten minutes

15  of eleven, when I took these two girls that were visiting,

16  friend's kids, back to Red Bank.  And she also confirmed like

17  Dion was out with the nephew on the bicycle and came back

18  sometime much later that evening because she fell asleep.  And

19  then Dion and I think his sister were getting a little loud in

20  the house and woke her up.  And she doesn't remember what time

21  it is.

22         But what is being told to you is we're talking about

23  sometime -- an offense happening sometime between 10:30 and

24  10:50 at night.  Somebody knows where Dion Harrell was in that

25  period of time other than only Dion Harrell.  And he is under

HARRELL 00788

1  absolutely no obligation to either speak with you or to call

2  in witnesses.  But he chose to do that.  And his witnesses

3  came in and testified, even though their stories don't

4  interlock one hundred percent.  That's what happens when you

5  deal with human beings.

6           On the other hand, I would say to you if their

7  stories came in, I think maybe even the Prosecutor will bring

8  this out, if they were pat stories, all the way down the line,

9  I think the State would probably have a good argument to say

10 to you, ladies and gentlemen, because almost word-for-word the

11 grandmother, the child's mother, the defendant, they all came

12 there and said exactly the same thing.  Their times matched

13 exactly.  Treat that as suspect.

14          But that's not what happened here.  I think these

15 people were get being very honest with you.  They might have

16 been a little frightened but they were being honest.

17          Dion also brought in Reginald Hendrix, who just

18 testified.  Does his time exactly match   No.  He says my

19 recollection is, not having written this down, that Dion got

20 to my house a little bit before ten, because I know I had to

21 get to the liquor store before ten o'clock and I borrowed his

22 bicycle.  But he was with his nephew.  He stayed until about

23 12:30 the next morning with the nephew.

24          Unless you throw out Dion's testimony, his mother's

25 testimony, the sister's testimony and Hendrix's testimony and

1  called them all liars, somebody was with Dion Harrell at the

2  time that this offense allegedly occurred.

3       Now, when Judge Labrecque tells you what the law is,

4  one thing he's going to say is, ladies and gentlemen, if you

5  feel that someone has some sort of an inherent prejudice in

6  this case, in that they -- you find that they have a motive to

7  lie, that they have an interest in the case, that they're

8  biased one way or another, you can use that in your

9  deliberations to affect the credibility.

10      I'm going to suggest to you now that I do not believe

11 when the twelve final jurors went into the jury room that you

12 should go in and say, well, let's start out as suspecting Dion

13 Harrell's testimony because he's the defendant here.  I'm

14 going to ask you not to do that for a simple reason.  Yes,

15 he's a defendant.  But technically I guess you could say he

16 does have an interest in the outcome of the case.  Every

17 criminal defendant would have an interest in the outcome of

18 the case.

19      That doesn't mean they're lying, because if you look

20 at his testimony in that vein, because he is a criminal

21 defendant, then every criminal defendant who testifies, who

22 elects to testify, could go into the jury room with three

23 strikes against them at least.  But every defendant's

24 testimony is suspect.

25      I don't believe that that should be the case and I

1   would ask you specifically not to do that in this case,

2   because I don't think any one of you, if it was yours or if it

3   was a family member or a close friend who was accused of a

4   crime and went to trial and testified, you wouldn't want the

5   jury in that case to go in with three strikes at least against

6   that person, especially if you believe him.

7              Now, if we look at the flip side of this case, how

8   has the State shown to you beyond a reasonable doubt that

9   Mr. Harrell was the person who attacked ▓▓▓▓▓▓▓▓▓?   My

10  position is they have not done that.  And I'm going to

11  highlight a few reasons why they have not done that.

12             One, the victim comes in.  I think you would all

13  agree that what happened to ▓▓▓▓▓▓▓▓ was terrifying.

14  She even said it herself.  She's never been so frightened

15  herself before in her life.  And it's something very, very

16  major in her life.  Seventeen and-a-half years of age.   I

17  can't think of anything more traumatic than being raped at her

18  young age.  And I think you would expect in that circumstance

19  that she would recollect even the most minute details.

20             In this case, she tells you -- she tells you she

21  doesn't know a lot of things.  She didn't know what age she

22  told the police her attacker was.  She didn't remember whether

23  the officer who assisted her for about almost three hours,

24  that being Detective Ann Samuels, it was a male or female.

25  She didn't recall after this attack took place that she told

Sauter-summation                                    16

1  the police that she met up with an unidentified black male on
2  the street and asked him did you see that guy who just ran by
3  here.  She didn't remember that at all.
4       As a matter of fact, she doesn't recall most of what
5  happened to her that night.  But the only thing she's sure of,
6  the only thing she was definitely positively sure of in this
7  courtroom was when Mr. Cunningham said can you identify the
8  person who attacked you, she said yeah.  Him.  And she pointed
9  to Dion Harrell.
10      I truly wonder if Mr. Harrell chose to sit back here
11 rather than at counsel table or if he was among a few of his
12 friends back here she could point him out.  She knows that she
13 described to the police a young black male, clean-shaven,
14 skinny, who she saw in McDonald's on one occasion three weeks
15 prior.
16      Well, if she can't remember anything else, I don't
17 know how she can remember him, because I don't honestly
18 believe she got a real good look at this person.
19      You have to remember, and I think the diagram that
20 Detective Samuels drew is in evidence, she drew a corner of
21 Broadway and North Fifth, Perry's Trophy Shop, and then a lot
22 that goes about seventy feet back.  She put street lights out
23 on the street.  And she also tells you the attack took place
24 way in the back of the lot, because the defendant took her
25 there, had to search the area with a flash light.  It's very

1  dark back there, I would assume, because nobody ever said in

2  this courtroom, so you can't assume that any of the lights

3  from that McFadden Motors was on or anything else.  You have

4  to assume it was dark, because that's the only logical

5  inference you can draw when you're not told anything about it.

6  And she just -- she varies a lot.

7          But what is of significance she tells you this person

8  came, and I think she showed you, put an arm around her neck

9  this way.  She started to scream.  He covered up her mouth.

10  And, her words, he dragged me, he pushed me, he shoved me on

11  to the ground.  He dragged me seventy feet, by

12  Detective Samuels estimation, by the neck, to the back of that

13  lot.

14          And the problem that I'm having, I would argue to

15  you, that should weigh in your consideration of her testimony

16  is the testimony of Dr. Louis.  Dr. Louis came in and said he

17  did a head-to-toe on her.  I looked at her.  I didn't see one

18  cut, one bruise, one abrasion.  Nothing.  Absolutely nothing.

19  I think anybody who has been dragged seventy feet by the neck,

20  thrown to the ground, pushed into a fence and shoved into the

21  ground during an attack, on asphalt, is going to have some

22  physical sign of that type of an attack.  You don't come out

23  of that unbruised.  It is nearly impossible.

24          So basically Dr. Louis says in very simple terms this

25  young girl did basically have sex with somebody.  Who we don't

1  know.  He's not medically able to determine.  But there's

2  nothing else on her at all.

3           Also what I find a little odd about her assertion of

4  what happened is she says she runs home, she tells her mom.

5  And I believe most of you have children.  And I think all

6  parents would want to trust that if something awful happened

7  to their child, the child would come to them and then tell

8  them.  And I think that you would feel immediate compassion

9  for a child who has had something like that happen. But Cynthia

10 Abbott says to you I told my mother and there was like no

11 reaction from her mother.  She didn't even call the police.

12 Cynthia Abbott herself called the police.

13          There's something missing here.  Something wrong.

14 Something not in accordance with human experience, logic,

15 common sense.  And the reason I mention all these other

16 factors is because if you find that there are suspicions in

17 her testimony, that should affect her credibility with you.

18 That should affect your determination as to whether or not her

19 ultimate conclusion in this case, that is, Dion Harrell was my

20 attacker, is also subject to suspicion.

21          She also says to you, she told the police, I saw him

22 one other time in McDonald's three weeks ago.  Well, Dion

23 himself tells you, nobody contradicts, he lives right across

24 the street from McDonald's.  He works at another McDonald's

25 and he's always in the McDonald's.

Sauter-summation                                    19

1         If he wanted to lie to you, too, he would actually

2   come and say, ladies and gentlemen, I never once saw ▓▓▓▓▓▓

3   ▓▓▓▓▓▓   Never set foot in McDonald's.  Does he say saying?

4   Yeah.  I seen her in McDonald's.  She's taking my order.

5         Something's not right here.  If she can't remember

6   whether or not it was a male or a female officer who drove her

7   to the scene of the crime, went over the crime scene and took

8   her to the Monmouth Med, who stayed with her for a while, she

9   can't remember if it's male or female with that, how can she

10  be so sure of somebody she saw three weeks ago in McDonald's

11  three weeks ago one time?  She must, in that busy area of

12  Long Branch, deal with many, many, many people.

13        The other thing that seems a little odd.  She had

14  gone through this traumatic of an experience.  She's back at

15  work three days later?  I don't know.  That -- more or less

16  I'm throwing that out to you as something to consider.  I'm

17  not so sure that a young girl who went through something like

18  that as she attempts to portray it in a courtroom would just

19  be emotionally capable of going back into McDonald's where she

20  allegedly saw her attacker three weeks ago and just continue

21  working like nothing's going on.

22        Now, with respect to the arrest of Dion Harrell, she

23  says I saw him.  I called the police.  The police showed up

24  and arrested him.  And then there's identification down at

25  police headquarters.

HARRELL 00795

Sauter summation                                          20

1        Now, on cross-examination of Dion Harrell, the

2    Prosecutor says, well, you're taking the jacket off before or

3    after the police got there.  I think that the State wants you

4    to infer that not only did Dion Harrell see the girl he

5    attacked, acknowledged that he was the attacker, saw her run

6    to the phone, was smart enough to try to put two and two

7    together and say, gee, she must be calling the cops.  If she's

8    going to call the police, she's going to identify me by the

9    white leather jacket I have on.  And, boy, I better get it off

10   of me.  I don't see that.

11       When Dion was being cross-examined, this is one thing

12   I do direct your attention to.  It's a little bit of an aside.

13   There's a lot of questions about whether or not he read his

14   Grand Jury transcript.  That shows you he did testify before

15   the Grand Jury.  No problem with that.  Do not, please do not

16   draw the inference that Dion Harrell was doing anything wrong

17   in reading that Grand Jury transcript, because he was not.

18   And any inference that you may have derived from the State's

19   questions I think would be wrong.

