UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KYHALLISTA JOHNSON, as the Administrator of the Estate of DION HARRELL, <br><br> Plaintiff, <br><br> vs. <br><br> STATE OF NEW JERSEY, NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF STATE POLICE, JOHN T. NICHOLS, BRIAN O'GIBNEY, AND CITY OF LONG BRANCH, <br><br> Defendants. | AMENDED COMPLAINT <br><br> Case No. 18-cv-11299 |

Plaintiff DION HARRELL, by his attorneys, GLENN A. GARBER, P.C. and RICKNER PLLC, alleges the following:

**PRELIMINARY STATEMENT**

1. Plaintiff Dion Harrell brings this action for compensatory damages, punitive damages, and attorney's fees pursuant to the statutory and common laws of the State of New Jersey for violations of the New Jersey Civil Rights Act and common law negligence; and pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his rights under the Constitution of the United States of America.

2. Mr. Harrell spent four years in jail and 26 years on the sexual offender registry for a 1988 rape he did not commit. His erroneous conviction, vacated based on exonerating DNA evidence, was caused by the wrongful actions of Brian O'Gibney and John T. Nichols, and their respective local and state agencies, and the State of New Jersey.

1

## JURISDICTION

3. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

4. Plaintiff further invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over any and all New Jersey state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## VENUE

5. Venue is proper for the United States District Court for the District of New Jersey, pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), and 28 U.S.C. § 1402(b), where Plaintiff resides, Defendants reside and maintain their relevant places of business, and where the actions complained of occurred.

## JURY DEMAND

6. Plaintiff Dion Harrell respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## THE PARTIES

7. At all times hereinafter mentioned, Dion Harrell ("Plaintiff" or "Harrell"), now represented by the Administrator of his Estate, Kyhallista Johnson, was a resident of the of the State of New Jersey.

8. Defendant State of New Jersey ("New Jersey") is a state in the United States of America.

9. Defendant New Jersey Department of Law and Public Safety, Division of State Police (the "State Police") is a public entity organized and existing under the laws of the State of New Jersey and is a law enforcement agency of the State of New Jersey. The State Police are responsible for the Office of Forensic Sciences.

10. Defendant John T. Nichols ("Nichols"), was at all times relevant to this Complaint a duly appointed and acting employee of New Jersey and the State Police, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New Jersey. He is sued in his individual capacity.

11. Defendant Brian O'Gibney ("O'Gibney"), was at all times relevant to this Complaint a duly appointed and acting officer of the Long Branch Police Department and an employee of the City of Long Branch, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Long Branch and the State of New Jersey. He is sued in his individual capacity.

12. Defendant the City of Long Branch (the "City") was and is a body politic and corporate empowered to exercise home rule. At all relevant times, the City exercised authority over the Long Branch Police Department, including O'Gibney and Detective Gregory Crumrine ("Crumrine"). The Long Branch Police Department is an administrative, executive, and enforcement function of the City. The City is responsible for establishing customs, policies, procedures, training, supervision and other supervisory roles over the department and its employees and contractors.

13. Defendants New Jersey, the State Police, and the City have waived immunity by

statute, as Plaintiff has timely submitted a Notice of Claim, dated October 31, 2016.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

**The Crime, Initial Investigation, and Plaintiff's Alibi**

14. On September 18, 1988, between approximately 10:30 and 10:45 pm, the victim, a seventeen-year (the "victim"), was accosted by a man she had just walked by ("the assailant"). He made a lewd comment, grabbed her from behind by her neck, and covered her mouth. He dragged her about seventy feet from the sidewalk into an empty parking lot. The assailant pulled down her pants and underwear and raped her until the victim told the assailant that her father was across the street. When the assailant got off of her, he snatched her purse. She ran home and told her mother, and her mother called the police.

15. That day, Plaintiff was playing basketball with friends, including a police detective, until about 10:00 pm when his friends drove him home. Between 10:00 pm and 10:30 pm, Mr. Harrell showered, changed and rode a bicycle with his nephew to a friend's house, where he stayed until about 12:30am.