20       It's not improper.  It's not unethical.  It's not any

21   of those things.  And I don't suspect for a minute that any of

22   you people thought the police officers didn't come in here

23   after having reviewed the police report.  And to be quite

24   honest, I didn't even ask them questions like that.  I just

25   kind of assume that they'd look at their police reports.  It's

HARRELL 00796

Sauter summation                                                    21

1   foolish to infer that they'd look at their police report.

2        And take Ann Samuels, for example.  She was asked what

3   specific descriptions did ▓▓▓▓▓▓ give you the person

4   who attacked her.  And she said may I please refer to my

5   report.  Nobody had a problem with that.  She referred to her

6   report.  Patrolman O'Gibney referred to his report.  The

7   doctor referred to the emergency room report.  There's nothing

8   improper about that.

9        But in that Grand Jury transcript, basically the only

10  thing that was elicited from that was that Dion Harrell did

11  not remember today that he saw ▓▓▓▓▓▓ go toward the

12  telephone.  That's all.  There's no testimony that he

13  overheard what she was saying, that she was making any

14  gestures, pointing to him or looking at him excitedly or doing

15  any of those things to give him any knowledge of why she was

16  on the phone or that the police were going to show up.  So I

17  ask you that you not draw that conclusion.

18       But what is of particular note is Patrolman O'Gibney

19  says to Dion Harrell I got to take you downtown.  I got to

20  take you to police headquarters.  And the defendant says okay.

21  Well -- and Patrolman O'Gibney, he tells him what he's being

22  arrested for.

23       Dion tells you he started crying.  He was twenty-one

24  years old at the time.  And he told you he's charged with

25  basically, in simple terms, raping somebody?  He starts to

1  cry.

2       And there was a specific reason that I asked

3  Patrolman O'Gibney did you know Dion Harrell from other

4  capacities.  He says I play basketball with him.  And he

5  basically told you he was a nuisance in Long Branch on

6  juvenile matters.  He's had contact with him before.  And even

7  he described it as being odd.  That when Dion was in

8  headquarters, that he was acting differently and he was

9  speaking to the detectives.  And from the moment of his arrest

10  he was asserting his innocence.  I didn't do it.  I didn't do

11  it.  Is the girl here that's acusing me?  I want to see her.

12  And Patrolman O'Gibney said that's odd.  That's real odd.  And

13  use your common sense.  Why?  If you had done something like

14  that, something serious and somebody just pointed you out and

15  said that's the person, why would you want to insist that you

16  have another face-to-face confrontation with this person?

17  Show the girl to me.  Show me to the girl.  Show the girl to

18  me.  I didn't do this.  Why is she saying this?  And I think

19  Patrolman O'Gibney said they more or less tried to tell him

20  you're crazy.  You're crazy for insisting on this.  No.  No.

21  I want to.  I want this girl to see me because she's got to be

22  wrong.  And the girl says, according to Patrolman O'Gibney, in

23  a cold deliberate manner, that's him.

24       Now, yeah, his recollection on that respect is

25  different than Dion, because Dion said how I remember her

1  sitting there paying more attention to her mom and just

2  looking up real briefly and saying, yeah.

3        But then again it's a difference of recollection.

4  And there was a -- I don't know quite how to describe it.   A

5  little bit of a broken battle between Mr. Cunningham,

6  Mr. Harrell and Mr. Cunningham wanted Mr. Harrell to say,

7  yeah, I think that Patrolman O'Gibney's lying.   Quite

8  honestly, their recollections are different.

9        But you do have before you the testimony of

10  Patrolman O'Gibney that the girl did state in a cold,

11  deliberate matter, that's him.   But you also have over the

12  last question that was asked of Patrolman O'Gibney, and I said

13  to him inasmuch as you describe ████████ speaking in a

14  cold deliberate manner, would you also say that Dion Harrell

15  at the time of his arrest adamantly maintained his innocence?

16  And he said yes; he did.

17        This is not some story that's been concocted over the

18  last three and-a-half years.   If it was, then Dion was pretty

19  smart right from the beginning.   Right from the getgo, because

20  the story has not changed.   The story was the same before the

21  Grand Jury.   It was the same, according to the detectives, the

22  date of his arrest.   And there really aren't too many

23  inconsistencies.   As a matter of fact, I think the Prosecutor

24  found two in the huge Grand Jury transcript.

25        Now, what else could the State have done to solidify

1  their case to you?  Well, exemplars were taken from the victim

2  in the hospital.  Samples were taken from Dion Harrell quite a

3  period of time later.  But the samples were still good.  And

4  they compared hairs.  And I think it was Mr. Moser who did the

5  hair samples.  And he said, well, we didn't find any hairs

6  that were not the victims on any of the victim's property.

7  Any of the clothing.

8      Well, I would suggest to you, in light of this

9  testimony, that when there is close body contact, as in a

10  sexual assault between two individuals, the likelihood that

11  hairs are going to be transferred from one person to another

12  are hot.  It did not happen in this case.  They found the

13  victim's hairs.

14      Then we get to Mr. Nichols.  And Mr. Nichols did, oh,

15  the blood work and a few other things.  Now, the blood shows

16  that the victim and the defendant have the same blood type.

17  They're both O.  They're both secreters.  That puts the two of

18  them in the forty to forty-five percent population range, that

19  being the majority of the population.  And for as much as

20  anybody's going to ask you to extrapolate down and say, well,

21  okay, separate the forty percent by two to get males and

22  females, we're down to twenty percent and take eighty percent

23  of that, which would bring it down to sixteen percent for

24  males in the population who are type O blood and are

25  secreters, it's still the majority, because I think that

Sauter summation                                    25

1   diagram was also marked into evidence.  And you see if Dion

2   Harrell had a very -- had a blood type that was minute in the

3   population, you could get down to .002, I think, by the time

4   you extrapolate it down.  But no matter how much

5   extrapolation, he's still in the majority.

6           Now, once they have that, well, is there anything

7   more that could be done to substantiate ▓▓▓▓▓▓▓ claim

8   that Dion Harrell is her attacker?  Well, the F.B.I. went on

9   line in January of 1989, three months after this crime, with a

10  DNA test available to any and all law enforcement agencies in

11  the country.  DNA tests finds specific genetic markers which

12  is a much more scientific, state-of-the-art test than what the

13  State Police Lab did.

14          Basically the State Police labs results are

15  inconclusive.  They don't tell you anything.  They tell you

16  basically that ▓▓▓▓▓▓▓ had sexual relations with

17  somebody who's a type O secretor.  That's it.  They could have

18  gotten much more specific and either pinpointed or exculpated

19  Mr. Harrell.

20          And ladies and gentlemen, we don't have an obligation

21  to do that test.  Dion Harrell's not to be put to the expense

22  of doing the test.  It's the State's obligation to prove this

23  case to you.  I suspect they could have done a lot more and

24  they did not do that.

25          Additionally, fiber evidence.  Mr. -- I think it was

HARRELL 00801

1  Mr. Moser or Mr. Nichols tells you the clothes are scraped
2  down, first examined microscopically, also with the naked eye.
3  They're scraped down and fibers, dirt, anything else is
4  removed from that on white paper.  I said, well, did anybody
5  happen to tell -- I mean you saw the victim's clothes.  Green
6  and white cotton, dark green pants, and a light green sweater.
7  Her attacker had on a red sweatshirt.

8          Well, did anybody ask you to look at those fibers?
9  Did anybody bother to tell you what the alleged assailant was
10 wearing?  No.  Nobody told you.  We can't compact all the dirt
11 and fibers and everything we got.  Never analyzed it in three
12 and-a-half years.  The State did not have that analyzed to see
13 was there a red fiber or not.

14         Did they -- in light of the description and the
15 identification three days later, did they knock on
16 Mrs. Harrell's door?  Did they get a search warrant?  Did they
17 go to her house with a search warrant and say, Mrs. Harrell,
18 we have your son under arrest.  He's identified for a sexual
19 assault.  It happened three days earlier.  We're coming in.
20 We're looking for a pocketbook or any other proceeds of the
21 alleged theft from the victim.  We're looking for a red
22 sweatshirt.  We're looking for white sneakers.  We're looking
23 for jeans.  Did they do that?  No.  Could they have?  It's up
24 to you to draw that conclusion.

25         I don't think this case was properly investigated at

1  all.  Not only an improperly investigated case.  The State

2  wants you to convict Mr. Harrell on one simple I.D.

3          It's frightening.  Real frightening.  A lot more

4  frightening than if you were sitting in this seat.  It's

5  actually frightening.  Absolutely frightening.

6          The last thing I really wanted to say to you ladies

7  and gentlemen is I also hope that you don't draw any adverse

8  -- this is almost a given.  I don't suspect you will.  Don't

9  draw any adverse inferences and say, gee, this family who came

10  in here and testified for him, there his good buddies.  If you

11  had to claim an alibi, obviously it would be people who you

12  knew, because if you were out on the street somewhere or on a

13  bus or a train, you never could find those people.  You'd

14  never -- no idea where to start to look. Like I said, that's

15  pretty much it.  But pretty much a given.

16          But to kind of wrap up in the same vein I started

17  with, proof beyond a reasonable doubt, someone related this to

18  me and I think it's a good idea how to understand the concept.

19          Let's assume as I stand in front of the jury -- you

20  never saw the defendant.  Defendant was sitting in that seat

21  with a bag over his head.  The whole trial.  You never knew

22  who it was.  He was referred to let's say by a number and not

23  by a name and you heard the testimony that you heard in this

24  trial.  Okay?

25          If you feel that, on the testimony that you heard,

Sauter-summation                                    28

1   that if you went into the jury room, deliberated and came back

2   out here saying to the Court and return a verdict of guilty

3   saying, yes, we feel tht the State has proved this case beyond

4   a reasonable doubt, that you would then not get upset and that

5   you would still have faith in the fact that you felt the case

6   was proven to you beyond a reasonable doubt.

7         If after the verdict was rendered the bag came off

8   the defendant's head and it was your wife, your husband, your

9   brother, your sister, or your child, if you have enough

10  confidence that the State has proved your case beyond a

11  reasonable doubt and you can convict somebody that you knew

12  based on what you heard, then by all means I have absolutely

13  no argument.  You'd have to return a verdict of guilty.

14        But in that type of a vein that you would come out

15  here and get upset then that maybe you didn't consider

16  something to the extent you should have or maybe they really

17  didn't prove it the way they should have and you would be

18  upset if you have didn't know the defendant, then in that

19  circumstance the case has not been proven to you beyond a

20  reasonable doubt.  And I am asking that you severely analyze

21  the testimony that the defense has presented to you no matter

22  what agencies add and come to your own conclusion, come to a

23  conclusion that's in accordance with what you believe to be

24  the facts and what you believe to be having justice served by

25  returning a verdict.