16. When the police interviewed the victim, she provided a very general description of the assailant with no particular identifying features – "a light-skinned black male, teens, early twenties, clean shaven, approximately five foot eight" wearing a red, long sleeved sweatshirt with white writing on the front, blue jeans and white sneakers. She did not know the assailant, but she said she had seen him about three weeks earlier at a McDonalds. Police canvassed the area but could not find anyone in the neighborhood who fit that description.

17. After the canvas, the victim was taken to the emergency room at the Monmouth Medical Center where she was examined by a doctor. They took vaginal, anal and oral swabs/slides, pubic hair combings, and fingernail scrapings. The rape kit was turned over to police, refrigerated, and then transported to the New Jersey State Police East Regional

18. Laboratory in Sea Girt, New Jersey for analysis. Police also collected several other items of physical evidence: (i) the victim's clothing (slacks, blouse, sweater, underwear), (ii) the bag used to initially collect the victim's clothing at the Monmouth County Emergency Room, (iii) the paper bags where the victim's clothing was transferred to after the initial collection at the hospital, and (iv) hair and fibers from the victim's clothing.

**Brian O'Gibney Fabricates Evidence and Initiates Prosecution Without Probable Cause**

19. Three days later the victim was working, and she thought she saw the assailant wearing a white leather jacket. The police arrived and arrested Plaintiff, who had a white leather jacket.

20. Initially, Harrell was cooperative. But when the police told him of the charges, he was shocked and told them he was innocent. He asked the officers to bring him to see the victim, thinking it would clear his name.

21. This was against protocol and proper procedure. A one-on-one show up, with a stranger, is suggestive and more likely to teach the victim to recognize a suspect, and falsely sure-up a tenuous identification, rather than ensure, through a line-up for instance, that the correct person is identified.

22. This was of particular concern in this instant case because, on information and belief, the victim never got a good look at her assailant, and when Harrell was arrested and prior to the show-up, the victim was equivocal and uncertain if Harrell was the assailant or someone she vaguely recognized from the past. Moreover, the description the victim provided of her assailant was very general and contained no distinguishing characteristics. And indeed Harrell was not in fact the assailant, and the victim was wrong when she thought he might be.

23. Nevertheless, Officer O'Gibney brought Harrell to see the victim for a one-on-one viewing.

24. This was wrong and unreasonable. The victim kept her head down and barely looked at Harrell. She sort of nodded to indicate "yes" but was far from a clear identification.

25. O'Gibney, however, decided to substantially alter the quality of the identification evidence. He falsely claimed that she stared right at Harrell and in a cold, deliberate manner, said that he was the assailant.

26. This bolstered identification was recorded in a police report, which was given to the prosecution and used to initiate proceedings against Harrell and to evaluate the viability of the prosecution.

27. In fact, initially, the shoddy one-witness identification contaminated by the improper show-up procedure was the only evidence against Harrell.

28. Even worse, this identification procedure helped cement Harrell as the assailant in the victim's mind, making it impossible to start over with a proper line up procedure, to see how well the victim could actually identify Harrell, and gravely undermined any chance of the prosecutor to fairly evaluate the case, for the court to understand the quality and propriety of the identification, or for Harrell to have a fair pretrial process or a fair trial.

**John T. Nichols Fabricates Evidence**

29. Nichols also fabricated evidence to strengthen this otherwise weak, legally insufficient case built on O'Gibney's bolstered, improper identification.

30. Nichols, the principal forensic chemist at the New Jersey State Police Laboratory, egregiously misstated conventional serology science and statistical analysis of that science, abandoning well-established scientific principles which were known in 1988 and 1989. On information and belief, he falsely told the prosecutor that only 2% of the New Jersey population that shared the blood-type, gender, and racial characteristics of Mr. Harrell could have been the donor of the semen recovered from a vaginal swab of the victim and the victim's underpants.

6

31. This fabrication was built on scientific falsehoods, which were provided to the prosecutor in a report dated April 28, 1989 and, on information and belief, relied upon to prosecute Mr. Harrell. Nichols also testified about these false underlying scientific premises at Harrell's trial.

32. In this case, the victim is Blood Type O and Harrell is Blood Type O. Both are "secretors" (80% of the population are "secretors" and 20% are "non-secretors"), and both secrete H antigens in their body fluids. And the material collected from the vaginal swab and the victim's underpants tested as H Blood Group Substance.