1       Thank you.

2       THE COURT:  Thank you, Ms. Sauter.

3       Mr. Cunningham.

4       MR. CUNINGHAM:  Thank you, Your Honor.

5       By the same token, let's say you sat here during this

6   trial and called the victim, she came in, sat behind a screen,

7   you never knew who she was 'til after you reached your

8   verdict.  Same applies there if after your verdict you take

9   the screen away and the victim is, in fact, your spouse, your

10  child, your loved one.

11      If you think back to jury selection, you'll recall

12  among the questions that were asked do any of you know

13  anybody, the witnesses, the victim, the defendant, the

14  attorneys, the police officers.  You were asked if you did

15  will that affect your ability to decide this case.  And

16  there's a reason for that.  The reason for that is this:  both

17  sides are supposed to ask you to decide this case based on the

18  evidence.  Not based on the emotion, not based on sympathy but

19  on the evidence.  And that's why we don't use jurors who are

20  the family of the defendant.  That's why we use people who

21  don't know anybody and who will listen to the evidence and

22  return a verdict that's based on it.

23      So when she asks do you consider that maybe she's a

24  relative, of course, well, my response is just as much as the

25  victim's irrelevant to the jurors.

# EXHIBIT C

k                                                — Direct                                    60

1            (Recess taken.)

2            (After recess.)

3            THE COURT:  All right, Mr. Cunningham.

4            MR. CUNNINGHAM:  Thank you, your Honor.  State calls

5    ███████████████.

6            COURT OFFICER:  Kindly place your left hand on the

7    Bible and raise your right hand.  Kindly state your full name

8    for the record and spell your last name.

9            THE WITNESS:  ███████████████████   ██████████

10   ████████████████

11   ████████████████████████ having been duly sworn, was

12   examined and testified as follows:

13   DIRECT EXAMINATION BY MR. CUNNINGHAM:

14        Q    ████████, stand back here, and I'll ask you to keep

15   your voice up so I can hear all the way back here.

16        Okay.  You have to answer yes or no.

17   A    Yes.

18        Q    A little bit louder.

19   A    Yes.

20        Q    And that's perfect.  You speak into that microphone

21   like that, I'll be able to hear you.  If I ask you anything and

22   you don't understand that question, I'll try and ask that

23   question again.  You have to say yes or no so, the lady in

24   front of you can write it down.

25   A    Yes.

HARRELL 00537

Direct                                                                  61

1      Q    How old are you, please?

2   A   Twenty-one.

3      Q    And back in 1988, where were you living?

4   A   ███ North Fifth Avenue, Long Branch.

5      Q    Who did you live there with?

6   A   My mother and my father.

7      Q    Were you working back then?

8   A   Yes.

9      Q    Where did you work?

10  A   McDonald's.

11     Q    What did you do at McDonald's?

12  A   Cashier.

13     Q    Do you recall what type of hours you worked, work the

14  same hours every day, every week, did they rotate?

15  A   Rotates sometimes on the weekends.

16     Q    Okay.  On the weekends, what type of hours did you

17  usually work?

18  A   11:00 --

19          MRS. SAUTER:  I'm going to object.

20  A   11:00 to 7:30.

21          MRS. SAUTER:  What she worked this particular day.

22          THE COURT:  Let's -- this is just preliminary

23  background.  I'll overrule the objection, go ahead.

24     Q    I'm sorry.  You say on the weekends you usually work

25  when?

HARRELL 00538

- Direct                                                    62

1   A   11:00 to 7:30.

2       Q   That would be 11:00 in the morning to 7:30 at night?

3   A   Yes.

4       Q   And was that working as a cashier?

5   A   Yes.

6       Q   Did you work any positions at that time, other than

7   cashier?

8   A   No.

9       Q   And how would you get to and from work?

10  A   Walk.

11      Q   How would you get from your house to the McDonald's?

12  A   Walked.

13      Q   What route would you take, what street would you walk

14  on?

15  A   Fifth Avenue and Broadway.

16      Q   I can't hear you, I am sorry.

17  A   Fifth and Broadway.

18      Q   Fifth and Broadway.  What would you do when you got to

19  Broadway?  You walked up Fifth Avenue to Broadway, right?

20  A   Yes.

21      Q   When you got to Broadway, what did you do?

22  A   Turn, make a left turn.

23      Q   And then how would you get to the McDonald's?

24  A   Go straight down.

25      Q   And that's where the McDonald's is?

HARRELL 00539

1   A   Yes.

2       Q   I'd like to direct your attention back to a Sunday,

3   September 18th, 1988; did you work that day, if you recall?

4   A   Yes.

5       Q   You recall what hours you worked?

6   A   4:00 to 10:00.

7       Q   4:00 in the evening?

8   A   Yes.

9       Q   Till 10:00 in the evening?

10  A   Yes.

11      Q   And what position were you working that night?

12  A   Cashier.

13      Q   Now, when you worked McDonald's, would you wear any

14  special clothes, or would you just wear whatever you had on

15  that day?

16  A   Uniform.

17      Q   Can you describe your uniform for me, please?

18  A   Green with white stripes.

19      Q   A dress?

20  A   No, no, shirt and a pants.

21      Q   Pants also green with white stripes?

22  A   No, just green.

23      Q   I'd like to show you, if I may, a shirt and pair of

24  pants previously been marked S-2 and S-3; do you recognize --

25  first why don't you take S-2, would you take these, do you

HARRELL 00540

- Direct                                                      64

1  recognize these at all?

2  A   Yeah, that's the work --

3      Q     You have to keep your voice up.

4  A   I used to work in these.

5      Q     What are these?

6  A   My uniform.

7      Q     These are the pants for your uniform?

8  A   Yes.

9      Q     And what about S-3, do you recognize this shirt?

10 A   Yes, that's my uniform top.

11     Q     Is that the top?

12 A   Uh-huh.

13     Q     When was the last time you saw this shirt and these

14 pants?  These particular ones?

15 A   I don't remember.

16     Q     Are these the shirt and pants that you were wearing on

17 September 18th, 1988?

18 A   Yes.

19     Q     What time did you get off work that night?

20 A   I don't remember.  I think it was about 10:00, 10:15.

21     Q     Okay.  And what, did the McDonald's close at that time

22 or did your shift just end?

23 A   No, my shift ended.

24     Q     So, somebody would have come on to replace you?

25 A   No.

HARRELL 00541

- Direct                                    65

k

1      Q    They would have closed your register?

2      A    Yes.

3      Q    And after your shift ended, did you have to do

4  anything with, what do they call it, the bank or whatever they

5  call it, the tray or the money, you have to count up the money

6  and account for it?

7      A    No.

8      Q    Somebody else does that?

9      A    Yes.

10     Q    Was there anything after your shift ended that you had

11  to do at the McDonald's?

12     A    I had to stock up cups and stuff for the morning.

13     Q    Supplies?

14     A    Yeah.

15     Q    You know how long that took you that night?

16     A    No, I don't remember.

17     Q    Did there come a point in time when you left the

18  McDonald's that night?

19     A    Excuse me?

20     Q    Did there come a time when you left that McDonald's

21  building that night?

22     A    No.

23     Q    After you got off work, did you leave the building at

24  some point?

25     A    Yes.

- Direct                                    66

1    Q    Okay.  Do you know what time that was?

2    A    I don't remember exactly what time that was.

3        Q    Can you give us an approximate time, or can you tell

4   us about how long after you got off work it was?

5    A    Probably about 15 minutes, about 10, 15.

6        Q    Ten or fifteen?

7    A    10:15.

8        Q    About 10:15?

9    A    Yes.

10       Q    And that was after you got done stocking the supplies?

11   A    Yes.

12       Q    Did you do anything else after you got done stocking

13   the supplies before you left?

14   A    No.

15       Q    You didn't stop to eat or stop to talk to your

16   friends or anything?

17   A    No.

18       Q    When you left the McDonald's, where were you going to

19   go to?

20   A    Home.

21       Q    And did you leave alone or with anybody else?

22   A    Alone.

23       Q    How did you -- what route did you follow in order to

24   go home that night?

25   A    I went straight up Broadway, and then make a right to go

HARRELL 00543

- Direct                                           67

1    back to Fifth Avenue.

2        Q    Can you tell me the streets that you would walk past

3    as you walked up Broadway?

4    A    The streets?  It's just Broadway.

5        Q    Are there any cross streets that you would walk past

6    or cross over?

7    A    No.

8        Q    So, as you walk from the McDonald's, the first street

9    you get to would be Fifth?

10   A    Yes.

11       Q    Okay.  Did something happen to you as you walked

12   home?

13   A    Yes.

14       Q    As you were walking along Broadway, were you on the

15   left side of the, or the right side of the street?

16   A    The right.

17       Q    Is that the same side of the street the McDonald's is

18   on?

19   A    Yes.

20       Q    What happened to you as you were walking along that

21   side of the street?  Did you see somebody?

22   A    Yes.

23       Q    Where did you see that person?

24   A    On the corner.

25       Q    You recall which corner, or what's on that corner?

HARRELL 00544

1   A   Store, stores.

2       Q   I can't hear you, I'm sorry.

3   A   A store.

4       Q   What type of a store?

5   A   I don't remember.

6       Q   Okay.  Where was this person, what was he doing?

7   A   Just standing there.

8       Q   And was there anything about him that attracted your

9   attention, or did you just notice that he was standing there?

10  A   I just noticed he was standing there, because he was,

11  because I was walking past.

12      Q   Was he standing on the side of the street that you

13  were walking on?

14  A   Yes.

15      Q   How close was he standing, or was he moving?

16  A   He was standing.

17      Q   And do you recall which way he was facing, was he

18  facing in this store, was he facing you or facing away from

19  you?

20  A   I don't remember.

21      Q   In order to get home, would you have to walk past this

22  person?

23  A   Yes.

24      Q   And did you do that?

25  A   Yes.

HARRELL 00545

k             ▬▬ - Direct          69.

1      Q    Did you have any conversation with that person at

2   that time?  Did either of you say anything?

3   A   He said something to me.

4      Q    Tell us what he said to you.

5   A   He said was I old enough to have sex, and I said leave me

6   alone.

7      Q    Was there anybody else in the area when he said that

8   to you?

9   A   No.

10      Q   How far from you was he when he said that?

11   A   I don't know.

12      Q    Was he as far away from you as I am from you right

13   now?

14   A   Yeah, I guess.

15      Q    I am sorry.

16   A   Yes

17      Q    Was he further away than I am right now?

18   A   No.

19      Q   And as he said this, were you still walking toward him

20   or had you passed him at this point?