33. Because serology testing is not very sensitive and discriminating (unlike DNA testing) it would not necessarily detect the blood of the assailant. Rather, the victim's blood can "mask" (or obfuscate the detection of) the blood type of a third-party's blood that may be present in the samples. Thus, no males could be excluded as the source of the semen that was recovered, a fact well-known in the 1980s. Nichols, nevertheless falsely represented that the serology results meant that the seminal material was Blood Type O, like Mr. Harrell's.

34. Moreover, the actual perpetrator could be a "non-secretor" who would not leave detectable antigen in his semen. Under this potential scenario, which applies to 20% of the male population, Mr. Harrell would have to be excluded as a contributor. This was a known scientific fact not reported or testified to by Nichols.

35. Nichols then stated that the seminal fluid could have only come from 32% of males, or roughly 16% of the population. But it is not scientifically acceptable to remove females from blood-type frequency estimations.

36. Compounding the errors, Nichols also factored in race – 12% of the population is African American – leading to the conclusion that only 2% of the population (i.e. 12% of 16%)

with Mr. Harrell's characteristics could have been the contributor of the recovered semen.

37. Put another way, Nichols took evidence that would have been virtually worthless to the prosecution, and through scientific chicanery, turned it into a 98% probability that Harrell was guilty.

38. Nichols never drafted a report stating that the serology testing had no value, despite the mandatory policies of the New Jersey State Police Laboratory.

39. But Nichols' supervisor, Henry Swordsma, told Long Beach Police Detective Gregory Crumrine that the testing was entirely inconclusive during a conversation in May of 1989. But Crumrine never documented this information and it was not provided to the prosecution, or the defense, despite being obvious *Brady* material.

40. Further, Nichols and Swordsma failed to disclose that it was improper to even test Harrell's blood because, due to the fact that the victim was a secretor and the evidence tested matched her blood type, it would never have been possible to match the evidence tested to anyone. The New Jersey State Police Laboratory's own guidelines in fact stated that it is not appropriate to test the suspect's blood type in this circumstance, but that was never disclosed to Harrell or his attorney, depriving them not only of evidence that undermined Nichols' ultimate testimony, it deprived Harrell of a chance to move to have this evidence excluded entirely.

41. The prosecutor was persuaded by Nichols' analysis, accepted it, and presented this evidence at trial. And it made for a powerful summation, as the prosecutor used this false 2% statistic to argue to the jury that the assailant had to be Harrell:

> My recollection -- I didn't write it down. My recollection is that it was l97. Let's call it two percent. That left two percent of the population. That excluded 98 percent of the population. What's left in that two percent? Is there anybody else we can exclude?

8

> If you recall his testimony, there is, because that two percent includes people -- I shouldn't say people. Black males who are secreters with type O blood. It includes those people, those men in that category who are too young or two old to produce semen. Sperm. So you can exclude them also. He wasn't able to give us a percentage. I think he said the age of eleven. I don't recall if he gave us a top number.
>
> Who else can be excluded from that population? People that don't fit the physical description that the victim gave the police the night he was raped. Fairly small remaining population of candidates is the rapist in this case.

42. Nichols' fabrication worked. On May 19, 1992, the jury convicted Harrell of sexual assault.

**Prison Term, Megan's Law, and Exoneration**

43. Harrell was sentenced to 8 years imprisonment and was released on parole after serving 4 years. Following his release, Harrell was forced to register as a sex offender under Megan's Law, N.J.S.A. 2C:7-1 through 2C:7-11, which made it nearly impossible for him to find a job or a place to live.

44. Further, he was arrested, and re-imprisoned, twice for violating Megan's Law, causing him to spend additional time incarcerated.

45. In 2014, Harrell's case was taken on by the Innocence Project, who filed a motion to have the evidence DNA tested, which was not available when Harrell was prosecuted. After an initial opposition by the Monmouth County Prosecutor, the motion was granted on consent on February 13, 2015. DNA test results, documented in a July 13, 2016 report from Bode Cellmark Forensics, excluded Mr. Harrell as the assailant.

46. Based upon the new DNA evidence, and upon the joint application of Mr. Harrell and the prosecution, the sexual assault conviction against Harrell, and the two Megan's Law violations, were vacated on August 3, 2016.