21   A   I was passing.

22      Q   I'm sorry?

23   A   I was walking past.

24      Q    Had you already gone by him?

25   A   Yeah.

HARRELL 00546

1    Q    Or were you still getting closer to him?

2    A    I was going by him.

3    Q    Did you get any -- was he in front of you or was he

4  behind you when he said this?

5    A    Behind me.

6    Q    Had he said anything to you before that?

7    A    No.

8    Q    What happened next?

9    A    I just kept walking, and then I felt somebody grab my neck.

10    Q    How far had you walked when you felt somebody grab

11  your neck?

         don't know.

    Q    Had you gone as far as from where you are to this back

14  window back here, or the wall with a painting on it, had you

15  gone that far?

16  A    No.

17    Q    Had you gone as far as this short little wall right

18  here?

19  A    Yeah.

20         MR. CUNNINGHAM:  Judge, do you have measurements up

21  there, as far as from the bench to the witness chair to this

22  bar?

23         THE COURT:  It's 25 feet 9 inches from the witness

24  chair to that rail.

25         MR. CUNNINGHAM:  Thank you.

1      Q.   Were you able to see the person that grabbed you by

2    the neck?

3    A.   Yes.

4      Q.   Had you seen that person before he grabbed you by the

5    neck?

6    A    I saw him once before.

7      Q.   I'll get to that in a second.

8           Was the person that grabbed you by the neck the person

9    that you had just walked by?

10   A    Yes.

11     Q.   How do you know that?

12   A    Because I saw his face.

13     Q.   Can you describe for us how it was that he grabbed

14   you around the neck?

15   A.   From behind with his arm like this (indicates).

16     Q.   Okay.  Can you hold your arm up to your neck the

17   way --

18   A    Like this.

19     Q.   -- the way he had his arm around you, would you do

20   that so the Judge can see you, please?

21   A    Like this.

22          MR. CUNNINGHAM:  Judge, for the record, indicating a

23   forearm.

24          THE COURT:  Forearm across the neck.

25     Q.   And where was he standing when he did this?

HARRELL 00548

- Direct                                    72

1  A  Behind me.

2     Q    What part of him were you able to see at this point?

3  A  At first I saw his arm, but then I slightly turned around,

4  I saw his face.

5     Q    How far was he from you when you saw his face?

6  A  He still had my neck.

7     Q    Was he as far from you as I am from you right now?

8  A  No.

9     Q    Was he closer?

10 A  Yes.

11    Q    How much closer?

12 A  Right behind me.

13    Q    Was this in the street, on the sidewalk, where?

14 A  On the sidewalk.

15    Q    Did he say anything to you at that point?

16 A  I don't remember.

17    Q    How did you feel at that point?

18 A  Scared.

19    Q    What did you do?

20 A  I tried to scream.

21    Q    Were you able to?

22 A  Yes.

23    Q    You did scream?

24 A  Yes.

25    Q    What, if anything, did he do?

HARRELL 00549

1  A   He put his hand over my mouth, covering my mouth.

2  Q   And did you keep screaming?

3  A   No.

4  Q   Why not?

5  A   'Cause I was scared.

6  Q   What happened next?

7  A   He had dragged me in back of the -- behind the Trophy

8  store.

9  Q   Behind the what?

10 A   Trophy.

11 Q   The --

12 A   Trophy.

13 Q   The Trophy store?

14 A   Yeah.

15 Q   Okay.  At this point, are you still on Broadway?

16 A   Yes.

17 Q   Or have --

18 A   No, on the side of Fifth Avenue.

19 Q   That would be the street you live on?

20 A   Yes.

21 Q   When you saw him initially, when he said something to

22 you, was he standing on Fifth or on Broadway?

23 A   It was right at the corner.

24 Q   And where were you at that point when he said that to

25 you, when he asked you if you were old enough for sex?

HARRELL 00551

X - Direct                                                                 74

1   A.  Going toward Fifth.
2   Q.  You were on Fifth at that point?
3   A.  I don't know, I guess.
4   Q.  At that corner?
5   A.  Yes.
6   Q.  You say that he dragged you to a lot?
7   A.  Yes.
8   Q.  Can you describe that lot for me?
9   A.  It was a parking space.
10  Q.  I've never been there, I have no idea what
11  it looks like.  How good can you describe it for me?
12  A.  It was an empty parking lot.
13  Q.  How big, as big as this room?
14  A.  A little smaller.
15  Q.  You recall what the bottom's like, the ground?
16  A.  No.
17  Q.  Do you recall if there were any cars in it?
18  A.  No, there wasn't.
19  Q.  I am sorry?
20  A.  No cars.
21  Q.  What part of the lot did you go to?
22  A.  The back.
23  Q.  And how far from the sidewalk is the back of the lot,
24  either in terms of feet, or is it as far from you as the back
25  here, or the wall with the painting, or further or closer, if

1  you're standing on the sidewalk, how far is the back of that

2  lot?

3  A    Probably a hundred feet.

4        Q    Would that be closer or further than that window up

5  there?

6  A    Further.

7        Q    Much further?

8  A    Yeah.

9             MR. CUNNINGHAM:  Judge, does your measurements

10  indicate how far the back wall is, do your measurements

11  indicate?

12             THE COURT:  Forty feet from the witness chair.

13        Q    And if you're standing on the sidewalk looking into

14  that lot, where is the Trophy shop?

15  A    Right here, right on the right.

16        Q    On your right, as you're looking into the lot?

17  A    Yes.

18        Q    Is there anybody else around that you saw at that

19  point?

20  A    No.

21        Q    What happened when you got to the back of the lot?

22  A    I remember him pushing me toward the fence.

23        Q    What type of a fence?

24  A    It was just a fence.

25        Q    You have to talk a little bit louder.  Is it a wooden

HARRELL 00552

k

――― Direct                                          76

1    fence like this in front of the jury here?

2    A   No.

3        Q   Do you recall what the fence was made of?

4    A   No.

5        Q   You recall how high the fence was?

6    A   No.

7        Q   Did he say anything to you at this point?

8    A   I don't remember.

9        Q   Did there come a point during this when he said

10   something to you again?

11   A   No.

12       Q   Where were his hands at this point?

13   A   I don't remember.

14       Q   What happened next?

15   A   He had dragged my pants down.

16       Q   Those are the pants that you showed us before?

17   A   Yes.

18       Q   I ask you to look at these pants, how do these pants

19   fasten?

20   A   With the zipper up, and this button right here.

21       Q   You have to talk louder.

22   A   Buttons right here.

23       Q   There's a button there?

24   A   Yeah.

25       Q   There's also a zipper?

HARRELL 00553

k                                          — Direct                          77

1    A    Yes.

2    Q    And is there a belt?

3    A    Yeah, it buckles.

4    Q    How does this belt work, can you show us how this belt

5    works?

6         (Witness complies.)

7    Q    Did you have the pants zipped and buttoned and the

8    belt shut when he attacked you?

9    A    Yes.

10   Q    And did there come a point in time when the belt was

11   undone?

12   A    I don't remember.

13   Q    How about when the pants were unbuttoned?

14   A    I don't remember.

15   Q    How about when the pants were unzipped?

16   A    (No response).

17   Q    Did you keep your pants on the whole time?

18   A    Yes.

19   Q    Was there any point in time when you didn't have your

20   pants on?

21   A    No.

22   Q    I ask you to look at the zipper here, see here where

23   the track is broken?

24   A    Yes.

25   Q    Was that like that when you went to work that night?

k                                    - Direct                        78

1   A   No.

2       Q   Do you know how that got like that?

3   A   When he pulled them down.

4       Q   I am sorry?

5   A   When he pulled them down, when he dragged them down.

6       Q   What did he do to drag your pants down?  Tell us how

7   he did that, what did he do?

8   A   It happened fast, I don't remember.

9       Q   Okay.  Were you able to see what he was doing as far

10  as taking your pants off?

11  A   No.

12      Q   Did you take your pants off?

13  A   No.

14      Q   Was there anybody else there?

15  A   No.

16      Q   Did you help him take your pants off?

17  A   No.

18      Q   Did you try and keep him from taking your pants off?

19  A   Yes.

20      Q   And were you able to keep him from taking your pants

21  off?

22  A   No.

23      Q   Did he take any of your other clothes off?

24  A   My panties had come down with my pants at the same time.

25      Q   Okay.  And did you take the panties off?

HARRELL 00555

Direct                                                          79

1   A   No.

2       Q   Did you help him take the panties off?

3   A   No.

4       Q   And I'll show you, if I can, what's marked as S-5, do

5   you recognize these?

6   A   Yes.

7       Q   What are these?

8   A   My panties.

9       Q   Okay.  Is this how they looked when you put them on

10  that day?

11  A   I don't remember.

12      Q   Okay.  If you look on the inside here, there appears

13  to be some blood or stain of some sort?

14  A   Yes.

15      Q   Do you recall, was that there when you put them on

16  that day?

17  A   I don't remember, I guess.

18      Q   What happened after he got your pants and your panties

19  off, what did he do to you?

20  A   He was touching me.

21      Q   With what?

22  A   With his hand.

23      Q   Where was he touching you?

24  A   On my vagina.

25      Q   Did he put his hand in your vagina?

- Direct                                    80

1   A   Yes.

2       Q   Did he put anything else in your vagina?

3   A   Yes.

4       Q   What?

5   A   His penis.

6       Q   Which did he do first?

7   A   His hand.

8       Q   Did he say anything at that point?

9   A   No.

10      Q   Did he say anything when he put his penis in your

11  vagina?

12  A   No.

13      Q   How long did he have his hand in your vagina?

14  A   For about a couple of seconds.

15      Q   And how long did he have his penis in your vagina?

16  A   For about five minutes.

17      Q   And where in the parking lot were you at that point?

18  A   In the back.

19      Q   Were you standing up, lying down?

20  A   On the ground.

21      Q   On the ground?

22  A   Yes

23      Q   You recall what the ground was like back there?

24  A   No.

25      Q   Were you able to see his face at all during this,

HARRELL 00557

1  while you're in the parking lot?

2  A   Yes.

3      Q   Where was he, that you could see his face?

4  A   On top of me.

5      Q   How far from your face was his face?  You show us with

6  your hands.

7  A   About (indicates).

8      Q   Do that again so the Judge can see, please?

9  A   About this high.

10          THE COURT:  Five, four inches from her face.

11          Mr. Cunningham --

12          MR. CUNNINGHAM:  Yes, sir.

13          THE COURT:  -- I made a commitment to you about

14  timing.

15          MR. CUNNINGHAM:  Yes, sir.

16          THE COURT:  Perhaps now is a time to take a break.

17          MR. CUNNINGHAM:  Yes, sir.

18          THE COURT:  All right.

19          All right.  Would you step down, ████████?

20          (Whereupon the witness steps down.)