**INJURIES AND DAMAGES**

47. This action seeks damages on behalf of Plaintiff for the extraordinary emotional pain and suffering, loss of liberty, and injuries to his person that Plaintiff was forced to endure as a consequence of Defendants' decidedly wrongful actions.

48. As a result of his wrongful conviction and unjust imprisonment, despite his actual innocence of the crime, Harrell suffered restrictions on his liberty for approximately 28 years—including approximately 4 years of wrongful imprisonment and 24 years as a registered sex offender, with related restrictions. He has suffered, and continues to suffer, severe and ongoing damages, specifically including lost educational and professional opportunities, lost income, physical pain and injuries, inadequate medical care, serious psychological and emotional damage, loss of familial relationships, and loss of quality of life.

## FIRST CLAIM FOR RELIEF:
## VIOLATIONS OF THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS UNDER 42 U.S.C. § 1983 FOR FABRICATION OF EVIDENCE AGAINST O'GIBNEY AND NICHOLS

49. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

50. Defendant O'Gibney fabricated evidence by creating a report with a false statement that the victim had clearly identified Harrell, when in truth she had barely looked at him.

51. Defendant Nichols fabricated evidence by creating a report with inaccurate scientific claims and forwarding that report to the prosecution who presented it at trial, including Nichols' entirely false claim that only 2% of the U.S. population could have contributed the seminal material, excluding 98% of the population, when in fact no adult males could be excluded.

52. As a direct and proximate result, O'Gibney and Nichols' fabrication of this false

inculpatory evidence, independently and collectively, violated Harrell's clearly established constitutional rights, including the right to not be unlawfully seized, the right to due process, and the right to a fair prosecution, fair pretrial process, and fair trial, and caused him to be wrongfully prosecuted and convicted and to suffer the injuries and damages described above.

**SECOND CLAIM FOR RELIEF:**
**NEW JERSEY CIVIL RIGHTS ACT**
**AGAINST O'GIBNEY, AND NICHOLS**

53. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

54. Defendants O'Gibney, and Nichols are liable to Plaintiff under New Jersey's Civil Rights Act, N.J.S.A. 10:6-2 et seq., because they deprived Plaintiff of due process or equal protection rights, privileges or immunities secured to him by the Constitution or laws of the United States as well as substantive rights, privileges or immunities secured by the Constitution or laws of the State of New Jersey, specifically when O'Gibney and Nichols fabricated evidence against Plaintiff, and when Nichols failed to turn over evidence favorable to the defense.

55. As a direct and proximate result, the fabricated and false inculpatory evidence violated Harrell's clearly established constitutional rights including the right to not be unlawfully seized, the right to due process, and the right to a fair prosecution, fair pretrial process, and fair trial, and caused him to be wrongfully prosecuted and convicted and to suffer the injuries and damages described above.

**THIRD CLAIM FOR RELIEF:**
**COMMON LAW NEGLIGENCE**
**AGAINST NEW JERSEY, STATE POLICE, THE CITY, O'GIBNEY, AND NICHOLS**

56. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

57. Nichols negligently performed his job, and Harrell was harmed as a result.

58. New Jersey and the State Police were also negligent in failing to train Nichols, and in failing to supervise Nichols, who provided expert evidence to prosecutors and testified in hundreds of cases. Inaccurate forensic testimony is a common cause of wrongful conviction.

59. New Jersey, the State Police, and Nichols owed a duty of care to Harrell.

60. New Jersey, the State Police, and Nichols breached their duty.

61. New Jersey, the State Police, and Nichols' negligence was the proximate cause of Harrell's wrongful conviction and caused him to suffer the injuries and damages described above.

62. O'Gibney negligently performed his job, and Harrell was harmed as a result.

63. The City was also negligent in failing to train O'Gibney, and in failing to supervise O'Gibney.

64. The City and O'Gibney owed a duty of care to Harrell.

65. The City and O'Gibney breached their duty.

66. The City and O'Gibney's negligence was the proximate cause of Harrell's wrongful conviction and caused him to suffer the injuries and damages described above.