21          THE COURT:  All right, ladies and gentlemen.  We're

22  going to terminate the testimony now, we'll start again

23  promptly at 9:15 tomorrow.

24          All right.  Don't discuss the case among yourselves or

25  with anyone else.  Drive carefully, we want all fourteen of you

# EXHIBIT D

```
 1                        Nichols              178
 2            Q.    How big was the vault, out of
 3       curiosity?
 4            A.    I would say 20 by 12.
 5            Q.    And you mean feet?
 6            A.    And an iron door.  Excuse me?
 7            Q.    You mean 20 feet by 12 feet?
 8            A.    Approximately.  With a cast iron
 9       door with a lock on it.
10            Q.    It's like a bank vault?
11            A.    Right.
12            Q.    Now, I'm going back, this is page
13       3 of 53.
14            A.    Okay.
15            Q.    Can you read this?  I can zoom
16       in.
17            A.    That's Ted's notes I think,
18       right?
19            Q.    Okay.  That was my next question.
20       3 of 53 on Exhibit A are notes by Ted
21       Mozer?
22            A.    Yes.
23            Q.    Sorry, wrong direction.  Now,
24       actually I'll zoom in a bit.  This is page
25       2 of 53.  And it says Date of Report
```

```
1                          Nichols                    179
2         4/15/89.  Do you see that?
3              A.     Yes.
4              Q.     Now, this says Results of
5         Examination and then it has a paragraph he
6         typed out, is that correct?
7              A.     Yes.
8              Q.     And he signs this, is that
9         correct?
10             A.     I'm sorry, what was that?
11             Q.     And he signs this paragraph, this
12        report?
13             A.     Ted, yes.
14             Q.     Is this his final conclusions
15        regarding the trace evidence?
16             A.     I would imagine.
17             Q.     Once you're finished doing
18        testing, you'd come to some sort of
19        conclusion, is that fair to say?
20             A.     Yes.
21             Q.     Would you type up a summary of
22        what you had determined once you were done
23        testing?
24             A.     Sometimes.
25             Q.     Okay.  Let me zoom out.  Now, I'd
```

```
 1                      Nichols              180
 2        just like to go to -- this is page 1 of 53.
 3        And it's dated 4/28/89, is that correct?
 4           A.    Yes.
 5           Q.    Now, this is page 1 of 1, so it's
 6        the only page in this report?
 7           A.    There was only 1 of 1, yes.
 8           Q.    Okay.  And this is a summary of
 9        your conclusions regarding Dion Harrell's
10        blood and saliva, is that right?
11           A.    Correct.
12           Q.    And it's signed by you?
13           A.    Correct.
14           Q.    And you sent it back to the Long
15        Branch Police Department, is that right?
16           A.    Yes.
17           Q.    Now, in this report, it doesn't
18        contain any information regarding what the
19        results of Dion Harrell's testing means
20        vis-à-vis the results of the victim's
21        testing, right?
22           A.    No, it's two separate reports.
23           Q.    Okay.  Did you draft a report
24        that analyzed the two sets of forensic
25        tests together?
```

```
1                        Nichols                 181
2            A.      Together?
3            Q.      Yeah.
4            A.      No, there's a report generating
5       the information from the victim's clothing
6       and then the report generating Dion
7       Harrell's results.
8            Q.      Right.  And is it fair to say
9       that you ultimately testified as to the
10      chances that Dion Harrell could be excluded
11      from the material that you tested from the
12      suspect?
13           A.      Not excluded.  Included.
14           Q.      Okay.  You testified as to the
15      chances he could be included?
16           A.      Yes.
17           Q.      Okay.  Now, is it fair to say
18      that a layperson wouldn't know that from
19      looking at this April report and the
20      January report regarding the suspect?
21                   MR. O'BRIEN:  Objection to the
22              form.  You may answer.
23           A.      Correct.
24                   MR. SIMMONS:  Join.
25           Q.      How would the police department
```

```
 1                         Nichols              182
 2         learn your conclusions regarding the fact
 3         that Dion Harrell could be included as
 4         providing the material that you tested from
 5         the suspect?
 6                    MR. O'BRIEN:  Objection to the
 7              form.  You may answer.
 8              A.    Would you repeat the question,
 9         please?
10              Q.    After the -- let me phrase it a
11         little differently.
12                    After the January 1989 report
13         regarding the forensic testing on the
14         victim's material, and the April 1989
15         testing of samples from Dion Harrell, did
16         you call the police department to explain
17         what those tests meant?
18              A.    No.
19              Q.    Did you call the prosecutor?
20              A.    No.
21              Q.    How would they know what that
22         testing meant, taken together?
23                    MR. O'BRIEN:  Objection to the
24              form.  You may answer.
25                    MR. SIMMONS:  Join.
```

```
                            Nichols              183
 1
 2          A.      There was no specific conclusion
 3     that we could reach.  Therefore it was
 4     never put into the report.
 5          Q.      So to rephrase, if there's no
 6     specific conclusion that can be reached,
 7     you wouldn't generate a report saying that?
 8          A.      No.
 9          Q.      Okay.  Now, actually, I'm going
10     to -- jumping around a bit, I apologize --
11     I'm going to go back to -- and pardon my
12     clicking through, I'll land and then
13     explain.
14               Going back to 16 of 53.  Now,
15     this report is dated January 13th, 1989 and
16     it's the testing of the materials obtained
17     from the victim.  Now --
18          A.      Oh.  All right.
19          Q.      Do you have it?
20          A.      I got the wrong page.  Okay.  Go
21     ahead.
22          Q.      And you're looking at the --
23     withdrawn.
24               Now, I think you testified
25     earlier that there were instances where AP
```

```
 1                      Nichols              184
 2          would come up positive but the sperm and
 3          p30 tests would come up negative, right?
 4               A.    Correct.
 5               Q.    And the sperm test requires you
 6          to actually see a spermatozoa in the
 7          sample, right?
 8               A.    Correct.
 9               Q.    Now, could you tell me how
10          sensitive the p30 test is?
11               A.    Couldn't give you any idea.
12               Q.    Okay.  Well, let me put it
13          differently.  Were there instances where --
14          let's say going back to 1989, were there
15          instances where you'd test a sample that
16          was positive for p30 but there was not
17          enough material to get a positive result in
18          the absorption-inhibition test?
19                    MR. O'BRIEN:  Objection to the
20               form.  You can answer.
21               A.    Are you saying positive p30 but
22          insufficient sample?
23               Q.    For absorption-inhibition.
24               A.    I would say that would be --
25          usually if we had enough for p30 -- seminal
```

```
1                       Nichols            185
2         stains can be as small as a postage stamp
3         or as big as a dinner plate.  So it would
4         depend on the sample that were being
5         tested.
6              Q.    Right.  My specific question
7         though is, were there instances when you
8         got a positive on the p30 test but did not
9         have enough material to get a result on the
10        absorption-inhibition test in 1988?
11             A.    I don't recall any.
12             Q.    Okay.  Do you have a copy of the
13        500-page manual?
14             A.    No.
15                   MR. RICKNER:  Mr. O'Brien,
16             Exhibit D?
17                   MR. O'BRIEN:  Yeah, are you
18             asking me a question?
19                   MR. RICKNER:  Does he have
20             Exhibit D?
21                   MR. O'BRIEN:  I e-mailed it to
22             him.  I don't believe he printed it
23             out.
24                   MR. RICKNER:  Okay.
25                   MR. O'BRIEN:  Why don't you just
```

```
1                          Nichols            186
2              put it up on the screen and ask him
3              questions from the screen.
4                    MR. RICKNER:  That's what I was
5              going to do.
6              Q.    Mr. Nichols, can you see the
7         screen well enough that you could just read
8         it off the screen if I zoomed in on
9         different sections?
10             A.    I have to get closer.  Go ahead.
11             Q.    Okay.  I'm going to bring up --
12        we're way off.
13                   Can you see a square that says
14        Special and Tech. Services Section?
15             A.    Yes.
16             Q.    Okay.  That's not actually the
17        first page of the forensic manual though.
18        Now we're on 5 of 478 on Exhibit D.  Can
19        you see New Jersey State Police Office of
20        Forensic Sciences?
21             A.    Yes.
22                   MR. RICKNER:  And then, for the
23             record, this is Harrell 106.
24             A.    Yes.
25             Q.    And you received the electronic
```

```
1                          Nichols                187
2         copy of this?
3              A.     Yes.
4              Q.     And did you recognize this
5         exhibit to include the biochemistry manual
6         that was in place from 1980 to 1991?
7              A.     Yes.
8              Q.     Now, besides this biochemistry
9         manual -- withdrawn.
10                    Would you consult this
11        biochemistry manual with regards to how to
12        perform testing?
13             A.     Yes.
14             Q.     Were there any other documents
15        generated by the State of New York that
16        also had guidelines for testing?
17                    MR. O'BRIEN:   State of New
18             Jersey.
19             Q.     Withdrawn.  Did it again.
20                    Were there any other documents
21        besides this biochemistry manual, from 1980
22        to 1991, that were generated by the State
23        of New Jersey in instructing you how to
24        perform biochemical tests?
25             A.     No.  This is the lab manual.
```

```
 1                    Nichols              188
 2          Q.     Okay.  When you say lab manual,
 3     what do you mean?
 4          A.     The biochemistry manual which
 5     shows you how to make up regents, what to
 6     test, what to look for.
 7          Q.     This is a summary of how the lab
 8     is run?
 9          A.     Well, it's instructions how to do
10     testing.
11          Q.     Now, I'm going to move down to
12     page 231 -- I should say it's Harrell 231,
13     so it's going to be a little -- and I
14     apologize for scrolling.
15               Now, this is page 130 out of 478
16     at the top.  Do you see it says Standard
17     Operating Procedures for Biochemical
18     Evidence?
19          A.     Yes.
20          Q.     And this is signed by T
21     something.  Who is that?
22          A.     That's Tom Brettell.
23          Q.     Who's Tom Brettell?
24          A.     Tom Brettell was the Central Lab
25     supervising scientist, then he was the
```

```
 1                    Nichols              189
 2        supervising scientist at Hammonton, then he
 3        was the assistant chief scientist, and then
 4        eventually became the chief scientist, over
 5        a period of 20 years or so.
 6             Q.    Did he write this section of the
 7        manual?
 8             A.    I don't know.
 9             Q.    Now, I'm going to scroll down to
10        section 5, this is Harrell 232 -- no,
11        that's not, excuse me.
12                  This is 133 and I believe it's
13        Harrell 234.  So at the top, it says Record
14        Keeping.  Do you see that?
15             A.    Yes.
16             Q.    And one of the sections says
17        "must completely document the location of
18        all stains and all negative controls."  Do
19        you see that?
20             A.    Yes.
21             Q.    Now, when it says location, what
22        do they mean by "the location of all stains
23        and all negative controls"?
24             A.    Where they are on the garment.
25             Q.    Okay.  And how would you perform
```

```
 1                    Nichols            190
 2        this documentation?
 3             A.    I would put my identification
 4        tags on the location of the stain and/or
 5        control.
 6             Q.    Okay.  So the way this
 7        requirement was satisfied was with the
 8        index cards that we discussed earlier?
 9             A.    Yes.
10             Q.    Now, I'm on page 110 of Exhibit
11        D, this is Harrell 211.  Can you see this,
12        Mr. Nichols?
13             A.    Yes.
14             Q.    It says Format for Reporting
15        Results.  Do you see that?
16             A.    Yes.
17             Q.    Now, if we scroll down onto the
18        next -- the following page, it says, "The
19        following formats will be used in
20        interpreting data."  Do you see that?
21             A.    Yes.
22             Q.    Now, let's look at number 1.
23        That says that genetic markers found in a
24        specimen are consistent with those found in
25        the whole blood of the suspect, do you see
```

```
1                          Nichols              191
2        that?
3              A.     Yes.
4              Q.     Now, where would you type up this
5        paragraph if that were the conclusion that
6        you reached in a particular test?
7              A.     I would go on a separate page on
8        the multi-page report.
9              Q.     Okay.  So if you go back to the
10       report that Mr. Mozer did regarding the
11       conclusions in the hair sample, a page like
12       that would be used to provide the data
13       interpretation for biochemical analysis?
14             A.     Correct.
15             Q.     Okay.  Now, if you look at the
16       bottom of this page, it says, "All
17       non-conforming statements will be approved
18       by the Technical Director and a copy will
19       be forwarded to the Assistant Chief
20       Chemist"?
21             A.     Correct.
22             Q.     Now, in 1988, who was the
23       technical director that would have to
24       approve this?
25             A.     That would be Henry Swordsma.
```

```
 1                    Nichols              192
 2          Q.    Okay.  And who would be the
 3     assistant chief chemist?
 4          A.    In 1988 that would be Chris
 5     Tindle.
 6          Q.    Now, is it fair to say that for
 7     Dion Harrell's case, you did not use one of
 8     these seven options?
 9          A.    Correct.
10          Q.    Why not?
11          A.    Because the victim and the
12     suspect were the same genetic markers, O
13     secretors.
14          Q.    Now, look at number 7, do you see
15     that?
16          A.    Yes.
17          Q.    Would this capture the results in
18     the Harrell case?
19          A.    Yes.
20          Q.    Okay.  Is there a reason that you
21     didn't use entry 7 in a report?
22          A.    No.
23          Q.    Can you tell me why not?
24          A.    I guess I just forgot.
25          Q.    Okay.  Were you required to issue
```

```
1                      Nichols                193
2        a conclusion in your reports?
3             A.     Was I required to?
4             Q.     Right.
5             A.     No.
6             Q.     So it was up to your discretion
7        as to whether or not to provide a final
8        analysis regarding your findings or not?
9                  MR. O'BRIEN:  Objection to the
10            form.  You can answer.
11            A.     Correct.
12                 THE WITNESS:  Am I supposed to
13            answer or?
14                 MR. RICKNER:  No, you did.
15                 MR. O'BRIEN:  You can answer.
16            Q.     Hold on for one moment.
17                 Now, I'd like you to turn to
18        Exhibit B, it's the testimony.
19                 (Biochemistry Manual Bates
20            Stamped NJSP HARRELL 102 through 579
21            marked Exhibit D for identification)
22            Q.     Now, Mr. Nichols, did you have an
23        opportunity to review your testimony from
24        the trial of Dion Harrell?
25            A.     Yes.
```