### FOURTH CLAIM FOR RELIEF:
### COMMON LAW MALICIOUS PROSECUTION
### AGAINST THE CITY AND O'GIBNEY

67. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

68. Defendant O'Gibney, despite knowing that probable cause did not exist to arrest and prosecute Harrell, intentionally, recklessly, and with malice, caused Harrell to be arrested, prosecuted, and convicted. Furthermore, O'Gibney intentionally withheld from and

misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Harrell.

69. Harrell is completely innocent. The prosecution finally terminated in Harrell's favor on August 3, 2016.

70. As a direct and proximate result, Harrell was wrongly convicted and imprisoned, causing him to suffer the injuries and damages described above.

71. The City, as O'Gibney's employer, is vicariously liable under respondeat superior for O'Gibney's actions.

**FIFTH CLAIM FOR RELIEF:**
**PROSECUTION WITHOUT PROBABLE CAUSE UNDER 42 U.S.C. § 1983**
**AGAINST O'GIBNEY**

72. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

73. Defendant O'Gibney, acting under color of law, despite knowing that probable cause did not exist to arrest and prosecute Harrell, caused Harrell to be arrested, prosecuted, and convicted.

74. Harrell is completely innocent. The prosecution finally terminated in Harrell's favor on August 3, 2016.

75. As a direct and proximate result, Harrell was wrongly convicted and imprisoned, causing him to suffer the injuries and damages described above.

**SIXTH CLAIM FOR RELIEF:**
***BRADY* VIOLATIONS UNDER 42 U.S.C. § 1983**
**AGAINST NICHOLS**

76. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

77. The fact that the serology testing was totally inconclusive was exculpatory evidence that needed to be turned over to the prosecution and the defense.

78. Nichols failed to document the fact that the serology testing was inconclusive, effectively meaning nothing. This failure deprived Plaintiff of due process.

79. Crumrine failed to documents his conversation with Swordsma, where he learned that the serology testing was inconclusive, and there is no evidence he ever told the prosecution. This failure deprived Plaintiff of due process.

80. As a direct and proximate result, Harrell was wrongly convicted and imprisoned, causing him to suffer the injuries and damages described above.

### SIXTH CLAIM FOR RELIEF:
### *BRADY*/DUE PROCESS VIOLATIONS UNDER THE NEW JERSEY CONSTITUTION AGAINST NEW JERSEY, STATE POLICE, AND THE CITY

81. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

82. The fact that the serology testing was totally inconclusive was exculpatory evidence that needed to be turned over to the prosecution and the defense.

83. Nichols failed to document the fact that the serology testing was inconclusive, effectively meaning nothing. This failure deprived Plaintiff of due process.

84. Crumrine failed to document his conversation with Swordsma, where he learned that the serology testing was inconclusive, and there is no evidence he ever told the prosecution. This failure deprived Plaintiff of due process.

85. As a direct and proximate result, Harrell was wrongly convicted and imprisoned, causing him to suffer the injuries and damages described above.

86. The City, as Crumrine's employer, is vicariously liable under respondeat superior

for O'Gibney's actions.

87. New Jersey and the State Police, as Nichols' employer, are vicariously liable under respondeat superior for Nichols' actions.

**WHEREFORE**, Plaintiff demands judgment in his favor as follows:

a. Judgment in favor of Plaintiff and against Defendants for the respective claims of this Complaint that name them;

b. Award compensatory damages to Plaintiff and against the Defendants, jointly and severally, in an amount to be determined at trial;

c. Award punitive damages to Plaintiff and against Defendants, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar proscribed conduct by Defendants in the future;

d. Award to Plaintiff and against Defendants pre-judgment and post-judgment interest on all sums awarded;

e. Award to Plaintiff and against Defendants the cost of pursuing this action, including reasonable attorneys' fees under 42 U.S.C. § 1988, N.J.S.A. § 10:6-2(f) and any other applicable fee shifting law;

f. Award to Plaintiff and against Defendants civil penalties under N.J.S.A. § 10:6-2(e);

g. A jury trial; and

h. Any other relief that the Court deems just and proper.

Dated:  New York, New York
        May 15, 2023

                              GLENN A. GARBER, P.C.

                              By:       /s/

                                Glenn A. Garber

The Woolworth Building
233 Broadway Suite 2370
New York, New York 10279
Phone: (212) 965-9370


Rickner PLLC

By:       /s/

    Rob Rickner

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401

*Attorneys for Plaintiff*

16