# EXHIBIT E

```
 1                                                      1

 2        UNITED STATES DISTRICT COURT
          DISTRICT OF NEW JERSEY
 3        ------------------------x

 4        KYHALLISTA JOHNSON as
          Administrator of the Estate of
 5        DION HARRELL,

 6                     Plaintiff,
                                    Index No.
 7             -against-           18-cv-11299(FLW)(LHG)

 8        STATE OF NEW JERSEY, NEW JERSEY
          DEPARTMENT OF LAW AND PUBLIC
 9        SAFETY, DIVISION OF STATE POLICE,
          JOHN T. NICHOLS, BRIAN O'GIBNEY,
10        AND CITY OF LONG BRANCH,

11                     Defendants.

12        ------------------------x
                                 June 2, 2022
13                               10:33 a.m.

14

15             Videotaped videoconference deposition

16        of HENRY SWORDSMA, taken by Plaintiff,

17        reported remotely by Elizabeth Santamaria, a

18        Shorthand Reporter and Notary Public by and

19        for the State of New York.

20

21

22

23

24

25
```

```
 1                                                      2

 2        REMOTE APPEARANCES:

 3

 4        RICKNER PLLC

 5             Attorneys for Plaintiff

 6             14 Wall Street

 7             New York, New York 10005

 8        BY:  ROBERT RICKNER, ESQ.

 9

10        DEPUTY ATTORNEY GENERAL

11        TIMOTHY P. O'BRIEN

12             Attorney for State Defendants, State of

13             New Jersey, Department of Law and

14             Public Safety, Division of State Police

15             and John T. Nichols

16             25 Market Street

17             P.O. BOX 112

18             Trenton, New Jersey 08625

19

20

21

22

23

24

25
```

```
 1                                                        3

 2          REMOTE APPEARANCES (CONTINUED):

 3

 4          RAINONE COUGHLIN MINCHELLO LLC

 5               Attorneys for Defendants Brian O'Gibney

 6               and City of Long Branch

 7               555 Rt. 1 South - Suite 440

 8               Iselin, New Jersey 08830

 9          BY:   FRANK J. DYEVOICH, ESQ.

10

11          PRESENT:

12          EMILY ROSE CARLTON

13          THOMAS DEVINE, Legal Video Specialist

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                                                    4

2                        STIPULATIONS

3

4         IT IS HEREBY STIPULATED AND AGREED, by

5     and between counsel for the respective

6     parties hereto, that all objections, except

7     as to form, are reserved to the time of

8     trial.

9         IT IS FURTHER STIPULATED AND AGREED

10    that the deposition may be signed and sworn

11    to before any officer authorized to

12    administer an oath.

13        IT IS FURTHER STIPULATED AND AGREED

14    that the sealing and filing of the

15    deposition be waived.

16

17

18

19

20

21

22

23

24

25
```

```
1                                            5
2              THE VIDEOGRAPHER:  Good morning.
3         We're going on the record at 10:33 a.m.
4         on June 2nd, 2022.  This is video unit
5         one, volume one of the deposition of
6         Henry Swordsma, in the matter of
7         Johnson v. State of New Jersey.
8              It is June 2nd, 2022.  This
9         deposition is being taken via zoom with
10        all parties appearing remotely.  My
11        name is Thomas Devine and I am the
12        videographer.  The court reporter is
13        Elizabeth and we're both from Pirozzi &
14        Hillman.
15             Counsel, would you please
16        identify yourselves and whom you
17        represent.
18             MR. RICKNER:  Hello.  My name is
19        Rob Rickner, Rickner PLLC, and I
20        represent the estate of Dion Harrell.
21             MR. DYEVOICH:  My name is Frank
22        Dyevoich with Rainone, Coughlin,
23        Minchello, D-Y-E-V-O-I-C-H, and we
24        represent the City of Long Branch and
25        Officer O'Gibney.
```

```
 1                                          6
 2              MR. O'BRIEN:  Good morning.
 3         Timothy O'Brien, Deputy Attorney
 4         General on behalf of the State of New
 5         Jersey, as well as John Nichols.
 6              THE VIDEOGRAPHER:  Thank you.
 7         Would the court reporter please swear
 8         in the witness, after which we may
 9         proceed.
10              COURT REPORTER:  Good morning.
11         My name is Elizabeth Santamaria.  I am
12         a registered professional reporter and
13         New York State Notary Public.
14              This deposition is being held via
15         videoconference.  The witness and I are
16         not in the same room.  The witness will
17         be sworn in remotely and the parties
18         stipulate that the testimony is being
19         given as if the witness was sworn in
20         person.
21              So stipulated, Counsel?
22              MR. RICKNER:  So stipulated.
23              MR. O'BRIEN:  So stipulated.
24              MR. DYEVOICH:  So stipulated.
25              (Continued on next page)
```

```
1                           Swordsma                7
2          HENRY SWORDSMA,
3                having been first duly sworn according
4                to law by the Officer, testifies as
5                follows:
6          EXAMINATION
7          BY MR. RICKNER:
8                Q.    So, Mr. Swordsma, my name is Rob
9          Rickner and I'm going to be asking you some
10         questions today.
11                     Have you ever had your deposition
12         taken before?
13               A.    I've only had one deposition
14         before.
15               Q.    Okay.  Well, you may remember
16         these rules from your prior deposition or
17         you may remember them from your prep, but I
18         just want to put them on the record so we
19         can get the -- an opportunity to get the
20         best transcript that we can get.
21                     So first, don't talk over me.
22         Wait for me to finish my long rambling
23         questions before jumping in with a response
24         so we get a nice question and answer on the
25         record.  Can you do that for me?
```

```
 1                      Swordsma              8
 2          A.    Yes, sir.
 3          Q.    Okay.  I have to ask this, but
 4     I'll make it brief.  Do you have any issues
 5     with your memory for any reason?
 6          A.    Very good question.  I'm going to
 7     say no.
 8          Q.    Is there anything --
 9          A.    I had to think -- I'm sorry.
10          Q.    I'm sorry.  I violated my own
11     rule.  I talked over you and I'm sorry
12     about that.  Let me phrase it differently.
13     Is there any reason beyond the ordinary
14     passage of time that you couldn't give full
15     and complete testimony today?
16          A.    Oh, no, no.
17          Q.    And you said that you had had
18     your deposition taken once before.  Was
19     that with respect to your work at the
20     forensics lab?
21          A.    Well, it involved the forensic
22     scientist, but no.
23                (Telephone interruption)
24          A.    Oh, someone is calling me.  I
25     will shut this off.  I apologize.  Let me
```

```
1                          Swordsma              9
2       shut my own off.  Sorry.
3            Q.    When you say it involved a
4       forensic scientist, were you testifying as
5       an expert?
6            A.    No.
7            Q.    What was the subject of the
8       litigation?
9            A.    Racial and age discrimination.
10           Q.    Were you a defendant in that
11      lawsuit?
12           A.    No.
13           Q.    Have you testified in court
14      before?
15           A.    Yes.
16           Q.    How many times have you testified
17      in court, do you think?
18           A.    I'm not sure.  Around 200 times.
19           Q.    And have you been cross-examined
20      during your testimony in court?
21           A.    Yes.
22           Q.    So do you understand how
23      important it is to give clear, accurate
24      answers when you testify?
25           A.    Yes.
```

```
1                      Swordsma              10
2            Q.    Did you prepare for this
3       deposition?
4            A.    Well, I read -- I read the packet
5       with the laboratory report, so I looked at
6       that.  And I'm going to say yes because I
7       observed something on the report.  So, I'm
8       going to say yes.
9            Q.    Okay.
10           A.    Only because for examination of
11      evidence -- I'm sorry.  I'm interrupting
12      you but I didn't answer that right.  No.  I
13      observed something on requests for
14      examination of evidence.  So, I'm going to
15      say I did prepare for it.
16           Q.    I guess I was using the word
17      prepare in maybe a different way than
18      you're using.
19                 What I meant is, is that did you
20      have a discussion with Mr. O'Brien about
21      your testimony today and the questions that
22      are going to be asked?
23                 MR. O'BRIEN:  Objection to the
24          form.  You may answer.
25           A.    We met yesterday.
```

```
 1                      Swordsma              11
 2           Q.    How long did you meet for?
 3           A.    Half an hour.
 4           Q.    And you said you reviewed some
 5     documents.  You referred to as a packet.
 6     What was in the packet?
 7           A.    Well, the report.  It involves
 8     the laboratory report from the regional
 9     laboratory and the request for examination
10     of evidence, the results and then the
11     notes, as well.
12           Q.    Do you know what a Bates stamp
13     is?
14           A.    I'm sorry.
15           Q.    This isn't a trick question.
16           A.    No.
17           Q.    Do you know what a Bates stamp
18     is?
19           A.    No.  No, I don't.
20           Q.    Did the documents you reviewed
21     have little numbers on the bottom right or
22     bottom left-hand corner?
23           A.    Oh, I'm sorry.  For example, what
24     I'm looking at, this page I'm looking at,
25     it says, resubmitted to the laboratory for
```

```
 1                        Swordsma                12

 2          storage, and it does have a date stamp.

 3               Q.    Not a date stamp.  What I mean

 4          is --

 5                    You know what?  Why don't I show

 6          you one.  I am going to pull up what was

 7          clearly marked as an exhibit in this case.

 8          One moment.

 9                    All right can you see?  For the

10          record, this was marked as Nichols Exhibit

11          A in a prior deposition and on the first

12          page I'm going to scroll down -- actually,

13          not a good example.  I'm on the third page.

14          Do you see right here where it says,

15          NJSPHarrell003?

16               A.    Yes.

17               Q.    Okay.  Thank you.  Do the

18          documents you have have numbers like that,

19          even if they are a bit hard to read because

20          of the underlying text?

21               A.    Give me a second, sir.  There are

22          a number of documents.  No, no.  The ones

23          I'm looking at, no.  I don't think any of

24          them do, no.

25               Q.    And how many pages are in the
```

```
1                        Swordsma                  13
2         packet?
3              A.    Can I give you an estimate?
4         Fifteen.  Oh, I have this -- the subpoena
5         here, too.  About 15.
6                   MR. RICKNER:  Now, Mr. O'Brien,
7              could you forward me a copy of whatever
8              documents you provided to Mr. Swordsma?
9                   MR. O'BRIEN:  I don't know that I
10             can do that at this time.  I know I
11             sent him basically the lab reports.
12             So -- but I'm not able to reproduce
13             exactly what I sent to him.
14             Q.    Mr. Swordsma, did you get those
15        documents via e-mail?
16             A.    No.  It was delivered -- it was
17        delivered by UPS.
18                  MR. RICKNER:  Okay.  I'm going to
19             call for production of the exact
20             documents that Mr. Swordsma was
21             provided and I will ask that
22             Mr. Swordsma retain a copy.
23             Q.    Besides the lab notes and reports
24        that you noted, did you review any other
25        documents?
```

```
1                      Swordsma              14
2          A.    No.
3          Q.    Did you talk to Mr. Nichols?
4          A.    No.
5          Q.    You understand by Mr. Nichols I
6     mean John Nichols?
7          A.    John Thomas Nichols, yes.  I did
8     not talk to him.
9          Q.    When was the last time you spoke
10    to Mr. Nichols, to your knowledge?
11         A.    Oh, okay.  Yeah, in 2009.
12         Q.    Okay.  So would it be fair to say
13    that you haven't spoken to Mr. Nichols in
14    over a decade?
15         A.    I haven't.
16         Q.    Okay.  I'm going to go through
17    your educational background briefly.  When
18    did you start college?  What year?
19         A.    1969.
20         Q.    And did you finish in four years?
21         A.    It was five years.
22               I gave an incorrect answer.  I'm
23    sorry.  I started college in 1964 and I
24    finished with my bachelor's degree in 1969.
25         Q.    Okay.  And what did you get a
```

```
 1                    Swordsma              15
 2      bachelor's degree in?
 3           A.    In chemistry.
 4           Q.    Did you go to graduate school?
 5           A.    Yes.
 6           Q.    When did you start graduate
 7      school?
 8           A.    1969.
 9           Q.    And where did you go to college?
10           A.    Virginia Tech.
11           Q.    And where did you go to graduate
12      school?
13           A.    Oh, Virginia Tech is the graduate
14      school.  Undergraduate was Bloomfield
15      College.
16           Q.    And when did you finish graduate
17      school at Virginia Tech?
18           A.    1972.
19           Q.    And did you get it at --
20                 What degree did you get?
21           A.    Master's degree in chemistry.
22           Q.    And following the master's degree
23      in chemistry did you get any other degrees?
24           A.    No.  No, we did not.
25           Q.    When did you start working in
```

```
1                      Swordsma              16
2       forensics?
3            A.    1972.
4            Q.    And what job did you have?
5            A.    I worked in the drug unit.
6            Q.    Isn't that in the forensics labs
7       in New Jersey?
8            A.    Yes, it was.
9            Q.    Okay.  Prior to beginning work in
10      the drug unit, did you get any specific
11      training in forensics?
12           A.    No.
13           Q.    In your bachelor's degree or
14      master's degree studies did you take any
15      classes on forensics?
16           A.    No.
17           Q.    When you got the job in the drug
18      lab, did they give you any training in
19      forensics?
20           A.    Yes.
21           Q.    What training was that?
22           A.    I would analyze a case under the
23      supervision of someone who was already
24      trained.  That lasted about six months.
25           Q.    Besides on-the-job training, did
```

1                          Swordsma              17
2          you have any classroom training in
3          forensics when you started at the drug lab?
4              A.      Periodically throughout my career
5          I attended classes on various subjects.  I
6          went to -- like I said, the most
7          significant one was in 2005 I went to the
8          drug enforcement agency training for three
9          days.
10             Q.     Did you ever receive any
11         certifications in forensics?
12             A.     No.
13             Q.     Did you ever hold any licenses
14         with respect to forensics?
15             A.     No.
16             Q.     How long were you in the drug
17         testing part of the New Jersey labs?
18             A.      That was off and on.  For
19         example, I retired in 2009 from the drug
20         unit, so it was off and on.  Let me try and
21         give you an estimate.  Fifteen years.
22             Q.     Okay.  So, besides working in the
23         drug testing lab did you have any other
24         labs that you worked in as part of the New
25         Jersey forensics --

```
 1                         Swordsma                    18
 2              A.    No.
 3              Q.    -- department?
 4              A.    No.
 5              Q.    Did you ever work at Sea Girt --
 6              A.    Oh, I'm sorry, sir.  Yeah, my
 7        career is so weird.  I worked in the ECRI
 8        testing unit for four years.
 9              Q.    And that would be at the
10        racetrack?
11              A.    Yes.
12              Q.    Drug testing horses?
13              A.    Yes.
14              Q.    Okay.  Did you ever work in Sea
15        Girt?
16              A.    At Sea Girt?  Yes.
17              Q.    In 1985 through 1990, can you
18        tell me what title or titles you had at Sea
19        Girt?
20              A.    I was the supervising forensics
21        scientist.
22              Q.    As a supervising forensics
23        scientist in that time period, what were
24        your responsibilities?
25              A.    I would review -- I would take --
```

```
 1                    Swordsma              19
 2         talk to people submitting evidence on more
 3         complicated cases and I reviewed a lot of
 4         the cases that went out of the laboratory.
 5         And if someone had a problem, I would talk
 6         to them.  I did observe people in court
 7         periodically also.
 8              Q.    Were you only supervising people
 9         in Sea Girt or were you supervising people
10         in other locations?
11              A.    Well, other locations as well.
12              Q.    Who did you report to between
13         1985 and 1990?
14              A.    It would be the chief scientist
15         and I -- I'm trying to think.  I don't
16         believe we had an assistant chief scientist
17         then.  So, I would report to the chief
18         scientist.  Also, I would report to the
19         state police personnel on the laboratory.
20         They were on -- they were on site.
21              Q.    Okay.  Would it be correct to say
22         that the state police personnel handled
23         more of the administrative side rather than
24         the scientific side?
25              A.    Yes.
```

```
 1                        Swordsma              20
 2           Q.    Okay.  Who was the chief that you
 3      reported to?
 4           A.    It was -- all right.  Give me a
 5      second.  That would be Dr. Richard
 6      Saserstein during that time period.
 7           Q.    Now, I'll give you a second.  If
 8      you need water or if you need a break, just
 9      ask.
10           A.    Yeah.  I should ask you for
11      permission.  Sorry.
12           Q.    You don't have to ask me for
13      permission.
14           A.    Okay.  Thank you.
15           Q.    Did you receive any training in
16      blood testing?
17           A.    Not -- I attended lectures, but
18      not really training in the analysis of
19      blood.  No, no.
20           Q.    Okay.  Did you receive any
21      training in the analysis of semen?
22           A.    No.
23           Q.    Between 1985 and 1990, would you
24      have been capable of doing an AP test?
25           A.    Just for the sake of my own
```

```
1                    Swordsma              21
2       knowledge, I did one or two AP tests.  It
3       wasn't really part of the case work.  It
4       was just to familiarize myself with the
5       procedure.  I would say maybe two times I
6       did that.
7            Q.    Okay.  What about a p30 test?
8            A.    P30?  No, no.
9            Q.    So it would be correct to say
10      that you've never done a p30 test?
11           A.    No, I haven't.
12           Q.    Have you done any antigen testing
13      to determine blood type?
14           A.    No.  No, I haven't.
15           Q.    I'm sorry.  You said you were the
16      supervising -- what was your title again?
17      I apologize for not writing it down.
18           A.    Supervising forensic scientist,
19      between 1985 and 1990.  Yeah.  Yes.
20           Q.    And how did you become a
21      supervising forensic scientist?
22           A.    Well, you know, I gained
23      experience working in the laboratory
24      between the time that -- before the time
25      that was mentioned, and then we take civil
```

```
 1                        Swordsma              22
 2         service tests.
 3              Q.    So --
 4              A.    And I passed the civil service
 5         test and was assigned to the crime testing
 6         unit.
 7              Q.    Before supervising forensic
 8         scientist did you have to pass a specific
 9         civil service test?
10              A.    Yes.
11              Q.    Okay.  And what were the subjects
12         on that test, if you remember?
13              A.    Yeah.  It included other material
14         besides forensic science.  It did include
15         forensic science, general chemistry,
16         biochemistry, biology.  It included -- I
17         think some of the tests -- I'm getting
18         confused what test was which, but included
19         some supervisory questions.
20              Q.    Questions about how to be a good
21         manager?  Things like that?
22              A.    Yes.  Yes, sir.
23              Q.    Now, between 1972 and 1990, were
24         you part of any forensics groups?
25              A.    70 -- yes.
```

```
1                        Swordsma              23
2              Q.     Professional organizations.
3              A.     Yes.
4              Q.     Which ones?
5              A.     The Northeastern Association of
6         Forensic Scientists, the Mid-Atlantic
7         Association of Forensic Scientists.  You
8         said 1990.  Just give me a second, sir.
9                   Okay.  Yeah.  That's it up until
10        1990.
11             Q.     Are you familiar with the
12        California Association of Criminalists?
13             A.     I've heard of it.  I don't know
14        if I ever read any of their literature.  I
15        should say I don't remember if I read any
16        of their literature.
17             Q.     What about the Bureau of Forensic
18        Services?
19             A.     No.  No, sorry.
20             Q.     Were you John Nichols' direct
21        supervisor between 1985 and 1990?
22             A.     Yes.
23             Q.     As his supervisor what did you
24        do?
25             A.     Now, just give me a second.  I'm
```

```
1                        Swordsma                  24
2        not sure when he came to East Lab.  It may
3        have been after 1985.  I'm sorry.  Could
4        you repeat your question, please.  I was
5        too busy --
6            Q.    Let me phrase it differently.
7        Let's say between 1987 and 1990 were you
8        John Nichols' direct supervisor?
9            A.    Yes, sir.
10           Q.    And what did you do with respect
11       to that supervision?
12           A.    Well, I reviewed his work.  I
13       talked to him, I evaluated him.  I know I
14       observed him in court once -- it may have
15       been more than one time -- and I discussed
16       any problems that we might have in the unit
17       and discussed how he was interacting with
18       his fellow co-workers.
19           Q.    Were there formal reviews?
20           A.    Yes.
21           Q.    Were there reports or some sort
22       of documentation generated following a
23       formal review?
24           A.    There was documentation on that,
25       yes.
```

```
 1                    Swordsma              25
 2            Q.    Is there a name for that
 3       document?
 4            A.    Yes.  I can't -- give me a
 5       moment, please.  I can't think of the
 6       formal name.  I'm sorry.
 7            Q.    You also saw him in court at
 8       least once?
 9            A.    Yes.
10            Q.    When was that?  What year?  I
11       know you don't remember the date.
12            A.    Probably in the time period from
13       '87 to '90, I would say.  And I'm not even
14       sure.  Somewhere in that period.
15            Q.    Based on your supervision of
16       Mr. Nichols, did you have any criticism of
17       his work?
18            A.    No.  No, I didn't.
19            Q.    When you supervised Mr. Nichols,
20       did you ever have to discipline him?
21            A.    No, I never did.
22            Q.    When you were reviewing
23       Mr. Nichols' work, did you ever find any
24       errors?
25            A.    I'm going to say I found some
```

```
 1                    Swordsma              26
 2        transcript -- clerical errors.  You know,
 3        notes and stuff.  And I don't remember
 4        specifically what they were but I know I
 5        always found things where their T's weren't
 6        crossed or something like that, equivalent
 7        to that, but I can't be specific.
 8             Q.     You mentioned earlier you noted
 9        something in the 15 or so pages worth of
10        documents.  Can you -- can you show me the
11        page that you were referring to by holding
12        it up to the screen?  And I'm going to see
13        if I can find it in my records.
14             A.     I will show you the bottom of
15        this page after --
16             Q.     That says March what 1989?
17             A.     March -- March 23$^{rd}$?
18             Q.     Okay.  And is there a title in
19        the document?
20             A.     It's a request for examination of
21        evidence.
22             Q.     Let me see what I can do.  Oh, I
23        think I may have actually found it.
24                    MR. DYEVOICH:  You're a wizard.
25                    MR. RICKNER:  Well, it was right
```

```
 1                      Swordsma              27
 2            at the top.  I think.
 3            Q.     So looking at Page 4, if you can
 4       see my cursor, this is Page 4 of Exhibit A
 5       marked in the Nichols deposition.  Is this
 6       the document you're talking about?
 7            A.     Yeah.  The one on the right.
 8            Q.     What is the issue that you noted?
 9            A.     I noticed I made a note, on the
10       bottom right hand corner.
11            Q.     Oh, that's your handwriting?
12            A.     Yes.
13            Q.     Oh, can you please read it?
14            A.     I'm going to refer to this too.
15       I don't think I can read it off the screen.
16            Q.     You can read it on your copy if
17       that's easier.
18            A.     Yeah.  I have vebal -- that means
19       verbal.  And the Police Officer -- uhm,
20       uhm.  And I wrote his last name.  I should
21       have said Detective Crumrine but I said
22       Crumrine.
23                   I have the date and time which
24       right now I can't -- I'm sorry.  I'm
25       leaving the screen for a second.
```

```
1                        Swordsma              28
2              Q.     No.   That's fine.
3              A.     Okay.   I said the time of the
4         day.   It looks like 10:26.   My initials, I
5         use HBS as my initials.   And it's either
6         May 10, 1989 or perhaps May 16th.   And I
7         said -- and I think something is cut off
8         here.   I said, Both victim and suspect H.
9                   I'm sure the word are is cut off
10        there.   So, in other words, I'm saying both
11        the victim and the suspect are blood group
12        substance H.
13             Q.     And what is the significance of
14        both the victim and suspect being substance
15        H?
16             A.     Well, he was -- he was --
17                  He was just making an inquiry and
18        I said, when they were both blood group
19        substance H, we could not draw a conclusion
20        on them.
21                  Could I just add, I didn't
22        remember anything about the case but then
23        when I saw that note that refreshed my
24        memory.   But I remember talking to him
25        about that case.
```

```
 1                    Swordsma              29
 2          Q.    So to be clear.  During that
 3     conversation, did you tell him due to both
 4     the victim and the suspect being substance
 5     H that you couldn't draw any conclusions?
 6          A.    That's correct.
 7          Q.    Besides that, do you remember
 8     anything else about this case?
 9          A.    No, I don't.
10          Q.    Now, when you cannot draw any
11     conclusions from a test, would that be
12     something that should be netted in a
13     report?
14               MR. O'BRIEN:  Objection to the
15          form.  You may answer.
16          A.    No.  To tell you the truth, I
17     just think -- it is listed in the report.
18     We do list his blood type and the secretor
19     status in the victims.  So I could
20     include -- include it in the report and if
21     someone has a question I will discuss it
22     with them as I did.  I don't mind doing
23     that.  But I think that's covered in the
24     report.
25               And I don't resent the fact that
```

```
1                    Swordsma              30
2        he called me on that or anything, no.  He
3        has a perfect right to do that but I really
4        think it's covered in the report.  They're
5        both -- because you have somewhere, but you
6        have the results.  Oh, and then we have
7        H -- blood group substance H was detected
8        in both their salivas.  Their blood test is
9        O and the Lewis as indicative of a secreter
10       Lewis A1B plus.
11                    I should tell you, in all
12       honesty, I wasn't sure about that and I
13       looked it up on the internet to refresh my
14       memory on that.  I really wasn't sure about
15       the Lewis.  But anyway, I did.
16            Q.    If I understand what you're
17       saying correctly, the fact that both the
18       victim and the suspect tested positive for
19       the substance H is noted on the report but
20       the conclusion that you can't draw any
21       conclusions from that isn't noted on the
22       report?
23            A.    I don't -- I -- oh, the
24       conclusion?  No.  No, it isn't.
25            Q.    Should the conclusion be noted on
```

```
 1                       Swordsma              31
 2        the report?
 3                    MR. O'BRIEN:  Objection to the
 4              form.  It's been asked and answered.
 5              You can answer it again.
 6              A.    I think it's covered on the
 7        report, sir.  I don't think so.  Um.
 8              Q.    Well, let's -- let's do this in
 9        two ways.  As a general matter, should a
10        conclusion that no determination can be
11        made pursuant to the testing that would be
12        performed, generally be included in the
13        report?
14                    MR. O'BRIEN:  Objection to the
15              form.  It's been asked and answered.
16              You can answer the question again.
17              A.    I didn't think it was necessary.
18              Q.    In general or in this --
19              A.    In a case just like this, which
20        there were other cases like this too.  Of
21        course there were.  Yeah, in something like
22        I just think that everybody would
23        understand.  And as I said, Detective
24        Crumrine called me and I know he's very
25        experienced.  So, I guess it didn't need
```

```
 1                      Swordsma              32

 2      explanation on occasion.

 3           Q.    So did you explain to Detective

 4      Crumrine the conclusion regarding the H

 5      substance?

 6           A.    That we couldn't draw a

 7      conclusion.  Yes, I did.  That is why he

 8      called actually.  And I thought it was -- I

 9      didn't write down everything he said.  As

10      you can see, this is brief, but I thought

11      it would be best to write down the reason

12      we couldn't draw a conclusion.  You know,

13      that they were both blood group substance

14      H.  They were both the same.

15           Q.    Just to be clear, did Detective

16      Crumrine tell you that no conclusion could

17      be drawn or did you say that to Detective

18      Crumrine?

19           A.    I said that to him.  He just --

20      when he called, he just wanted me to talk

21      about the case.  He didn't really -- oh,

22      I'm sorry -- he didn't really ask a

23      specific question, to the best of my

24      knowledge.

25                 MR. O'BRIEN:  Just a moment.  I'm
```