UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF TRENTON

| | |
|---|---|
| KHALLISTA JOHNSON, as Administrator of the Estate of DION HARRELL, | : HON. GEORGETTE CASTNER, U.S.D.J. |
| | : HON. J. BRENDAN DAY, U.S.M.J. |
| | : |
| Plaintiff, | : Civ. Dkt. 2:18-cv-11299 |
| | : |
| v. | : |
| | : |
| STATE OF NEW JERSEY, NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF STATE POLICE, JOHN T. NICHOLS, BRIAN O'GIBNEY, AND CITY OF LONG BRANCH, | : |
| | : |
| Defendants. | : |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625-0112
Attorney for Defendants the State of
New Jersey, New Jersey Department of
Law and Public Safety, Division of
State Police, and John T. Nichols

Braheme L. Days
Deputy Attorney General
  On the Brief

**TABLE OF CONTENTS**

Page(s)

PRELIMINARY STATEMENT..............................................1

STATEMENT OF FACTS/PROCEDURAL HISTORY..............................4

STANDARD OF REVIEW.................................................9

ARGUMENT.........................................................11

    POINT I

        PLAINTIFF'S FEDERAL AND STATE LAW CLAIMS AGAINST
        THE STATE OF NEW JERSEY AND NJSP, AND DEFENDANT
        NICHOLS IN HIS OFFICIAL CAPACITY, ARE BARRED BY
        SOVEREIGN IMMUNITY; THE SECTION 1983 AND NJCRA
        CLAIMS FAIL BECAUSE STATE DEFENDANTS ARE NOT
        "PERSONS" WHO MAY BE HELD LIABLE.....................11

            A. State Defendants Are Entitled to Sovereign
               Immunity ....................................11

            B. State Defendants Are Not "Persons" Who May
               Be Held Liable ..............................14

    POINT II

        PLAINTIFF'S SECTION 1983 CLAIM AGAINST DEFENDANT
        NICHOLS FOR "FABRICATING EVIDENCE" DURING HIS
        TESTIMONY AT PLAINTIFF'S TRIAL IN 1992 IS BARRED BY
        ABSOLUTE IMMUNITY...................................17

    POINT III

        INDIVIDUAL CAPACITY CLAIMS AGAINST DEFENDANT
        NICHOLS BASED UPON ALLEGED *BRADY* VIOLATIONS SHOULD
        BE DISMISSED BECAUSE NICHOLS DID NOT VIOLATE *BRADY*,
        AND IS OTHERWISE ENTITLED TO QUALIFIED IMMUNITY......22

            A. The Information Allegedly Withheld Was Not
               Exculpatory as a matter of Law ..............24

i

B. Even If the Report Which Defendant Nichols "failed" to Generate Is Considered Favorable Evidence Under *Brady,* the Report Was Not Suppressed ...........................26

C. The Allegedly Withheld Information Was Not Material to Plaintiff's Guilt or Punishment and Thus Not Exculpatory Under *Brady* .........28

D. Nichols Is Entitled to Qualified Immunity Because No Clearly Established Law at the Time of Plaintiff's 1992 Trial Obligated Nichols to State in His Report That the Results of the Serology Testing Were "Inconclusive" ..............................31

POINT IV

HARELL'S NEGLIGENCE CLAIM SHOULD BE DISMISSED BECAUSE DEFENDANT NICHOLS IS IMMUNE AND WAS NOT NEGLIGENT35

A. Defendant Nichols Is Entitled to Good Faith Immunity ........................................35

B. The Evidence in the Summary Judgment Record Fails to Establish that Defendant Nichols Was Negligent ........................................37

CONCLUSION.....................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases Cited**

*Alabama v. North Carolina*,
   560 U.S. 330 (2010) ..................................................10

*Alabama v. Pugh*,
   438 U.S. 781 .........................................................12

*Allen v. New Jersey State Police*,
   974 F.3d 497 (3d Cir. 2020) .........................................14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .............................................10, 11

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) .................................................32

*Brady v. Maryland*,
   373 U.S. 83 (1963) ..............................1, 22, 23, 24

*Brady v. Michelin Reifenwerke*,
   613 F. Supp. 1076 (D. Miss. 1985) ..................................13

*Breakiron v. Horn*,
   642 F.3d 126 (3d Cir. 2011) .........................................23

*Briscoe v. LaHue*,
   460 U.S. 325 (1983) .........................................17, 18, 21

*Butz v. Economou*,
   438 U.S. 478 (1978) .............................................12, 18

*Calkins v. Sumner*,
   13 Wis. 193 (1860) ..................................................19

*Canico v. Hurtado*,
   676 A.2d 1083 (N.J. 1996) .......................................35, 36

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................10

*College Savings Bank v. United States of America*,
948 F. Supp. 400 (D.N.J. 1996) ...............................13

*Doe v. Small*,
Dkt. No. 1:21-CV-11189, 2023 WL 1750405 (D.N.J. Feb.
2, 2023) ....................................................38

*Edelman v. Jordan*,
415 U.S. 651 (1974) .........................................11

*Fielder v. Stonack*,
661 A.2d 231 (N.J. 1995) ....................................36

*Gardner by Gardner v. Parson*,
874 F.2d 131 (3d Cir. 1989) .................................17

*Gibson v. Superintendent of New Jersey Dep't of Law
and Public Safety*,
411 F.3d 427 (3d Cir. 2005) ............................33, 37

*Giglio v. United States*,
405 US 150 (1972) ......................................22, 24

*Gormley v. Wood-El*,
93 A.3d 344 (N.J. 2014) .....................................36

*Hafer v. Melo*,
502 U.S. 21 (1991) ..........................................12

*Harvey v. Plains Twp. Police Dep't*,
635 F.3d 606 (3d Cir. 2011) .................................15

*Hunter v. Bryant*,
502 U.S. 224 (1991) .........................................32

*Hyatt v. County of Passaic*,
340 Fed. Appx. 833 (3d Cir. 2009) ...........................14

*Imbler v. Pachtman*,
424 U.S. 409 (1976) ....................................21, 22

*Kyles v. Whitley*,
514 U.S. 419 (1995) ...........................24, 25, 33, 37

*Leang v. Jersey City Bd. of Educ.*,
969 A.2d 1097 (N.J. 2009) ...................................35

iv

*Marino v. Industrial Crating Co.*,
  358 F.3d 241 (3d Cir. 2004) ..................................10

*Martinez v. S. Woods State Prison, No. A-1738-18T3*,
  2019 N.J. Super. Unpub. LEXIS 2351 (N.J. Super. App.
  Div. Nov. 19, 2019) ........................................16

*McLaughlin v. Watson*,
  271 F.3d 566 (3d Cir. 2001), cert. denied, 535 U.S.
  989 (2002) .................................................33

*Meyer v. New Jersey*,
  46 F.2d 1252 (3d Cir. 1972) ................................12

*Mullenix v. Luna*,
  577 U.S. 7 (2015) ..........................................32

*N.E. for J.V. v. State Dep't of Child. & Fams., Div.
  of Youth & Fam. Servs.*,
  158 A.3d 44 (N.J. Super. App. Div. 2017) ..................36

*Nicini v. Morra*,
  212 F.3d 798 (3d Cir. 2000) ................................36

*Oklahoma City v. Tuttle*,
  471 U.S. 808 (1985) ........................................15

*Papasan v. Allain*,
  478 U.S. 265 (1986) ........................................13

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) .................................11, 12, 13

*Quern v. Jordan*,
  440 U.S. 332 (1979) ........................................12

*Rehberg v. Paulk*,
  566 U.S. 356 (2012) ........................................17

*Saldana v. Kmart Corp.*,
  260 F.3d 228 (3d Cir. 2001) ................................11

*Scott v. Harris*,
  550 U.S. 372 (2007) ........................................10

v

*Seminole Tribe of Florida v. Florida*,
   517 U.S. 44 (1997) .......................................11, 13

*Smith v. Holtz*,
   210 F.3d 186 (3d Cir. 2000) ......................26, 33, 37

*Smith v. New Jersey*,
   908 F. Supp. 2d 560 (D.N.J. 2012) ........................15

*State v. Carter*,
   449 A.2d 1280 (N.J. 1982) ................................23

*State v. Nelson*,
   715 A.2d 281 (N.J. 1998) .................................23

*Strickler v. Green*,
   527 US 263 (1999) ........................................23

*Strickler v. Greene*,
   527 U.S. 263 (1999) .........................23, 25, 26, 28

*Telzer v. Borough of Englewood Cliffs*,
   Civil Action No. 13-4306 (JMV), 2018 U.S. Dist.
   LEXIS 61856 (D.N.J. Apr. 12, 2018), aff'd, 783 Fed.
   App'x 253 (3d Cir. 2019) .................................29

*Tormasi v. Lanigan*,
   363 F. Supp. 3d 525 (D.N.J. 2019) ........................15

*Townsend v. Pierre*,
   110 A.3d 52 (N.J. 2015) ..................................38

*United States v. Agurs*,
   427 U.S. 97 (1978) .......................................22

*United States v. Bagley*,
   473 U.S. 667 (1985) ..................................22, 23

*United States v. Moyer*,
   726 F. Supp. 2d 498 (M.D. Pa. 2010) ......................24

*United States v. Perdomo*,
   929 F.2d 967 (3d Cir. 1991) ..............................33

*United States v. Risha*,
   445 F.3d 298 (3d Cir. 2006) ..............................23

*Velez v. City of Jersey City*,
    850 A.2d 1238 (N.J. 2004) ....................................14

*White v. Pauly*,
    580 U.S. 73 (2017) .........................................31

*Will v. Michigan Dept. of State Police*,
    491 U.S. 58 (1989) .................................12, 15, 16

*Zaloga v. Borough of Moosic*,
    841 F.3d 170 (3d Cir. 2016) ................................32

**Statutes Cited**

42 U.S.C. § 1983.........................................8, 15

N.J. Stat. Ann. 10:6-1 to -2.................................8

N.J. Stat. Ann. § 10:6-2....................................16

N.J. Stat. Ann. §§ 59:1-1 to 12-3...........................35

N.J. Stat. Ann. § 59:2-2(b).................................37

N.J. Stat. Ann. § 59:3-3.............................35, 36, 37

**Constitutions Cited**

U.S. Const., Amend. XI......................................12

**Federal Rules Cited**

Fed. R. Civ. P. 56(a).......................................10

## PRELIMINARY STATEMENT

Plaintiff Estate of Dion Harrell (hereafter, "Harrell" or "Plaintiff") brings this action against Defendants State of New Jersey, Department of Law and Public Safety, Division of State Police (hereafter, "NJSP"), and John T. Nichols (hereafter, collectively, the "State Defendants"), in connection with his trial and conviction for sexual assault in the New Jersey Superior Court in 1992. Plaintiff brings this civil rights lawsuit because his conviction was later overturned. He claims that Defendant Nichols withheld testified falsely at trial and exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). However, as discovery revealed, Defendant Nichols did not testify falsely and committed no *Brady* or other violation of law.

The State presented a strong case at trial. The victim testified that she had seen the man who assaulted her before at her place of work (McDonald's). Three days after the assault, the victim was working at McDonald's when she observed the man again and called the police. The police arrived and arrested Plaintiff, whom the victim identified at that time and later at the police station as the man who assaulted her. Plaintiff resided across the street from the McDonald's.

On the day of the assault, a sex crimes kit was used to

1

collect evidence from the victim's person and clothes. Serology testing of blood evidence recovered from the victim's body and clothes was conducted by Nichols and revealed that both the victim and the man who attacked her were Blood Type O, Blood Group Substance H, as was Plaintiff. At trial, Nichols testified that 16% of the male population are Blood Type O, Blood Group Substance H.

On cross-examination, Nichols agreed that DNA testing of the blood evidence (which was not done) would have allowed the police to be able to possibly conclude with a strong degree of scientific certainty that a particular person committed the crime. Nichols agreed with defense counsel that the serology testing could only show that Plaintiff (as well as Nichols himself) was part of the 16% of the male population who could have caused the stain on the victim's clothing. In her summation, defense counsel argued that the results of the serology tests were "inconclusive" and "don't tell you anything" and that the police did not perform scientific tests that would have been more definitive. However, the jury credited the victim's testimony over that of Plaintiff and his four alibi witnesses and found him guilty of sexual assault.

The State Defendants now move for summary judgment as to all claims against them. First, Plaintiff's constitutional claims

against Defendant Nichols in his official capacity, and against Defendants State of New Jersey and NJSP, fail as a matter of law because these Defendants are not "persons" who may be held liable. Plaintiff's state law tort claim for negligence is barred by sovereign immunity.

Second, Plaintiff's individual capacity constitutional claims against Defendant Nichols in connection with his testimony at Plaintiff's 1992 trial fail because Nichols is entitled to absolute immunity.

Third, Plaintiff's individual capacity constitutional claims against Defendant Nichols should be dismissed because the undisputed evidence in the summary judgment record establishes that no violation of *Brady* occurred and Defendant Nichols is otherwise entitled to qualified immunity because there was no law that clearly established that Nichols' conduct violated Plaintiff's constitutional rights.

Fourth, to the extent that Plaintiff's state law tort claim for negligence is allowed to proceed, the claim should be dismissed as Defendant Nichols is entitled to immunity and the evidence otherwise fails to establish any actionable negligence on his part.

## STATEMENT OF FACTS/PROCEDURAL HISTORY

On the evening of September 18, 1988, C.A., a seventeen year old female, was sexually assaulted while walking home from her job at McDonald's in Long Branch, New Jersey. Statement of Material Facts ("SOMF"), ¶2.  C.A. was grabbed from behind while walking down the sidewalk and dragged about seventy feet into an empty parking lot, where the assault took place. *Id.* at ¶3.  C.A. ran home afterwards and told her mother what occurred; Her mother contacted the police. *Id.* at ¶4.  C.A. gave detailed description of her attacker and recalled seeing him before at McDonald's while she was working. *Id.* at ¶5.

Three days after the attack, on September 21, 1988, C.A. was working at McDonald's when she saw the man who she believed attacked her and contacted the police. *Id.* at ¶7. The police arrived and arrested the man identified by C.A. *Id.* at ¶10, 12. The police confirmed at the scene that the man they arrested, Plaintiff, was the man who Plaintiff said attacked her. *Id.* at ¶11. Later at police headquarters, C.A. again identified Plaintiff as the man who attacked her. *Id.* at ¶13.  At the time, Plaintiff lived across the street from the McDonald's. *Id.* at ¶8.

C.A. was examined at Monmouth Medical Center on the night of the assault and a sex crimes kit was performed. *Id.* at ¶6. The kit

as well as other items of evidence, including the victim's clothes, were turned over by Long Branch Police the New Jersey State Police lab for analysis. *Id.* On January 23, 1989, Defendant Nichols, a Principal Forensic Scientist, prepared a serology report for the specimens obtained from the sex assault kit. *Id.* at ¶14. The substances left on C.A.'s body and clothes by the attacker were Blood Group Substance H (saliva) and Blood Type O (blood). *Id.* Samples from Plaintiff were analyzed and he was found to have Blood Group Substance H (saliva) and Blood Type O (blood). *Id.* at ¶¶14, 15. Nichols noted these findings in his serology report, which was produced to Plaintiff's defense counsel prior to trial. *Id.* at ¶¶15, 16.

At trial, C.A. testified that she saw Plaintiff's face before and during the assault, and that she recalled seeing Plaintiff in McDonald's on a prior occasion, and three days after the assault, which prompted her to call the police. *Id.* at ¶18. C.A. identified Plaintiff again at the police station as the man who assaulted her. *Id.* at ¶19.

Defendant Nichols testified that both C.A. and Plaintiff were Blood Type O, as are 40 to 45% of the population. *Id.* at ¶21. Nichols further testified that Plaintiff is a "Group O secretor" and that 16% of the male population is a Group O secretor. *Id.* at

5

¶22.  Nichols testified that serology testing of the seminal fluid recovered from the victim revealed that the attacker is a Group O secretor. *Id.* at ¶23.  The trial court sustained an objection to the Prosecutor's question seeking to further narrow down the population of males who could have left the evidence found on C.A.'s person and clothes. *Id.* at ¶24.  Nichols did not testify that Plaintiff was the source of the blood evidence recovered from C.A. *Id.* at ¶25.

On cross-examination, Nichols agreed with defense counsel that DNA testing of the blood evidence would have allowed the police to conclude with a strong degree of scientific certainty that a particular suspect was the person who assaulted C.A. *Id.* at ¶25.  Nichols confirmed that 16% of the male population are Group O secretors and could have been the source of the evidence recovered from C.A. *Id.* at ¶26.  When asked whether it was his opinion that because Plaintiff is a Group O secretor, "there is a good chance that he is the one who actually committed this assault," Nichols testified that "I am only including him in that number of people who could have caused that stain." *Id.* at ¶¶27, 28.  Nichols agreed that the fact that Plaintiff is a Group O secretor is "not unique" and that the number of people who could have cause the stain was a wide range of the population. *Id.* at

6

¶¶29, 31. Nichols added that he (Nichols) is also a Group O secretor. *Id.* at ¶30.

Plaintiff's defense consisted of his own testimony and that of several alibi witnesses including his sister, mother and two others. *Id.* at ¶32.

In his summation, the Prosecutor argued that only two percent of Black males are Group O secretors and that this population can be further reduced by excluding males too old or too young to produce sperm, or those who do not fit the physical description of the attacker. *Id.* at ¶33. Plaintiff's defense counsel argued in her summation that the serology tests results were "inconclusive" and "don't tell you anything" and that the police failed to perform more definitive tests that would have "pinpointed or exculpated" Plaintiff. *Id.* at ¶34. The jury found Plaintiff guilty of second degree sexual assault and he was sentenced to eight years in prison with a consecutive four years of incarceration for an unrelated burglary offense. *Id.* at ¶¶35-37. Plaintiff was paroled after serving four years. *Id.* at ¶38. In 2014, DNA testing of the evidence in his case excluded him as the source of the evidence found on the victim's body and clothes and his conviction was overturned. *Id.* at ¶¶39-41.

On July 2, 2018, Plaintiff filed the Complaint in this

action.[1]  *Id.* at ¶1.  In the latest operative pleading, a seven-count Second Amended Complaint, Plaintiff brings claims against State Defendants under the Federal Civil Right Act, 42 U.S.C. § 1983 ("Section 1983"), the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. §§ 10:6-1 to -2, and the New Jersey Constitution. *Id.*  Specifically, in Count One, Plaintiff claims that Defendant Nichols violated his Fourteenth Amendment right to due process by providing false testimony at his 1992 trial. In Counts Two and Six, Plaintiff claims that Nichols violated the NJCRA and the Fourteenth Amendment by failing to turn over exculpatory evidence in violation of *Brady*. In Count Seven, Plaintiff brings *Brady* and due process claims under the New Jersey Constitution against Defendants State of New Jersey and NJSP. Plaintiff also brings claims a common law negligence claim against the State Defendants in Count Three. *Id.*

At her deposition, C.A. continued to maintain that Plaintiff was the man who assaulted her. *Id.* at ¶42.  Nichols testified that he was not required to write an additional report explicitly detailing conclusions of the serology tests. *Id.* at ¶43.  Nichols agreed that he did not use one of the seven options listed in the

---

[1] Harrell died in 2021 while the matter was in discovery and the case was stayed for a year while his estate was settled and the estate representative decided to continue with the litigation.

Forensic Sciences Biochemistry Manual in use at the time, including the option which states: "The genetic markers identified in specimen ___ are consistent with the genetic markers identified in the blood/saliva controls of both the victim and suspect; therefore, the suspect cannot be excluded as a possible source of the semen (For use when the victim and suspect markers are the same)." *Id.* at ¶¶44-46.

Nichols' supervisor, Henry Swordsma, testified that Nichols' report listed Plaintiff's and the victim's blood type and secretor status, and that the reporting formats in the Biochemistry Manual were not mandatory or required, and that scientists had leeway in how they reported results. *Id.* at ¶¶48, 51. Swordsma testified that he reported to Long Branch Police Detective Crumrine that the results of the serology testing performed by Nichols were inconclusive because both the victim and suspect (Plaintiff) were blood group substance H, and documented their conversation in handwritten notes on the lab report. *Id.* at ¶¶49, 50.

This motion follows.

## **STANDARD OF REVIEW**

Summary judgment is appropriate when the Court is satisfied that the materials in the record demonstrate that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Ibid.* In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Initially, the movant has the burden to demonstrate the absence of a genuine issue of material fact. *Scott*, 550 U.S. at 380; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmoving party must identify specific facts showing that there is a genuine issue for trial. *Ibid.* To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving

party. *Anderson*, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

<u>**ARGUMENT**</u>

**POINT I**

**PLAINTIFF'S FEDERAL AND STATE LAW CLAIMS AGAINST THE STATE OF NEW JERSEY AND NJSP, AND DEFENDANT NICHOLS IN HIS OFFICIAL CAPACITY, ARE BARRED BY SOVEREIGN IMMUNITY; THE SECTION 1983 AND NJCRA CLAIMS FAIL BECAUSE STATE DEFENDANTS ARE NOT "PERSONS" WHO MAY BE HELD <u>LIABLE.</u>**

Plaintiff's federal and state law claims against Defendant Nichols in his official capacity and the State of New Jersey and NJSP should be dismissed.

**A.    <u>State Defendants Are Entitled to Sovereign Immunity.</u>**

The Eleventh Amendment to the Constitution, which immunizes States and state agencies against unconsented-to suits in federal court. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662 (1974). While Congress has the power, when exercising its legislative powers under section five of the Fourteenth Amendment, to override Eleventh Amendment immunity, it is well established that, in enacting Section 1983, it did not do so. *Quern v. Jordan*, 440 U.S. 332, 340 (1979)

11

(Congress did not abrogate the State's Eleventh Amendment immunity in enacting Section 1983); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989); *Hafer v. Melo*, 502 U.S. 21, 26 (1991).

A federal cause of action cannot be maintained against either a state or state agency. *Quern v. Jordan*, 440 U.S. at 332; *Alabama v. Pugh*, 438 U.S. 781 (1978); *Meyer v. New Jersey*, 46 F.2d 1252 (3d Cir. 1972). The prohibition against naming a state or a state agency as a party derives from the Eleventh Amendment, which provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of any foreign state.

[U.S. Const., Amend. XI.]

The Eleventh Amendment precludes federal jurisdiction over a state absent the state's consent to suit. *Pennhurst*, 465 U.S. at 99.

The immunity from suit extends to "agencies or Departments" of the state as well. *Id.* at 101-02; *Alabama*, 438 U.S. at 781. The state is considered the real party in interest in two circumstances -- whenever "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration' or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *College Savings Bank v. United States of America*, 948 F. Supp. 400, 409 (D.N.J.

12

1996) (internal quotation marks omitted) (quoting *Pennhurst,* 465 U.S. at 101 n. 11). A state's sovereign immunity can be invoked even where the suit is against a state agency, official or *employee. Brady v. Michelin Reifenwerke*, 613 F. Supp. 1076, 1080 (D. Miss. 1985)(emphasis added).

The jurisdictional bar of the Eleventh Amendment applies irrespective of the nature of the claim, or the type of relief sought. *See Papasan v. Allain*, 478 U.S. 265, 276 (1986) (the bar "exists whether the relief sought is legal or equitable"); *Pennhurst,* 465 U.S. at 100 ("In the absence of consent a suit in which the State or one of its agencies or departments is named as a defendant is proscribed by the Eleventh Amendment"); *Seminole Tribe*, 517 U.S. at 58 ("we have often made it clear that the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment").

Here, Plaintiff brings claims under Section 1983 and the NJCRA against the State, NJSP, and Defendant Nichols, a NJSP employee, in his official capacity. The State's sovereign immunity under the Eleventh Amendment applies to these claims as the State Defendants have not consented to suit. Accordingly, Plaintiff's Section 1983 and NJCRA claims against the State Defendants in Counts One, Two, Six, and Seven fail as a matter of law.

Plaintiff's state law negligence claim should also be dismissed as barred by sovereign immunity. The State of New Jersey did not waive its sovereign immunity for itself, its agencies, or its employees, for state tort claims brought in federal court. As the Third Circuit has recently explained, "the New Jersey Tort Claims Act does not constitute waiver of immunity from suit in federal court; the statute reflects a limited waiver only of the State's immunity from suit in *state* court." *Allen v. New Jersey State Police*, 974 F.3d 497, 505 (3d Cir. 2020) (citing *Velez v. City of Jersey City*, 850 A.2d 1238, 1241-42 (N.J. 2004)); *see also Hyatt v. County of Passaic*, 340 Fed. Appx. 833, 837 (3d Cir. 2009) ("The [NJ]TCA, which allows suits against public entities and their employees in state courts, does not expressly consent to suit in federal courts and thus is not an Eleventh Amendment waiver."). Thus, Plaintiff's state law negligence claim in Count Three against the State Defendants should be dismissed.

### B. **State Defendants Are Not "Persons" Who May Be Held Liable.**

Section 1983 does not create a substantive right, but instead provides a remedy for the violation of rights created by federal law. *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To state a claim under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States

14

and that the alleged deprivation was committed or caused by a person acting under color of state law. *Tormasi v. Lanigan*, 363 F. Supp. 3d 525, 534 (D.N.J. 2019); *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011). The statute provides, in relevant part:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[42 U.S.C. § 1983 (emphasis added).]

"The statute's text is clear: a [Section] 1983 suit may only be brought against a defendant who is considered a 'person' within the meaning of [Section] 1983." *Smith v. New Jersey*, 908 F. Supp. 2d 560, 563 (D.N.J. 2012).

In *Will*, the Supreme Court held that a State, or an official of the State while acting in his or her official capacity, is not a "person" within the meaning of Section 1983. 491 U.S. at 71. While state officials literally are persons, a suit against a state official in his or her official capacity is not a suit against the official, but is a suit against the official's office. "As such, it is no different from a suit against the State itself." *Id.*

15

Similar to Section 1983, the NJCRA provides a cause of action to any person who has been deprived of any rights under either the federal or *state constitution* by a "person" acting under color of law. *See* N.J. Stat. Ann. § 10:6-2a. The NJCRA is modeled after Section 1983. *See, e.g., Martinez v. S. Woods State Prison, No. A-1738-18T3,* 2019 N.J. Super. Unpub. LEXIS 2351, at *4 (N.J. Super. App. Div. Nov. 19, 2019). In both the NJCRA and Section 1983 context, Courts have held that "person" does not permit a cause of action against a state. *See id.,* at *3 ("... [Section] 1983 did not create a cause of action against a state, because a state is not a person. The same conclusion is mandated under the analogous NJCRA."); *see also, Will*, 491 U.S. at 109 (a state, agency, or an official of the State acting in his or her official capacity, is not a "person" within the meaning of Section 1983).

Here, Defendant Nichols, a former employee of the NJSP, is unquestionably an "arm" of the State. Therefore, to the extent that Plaintiff seeks monetary damages against Defendant Nichols in his official capacity, those claims should be dismissed. Similarly, Plaintiff's NJCRA claim against Defendant Nichols under Count Two should also be dismissed because he is not a "person" under the NJCRA.

16

**POINT II**

**PLAINTIFF'S SECTION 1983 CLAIM AGAINST DEFENDANT NICHOLS FOR "FABRICATING EVIDENCE" DURING HIS TESTIMONY AT PLAINTIFF'S TRIAL IN 1992 IS BARRED BY ABSOLUTE IMMUNITY**

A trial witness sued under Section 1983 enjoys absolute immunity from any claim based on his or her testimony. *Briscoe v. LaHue*, 460 U.S. 325, 335-36 (1983). When a police officer, or any other actor having a critical role in the judicial process, appears as a witness at trial, he or she may be reasonably viewed as acting in the same capacity as any other witness who testifies at trial. *Id.* Conversely, that police officer or other actor having a critical role in the judicial process who testifies at trial may also be reasonably viewed as an official performing a critical role in the judicial process. *Id.* For purposes of absolute immunity, any person, governmental or otherwise, who performs an integral part in the judicial process, enjoys absolutely immunity from subsequent damages liability as a consequence of performing their judicial duties. *Id.* at 335; *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012); *Gardner by Gardner v. Parson*, 874 F.2d 131, 146 (3d Cir. 1989).

Briscoe was convicted of burglary in state court. *Briscoe*, 460 U.S. at 326. Briscoe filed a Section 1983 complaint against Officer LaHue, alleging that LaHue had violated his constitutional

17

rights by committing perjury, which led to Briscoe's conviction. *Id.* LaHue testified that Briscoe was one of no more than 50 to 100 people in Bloomington whose prints would match a partial thumbprint on a piece of glass found at the scene of the crime. *Id.* at 327. Briscoe alleged that LaHue's testimony was false because the FBI and state police considered the partial print too incomplete to be of value. *Id.*

The United States Supreme Court reiterated that the common law provided absolute immunity from damages liability for all persons who played an integral part of the judicial process. *Id.* at 335. This immunity applies to lay persons and governmental officers alike. *Id.; see also Butz v. Economou*, 438 U.S. 478, 512 (1978) (holding that absolute immunity is necessary "to assure that judges, advocates, *and witnesses* are able to perform their respective functions without harassment or intimidation") (emphasis added). Recognizing the principles long established by the common law, the Court in *Briscoe* stated, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Id.* at 332 (quoting *Calkins v. Sumner,* 13 Wis. 193, 197 (1860)).

Similar to *Briscoe*, Plaintiff in this case alleges that

18

Defendant Nichols told prosecutors, and then testified at trial, that there was a 98% chance that the blood type evidence recovered from the victim belonged to the Plaintiff. SOMF, ¶1. Plaintiff characterizes Nichols' testimony as "scientific chicanery." *Id.* However, the undisputed evidence establishes that Defendant Nichols *never said this*. SOMF, ¶¶17, 21-31. When the prosecutor attempted to ask Defendant Nichols on redirect examination whether the question the odds that the blood type evidence recovered from the victim belonged to Plaintiff, defense counsel objected and the court sustained the objection. SOMF, ¶24. As a matter of fact, it was the Prosecutor in his summation, and *not* Defendant Nichols, who presented the jury with the 98% mathematical probability that forms the basis for Plaintiff's Section 1983 claim against Defendant Nichols in Count One. SOMF, ¶33.

At Plaintiff's 1992 trial, Nichols testified that "80% of the population are secretors," "40 to 45% of the population are O's (blood group O)," and "the victim and the suspect would fall in line with 40 to 45% of the population." SOMF, ¶21. Nichols broke down the percentages further stating that "32% of the population will fall into Group O secretor," and when broken down into males versus females, "you have approximately 16% of males would be O secretors." SOMF, ¶22. He indicated that the seminal fluid, when

combined with the fact that the person is an O secretor, is only capable of coming from 16% of the population. *Id.* On cross-examination, defense counsel asked Defendant Nichols to confirm that Plaintiff is placed "in the general population 40 to 45% secretor population of about 32% male secretor population of about 16%?" SOMF, ¶26. At no point did Defendant Nichols testify that he concluded with a reasonable degree of scientific certainty that Plaintiff was a contributor to the tested samples. SOMF, ¶¶21-31.

Defense counsel further clarified through Defendant Nichols' testimony that the results of the serology testing were not conclusive. Specifically, defense counsel asked Defendant Nichols, "Would it be fair to say that in no way, shape or form are you trying to give the jury the impression that because Harrell is an O secretor that there is a good chance that he is the one who actually committed this assault?" SOMF, ¶27. Nichols responded, "I'm saying that Mr. Harrell would fit the statistical representation of those people that could contribute to that stain. I'm not, in other words, I'm not excluding him. I am only including him in that number of people who could have caused that stain." SOMF, ¶28. Defendant Nichols further remarked that he (Defendant Nichols) is also an O secretor and thus could have caused the stain. SOMF, ¶30. Defense counsel then asked whether the number of

people who could have caused the stain consisted of a wide range of the population, to which Nichols answered "yes. It's 16% of the male population." SOMF, ¶31.

This case and *Briscoe* both involve witnesses for the State later accused of overstating the evidentiary significance of ordinary scientific findings. However distorted or overreaching LaHue's testimony was in *Briscoe* regarding the evidentiary value of the plaintiff's partial thumbprint, the Supreme Court concluded that the same principles undergirding absolute immunity for prosecuting attorneys also applied to LaHue. *Briscoe*, 460 U.S. at 345 (citing *Imbler v. Pachtman*, 424 U.S. 409 (1976)). The Court reasoned that this immunity should not be reserved solely judges and prosecutors, but extend to witnesses, who play an equally integral role in the trial process. *Id.* at 345-46.

Witnesses such as Nichols should not have to fear being sued based on their testimony. To permit such liability would thwart the purpose of a trial, i.e., to submit facts to "the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." *Imbler,* 424 U.S. at 440.

Therefore, Counts One and Two should be dismissed.

## POINT III

**INDIVIDUAL CAPACITY CLAIMS AGAINST DEFENDANT NICHOLS BASED UPON ALLEGED *BRADY* VIOLATIONS SHOULD BE DISMISSED BECAUSE NICHOLS DID NOT VIOLATE *BRADY*, AND IS OTHERWISE ENTITLED TO QUALIFIED IMMUNITY.**

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held a criminal defendant has a due process right to receive material in the possession of the prosecutor that is favorable to the defense. Because the purpose of the right is to ensure that criminal defendants receive a fair trial, a prosecutor's withholding of evidence favorable as to either guilt or the sentence is unconstitutional "irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

A prosecutor's duty to disclose favorable material applies even when the defendant fails to request them. *See United States v. Agurs*, 427 U.S. 97, 110 (1978) (in some situations evidence is of such substantial value to defense that fairness requires its disclosure "even without a specific request"). Favorable material also includes impeachment material. *See United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 US 150 (1972).

To establish a violation of *Brady*, a plaintiff must allege and ultimately prove three essential elements: (1) the evidence at issue must be favorable to the accused, either as exculpatory or impeachment evidence; (2) the State must have suppressed the

evidence, either purposely or inadvertently; and (3) the evidence must be material to defendant's case. *Strickler v. Green*, 527 US 263, 281-82 (1999); *State v. Nelson*, 715 A.2d 281, 286 (N.J. 1998). "This is an objective test, meaning that no bad-faith inquiry is required." *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). Suppressed evidence is considered "material" and prejudice results from suppression "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" as to either guilt or punishment. *Bagley*, 473 U.S. at 682; *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011). The existence of those three elements evidences the deprivation of a defendant's constitutional right to a fair trial under the due process clause. *Brady*, 373 U.S. at 87; *see State v. Carter*, 449 A.2d 1280, 1293 (N.J. 1982).

Here, Plaintiff's *Brady*-based claims should be dismissed because: a) the evidence which Defendant Nichols is accused of withholding is not exculpatory as a matter of law and thus any alleged withholding did not violate *Brady*; b) even if the evidence in question is considered exculpatory, it was not material to Plaintiff's guilt or punishment, and thus was not subject to the *Brady* duty to disclose; and c) Defendant Nichols is entitled to qualified immunity because there was no clearly established duty

on the part of Defendant Nichols at the time of Plaintiff's trial to disclose the material.

A. **The Information Allegedly Withheld Was Not Exculpatory as a Matter of Law.**

Exculpatory evidence within the meaning of *Brady* is evidence which "goes to the heart of the defendant's guilt or innocence as well as that which might alter the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Moyer*, 726 F. Supp. 2d 498, 512 (M.D. Pa. 2010) (quoting *Giglio*, 405 U.S. at 154). Evidence is favorable to the accused under *Brady* "if it would tend to exculpate him or reduce the penalty." *Brady*, 373 U.S. at 87-88. Under *Brady*, the prosecutor has a duty to "learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

Even though this duty of disclosure is tightly tethered to constitutional guarantees of due process, "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Id.* at 436-37 (citation omitted). Rather, the prosecution's failure to disclose evidence rises to the level of a due process violation under *Brady* "only if the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* at 434. "The question

24

is not whether the defendant would more likely than not have received a different verdict with the [concealed] evidence, but whether, in its absence, he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

In *Strickler*, the United States Supreme Court held that there is never a "real" *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. 527 U.S. at 280. The three components of a "true" *Brady* violation are: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Ibid.* (citation omitted).

Withholding alleged *Brady* material does not automatically mean that there was a *Brady* violation. The question of whether the prosecution must disclose evidence, i.e. whether the evidence is *Brady* material, should be determined independently of an inquiry into whether suppression of that evidence undermines confidence in the outcome of a criminal trial, i.e., whether the evidentiary suppression constitutes a *Brady* violation. *Smith v. Holtz*, 210 F.3d 186, 196 (3d Cir. 2000).

Here, it is clear that the evidence which was allegedly

25

withheld from the Prosecutor, specifically, that the lab results were inconclusive, is not *Brady* material. First, the information that the serology testing is inconclusive is not exculpatory evidence. It offers <u>no value</u> as to Plaintiff's guilt or innocence. As Plaintiff's defense counsel told the jury in her closing argument during his criminal trial, the lab results are "basically inconclusive" and tell the jury nothing in regard to Plaintiff's guilt or innocence. SOMF, ¶34. Thus, it cannot be considered *Brady* material when it admittedly had no bearing on Plaintiff's guilt or innocence under the first prong of the *Brady* material test.

**B. <u>Even If the Report Which Defendant Nichols "Failed" to Generate Is Considered Favorable Evidence Under *Brady*, the Report Was Not Suppressed.</u>**

Assuming arguendo that evidence which was withheld from the defendant is exculpatory, to establish a *Brady* violation, the evidence must have been suppressed by the prosecution, either willfully or inadvertently. *Strickler*, 527 U.S. at 280.

Here, the information in question – Defendant Nichols' report stating that both Plaintiff and the victim were Substance H Blood Group O secretors - was not withheld from Plaintiff's defense counsel at the time of trial in 1992, as evidenced by the fact that defense counsel argued to the jury in her closing statement that the NJSP Forensics Lab's serology test results were

26

inconclusive due to this very fact. SOMF, ¶34. Thus, Plaintiff cannot argue much less prove that his defense counsel was not provided with this information when she argued it in his defense at trial. Moreover, Defendant Nichols' supervisor, Henry Swordsma, documented in the lab report that he spoke with Detective Crumrine regarding the inconclusive results of the serology test. SOMF, ¶¶16, 47-51.

Assuming that the information that the serology test results were inconclusive constitutes *Brady* material, this material was not, in fact, withheld from the Plaintiff's defense attorney at the time of the 1992 trial. That fact completely undercuts Plaintiff's *Brady* claims against Defendant Nichols. Plaintiff's theory is that, because the word "inconclusive" is not expressly stated in the forensic lab report, *Brady* must have been violated. However this argument has no support in caselaw nor was there any requirement at the time for such a conclusion to be delineated in a forensics lab report. SOMF, ¶¶43-51.

Additionally, Plaintiff's *Brady* violation claim against Defendant Nichols fails in light of the undisputed testimony from Henry Swordsma, Nichols' supervisor, that he informed Detective Crumrine, the investigator for the City of Long Branch Police Department, about the laboratory results and their meaning, i.e.,

27

that they did not conclusively link Plaintiff to the blood evidence recovered from C.A.'s clothes. SOMF, ¶¶47-50. Thus, Defendant Nichols, through his NJSP Forensics Lab supervisor Swordsma, disclosed favorable material to the police and his duty to disclose was met. SOMF, ¶¶16, 47-51.

It is absolutely clear from Swordma's deposition testimony that the supposedly favorable evidence which Plaintiff faults Defendant Nichols for not baldly stating in his report was, in fact, disclosed to the police prior to Plaintiff's trial, thus undercutting Plaintiff's *Brady* claim against Defendant Nichols. Not only was it disclosed to the police, the handwritten note was included in the forensics lab report turned over to defense counsel prior to Plaintiff's trial, and was argued by Plaintiff's defense counsel in her closing at the conclusion that trial. SOMF, ¶¶34, 50.

C. **The Allegedly Withheld Information Was Not Material to Plaintiff's Guilt or Punishment and Thus Not Exculpatory Under *Brady*.**

Only evidence which is material to the defendant's guilt or punishment need be disclosed under *Brady*. *Strickler*, 527 U.S. at 281-82. *See*, *e.g.*, *Telzer v. Borough of Englewood Cliffs*, Civil Action No. 13-4306 (JMV), 2018 U.S. Dist. LEXIS 61856, at *45 (D.N.J. Apr. 12, 2018), aff'd, 783 Fed. App'x 253 (3d Cir.

2019)(affirming dismissal on summary judgment of plaintiff's *Brady* claim where plaintiff failed to show how the allegedly withheld evidence affected the result of plaintiff's criminal trial).

Here, Plaintiff's *Brady* violation claim against Defendant Nichols fails because the alleged evidence that was withheld, i.e., an additional report that Nichols never prepared, would not have affected the outcome of Plaintiff's criminal trial. Failing to generate an additional report with Plaintiff's proposed format #7 from the biochemistry manual, SOMF, ¶44, and/or a report simply stating the results were inconclusive, would not have definitively revealed that Plaintiff was *not* the person who sexually assaulted C.A., and there was no testimony at the criminal trial by Defendant Nichols indicating that the blood recovered from the victim's clothing came from Plaintiff. Rather, the forensic evidence presented at trial was inconclusive as could be deduced from the laboratory reports alone, as they were produced in discovery before trial, or through testimony on direct and cross-examination. SOMF, ¶¶25-31.

Moreover, the police were, in fact, advised by Nichols' supervisor, Swordsma, that no conclusion could be drawn as to whether the blood came from Plaintiff. SOMF, ¶¶49-50. Plaintiff's defense attorney argued as much in her closing statement at trial.

29

SOMF, ¶34. This fact also could have been deduced through trial testimony, as the handwritten note on the lab report was made available to Plaintiff's defense attorney in discovery in prior to trial. SOMF, ¶16.

In sum, Plaintiff was not prejudiced in his criminal trial since the alleged exculpatory information was in fact presented to the jury in defense counsel's closing argument, and the jury still convicted Plaintiff on the strength of the victim's identification and Plaintiff's weak alibi. Accordingly, the alleged exculpatory evidence, which was presented to the jury, cannot be said to be evidence that would likely affect the outcome of the trial if it were not presented to the jury. Indeed, despite the defense's argument that that the State's lab results were inconclusive because the victim and Plaintiff were both substance H Blood Group O secretors, the jury unanimously found Plaintiff guilty. Thus, as a matter of law, there can be no reasonable probability of a different result.

Clearly, the jury must have been more convinced by the State's witnesses; specifically, that the victim had seen Plaintiff before the assault, that she clearly saw Plaintiff's face during the assault when he was on top of her, when she identified Plaintiff as the man who assaulted her when she saw him later on inside the

McDonald's she worked at, and when she identified him again later on at the police station when she looked at him and told co-Defendant O'Gibney that it was Plaintiff who had assaulted her. SOMF, ¶¶17-20.

Thus, Plaintiff's *Brady* claim fails and Counts One, Two, Six and Seven should be dismissed as to the State Defendants.

D. **Nichols Is Entitled to Qualified Immunity Because No Clearly Established Law at the Time of Plaintiff's 1992 Trial Obligated Nichols to State in His Report That the Results of the Serology Testing Were "Inconclusive."**

Even if the Court found a violation of *Brady* – and it should not -- Defendant Nichols is entitled to qualified immunity because it was not clearly established that his conduct violated *Brady* at the time of trial in 1992.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 77 (2017)(quoting *Mullenix v. Luna*, 577 U.S. 7, 11, (2015)). "[F]or the right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12. (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The standard for qualified immunity is tilted in favor of shielding government actors and '"gives ample room for mistaken judgments by protecting all but the plainly

31

incompetent or those who knowingly violate the law'". *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

In *Saucier v. Katz*, the Supreme Court divided the analysis of qualified immunity into two parts: first, the court considering qualified immunity must ask whether the alleged facts, taken in the light most favorable to the injured party, show that the government official's conduct violated a constitutional right; second, the court must ask whether the right was clearly established in light of the specific context of the case and not as a broad general proposition. 533 U.S. 194 (2001).

Here, Plaintiff accuses Defendant Nichols of failing to write a report stating that the results of the serology testing were inconclusive. However, at the time of Plaintiff's trial in 1992, there was no clearly established law entitling Plaintiff to receive such a report as a matter of constitutional due process. *See Gibson v. Superintendent of New Jersey Dep't of Law and Public Safety*, 411 F.3d 427, 443-44 (3d Cir. 2005). Courts are required to review the "case law existing *at the time* of the defendant's alleged improper conduct" and determine whether there was "sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally

prohibited." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001), cert. denied, 535 U.S. 989 (2002).

Although evidence in the hands of the police could be imputed to the prosecutor, *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991), the United States Supreme Court did not settle this matter until 1995. *Gibson,* 411 F.3d at 443 (citing *Kyles v. Whitley*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.")). More importantly, the related duty of the police to disclose information to the prosecutor was not widely addressed until later. *Id.* at 444. As late as the year 2000, the Third Circuit could only *assume* that police officers "have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists." *Id.* (quoting *Smith*, 210 F.3d at 197 n. 14).

Defendant Nichols is entitled to qualified immunity in this case because Plaintiff's constitutional right was not clearly established prior to 1992, when Nichols was involved in the forensic testing of the blood evidence in Plaintiff's criminal case. Thus, there was no affirmative duty at the time for law enforcement or other employees employed by a law enforcement agency to disclose favorable evidence to a prosecutor. Plaintiff cannot identify any

case law that clearly establishes Nichols, or, by extension, his employer, Defendants State of New Jersey and the NJSP, violated his constitutional rights under *Brady*. Hence, State Defendants are entitled to qualified immunity.

Even if it had been clearly established, Plaintiff's *Brady* claims against the State Defendants fail in light of the undisputed evidence that Detective Crumrine was informed by Nichols' supervisor Swordsma as to the results of the serology testing and their meaning. SOMF, ¶¶49-40. Thus, Defendant Nichols, through his supervisor Henry Swordsma, disclosed "favorable" material to the police.

Through Swordsma's deposition testimony on June 2, 2022, Swordsma did in fact explain to the police, specifically Detective Crumrine, that the laboratory results were inconclusive. SOMF, ¶¶49-50. He also indicated that he wrote it on a note to the police, which was part of the original criminal discovery. SOMF, ¶¶47-51.

There is not any sufficient precedent at the time of the alleged misconduct factually similar to the Plaintiff's allegations, that would put Nichols on notice. Plaintiff does not identify law that the "failure" to generate a report with specified conclusions itself violates his due process rights, nor can he. Thus, Nichols is entitled to qualified immunity and Counts One, Two, Six, and Seven should be dismissed.

POINT IV

**HARELL'S NEGLIGENCE CLAIM SHOULD BE DISIMSSED BECAUSE DEFENDANT NICHOLS IS IMMUNE AND WAS NOT NEGLIGENT**

The State Defendants are entitled to summary judgment on Count Three (Negligence) because the evidence establishes that Defendant Nichols is entitled to good faith immunity under the New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. §§ 59:1-1 to 12-3. Even if Nichols was not immune, the evidence fails to establish that Nichols was negligent.

**A. Defendant Nichols Is Entitled to Good Faith Immunity.**

Under the NJTCA, a State employee is immune from liability if under either an objective or a subjective analysis that the acts performed were in good faith in the execution or enforcement of any law. *N.J. Stat. Ann. §* 59:3-3. *See, e.g., Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1112 (N.J. 2009) (citing *Canico v. Hurtado*, 676 A.2d 1083, 1085-86 (N.J. 1996)). This section effectively provides qualified immunity with respect to the enforcement of the law. *N.E. for J.V. v. State Dep't of Child. & Fams., Div. of Youth & Fam. Servs.*, 158 A.3d 44, 59 (N.J. Super. App. Div. 2017).

The qualified immunity under N.J. Stat. Ann. § 59:3-3 has two components. *Ibid.* Public employees are entitled to the immunity if they can establish either that their conduct was "objectively

35

reasonable," or that they acted with subjective good faith. *Ibid.*
(citing *Fielder v. Stonack*, 661 A.2d 231, 246 (N.J. 1995)). "In
determining whether an employee has established qualified immunity
under N.J. Stat. Ann. § 59:3-3, the court applies the same
standards of objective reasonableness that are used in federal
civil rights cases." *Ibid.* A public employee acts with objective
reasonableness "if the actor's conduct did not violate a clearly
established constitutional or statutory right." *Id.* at 59 (citing
*Gormley v. Wood-El*, 93 A.3d 344, 367-68 (N.J. 2014). "Negligence
is insufficient to defeat the immunity provided by [*N.J. Stat.
Ann. §*] 59:3-3." *Nicini v. Morra*, 212 F.3d 798, 815 (3d Cir.
2000); *Canico*, 676 A.2d at 1086.

Count Three has been advanced under New Jersey common law, so
the NJTCA's good faith immunity applies. Here, the record
demonstrates that Defendant Nichols is entitled to immunity under
N.J. Stat. Ann. § 59:3-3 because his acts were objectively
reasonable, and alternatively because his acts were taken in
subjective good faith. As discussed below, Defendant Nichols'
serology testing and authored report did not violate any clearly
established constitutional or statutory right at the time because
*Brady* violations did not extend to law enforcement officials. *See
Kyles*, 514 U.S. at 437-38; *Smith*, 210 F.3d at 197 n. 14; *Gibson*,

411 F.3d at 443. Moreover, Defendant Nichols' serology testing was performed in the good faith enforcement of the law – specifically, receiving the specimens from the Long Branch Police Department, testing of the samples received and recording the results in report. SOMF, ¶¶14-15. Because the record does not indicate any unreasonable actions taken by Defendant Nichols, either objectively or subjectively, he is entitled to qualified immunity. As Defendant Nichols is not liable, neither is his employer, Defendant NJSP. *See* N.J. Stat. Ann. § 59:2-2(b) (providing that a public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable). Thus, Count Three should be dismissed.

B. **The Evidence in the Summary Judgment Record Fails to Establish that Defendant Nichols Was Negligent.**

To prevail on a claim of negligence, a plaintiff must establish the following elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages. *Doe on behalf of Doe v. Small*, Dkt. No. 1:21-CV-11189, 2023 WL 1750405, at *11 (D.N.J. Feb. 2, 2023) (citing *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015)).

Here, Plaintiff's negligence claim fails because there is no evidence to establish that Defendant Nichols' alleged negligent failure to prepare a report baldly stating that the serology test

37

results were inconclusive was the *proximate cause* of the guilty verdict against Plaintiff and his prison sentence. The prosecution had substantial evidence available which included *two* separate positive out-of-court and one in-court identifications from the victim, C.A., SOMF, ¶¶7, 11, and 13, who, to this day, still believes Plaintiff was the man who sexually assaulted her. SOMF, ¶42.

Additionally, Plaintiff's botched attempts to establish an alibi defense through the testimony of family members and friends also led the jury to discredit his testimony. SOMF, ¶32. Plaintiff's own criminal defense attorney made remarks during her closing statements that no conclusion could be drawn from scientific evidence to link Plaintiff to the blood evidence retrieved from C.A.'s clothing. SOMF, ¶34. While a closing statement in and of itself is not evidence, it is still something a jury can listen to and take into consideration when making their deliberations. In short, the record demonstrates that there were various other reasons for Plaintiff's guilty verdict and ultimate sentence, and not simply because Defendant Nichols did not explicitly testify to a magic phrase that could have been easily deduced either from his report or from testimony during proper cross-examination.

Plaintiff's negligence claim is premised upon language not included in Defendant Nichols' report specifically indicating that no conclusions could draw from the testing is exculpatory. In fact, that is not true. That the serology testing was inconclusive, as Nichols himself testified at trial, was neither inculpatory nor exculpatory. In fact, Nichols indicated that he *himself* would be in the percentage of the male population that could have contributed to the sample tested because he is the same blood type. SOMF, ¶30. Plaintiff was not charged and convicted on the strength of the serology testing, but rather on the testimony of the victim, C.A., who identified Plaintiff as her assailant. If Nichols did what Plaintiff faults him for not doing in this case – writing an additional report that baldly stated that no conclusions could be drawn from the serology testing - cannot be said to have clearly exculpated Plaintiff and proved his innocence on the sexual assault charge, negating C.A.'s positive identification of Plaintiff as her assailant and the failure of Plaintiff's alibi witnesses to provide him with an actual alibi.

Likewise, there is nothing in the record to demonstrate that the State of New Jersey or the NJSP were negligent in training Defendant Nichols and/or negligent in failing to supervise Nichols, because as Nichols has indicated, an additional report

39

was not required. SOMF, ¶43. He did concede, however, that per the Biochemistry Manual, option number seven could have been written in a report as it did capture the results in the Plaintiff case, SOMF ¶46; however, according to Swordsma, Nichols' supervisor, the there was no requirement to use these specific formats and no conclusion needed to be written in a report if no conclusion could be drawn. SOMF, ¶¶48-51. Because Plaintiff has failed to establish that the Nichols' lack of a subsequent report was the proximate cause of Plaintiff's harm, Plaintiff also cannot prove that Defendant NJSP's alleged failure to train and supervise Nichols was the proximate cause of any harm.

For the foregoing reasons, Count Three should be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's claims against the State Defendants should be dismissed with prejudice.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:  s/ Braheme L. Days
     Braheme L. Days
     Deputy Attorney General

Dated: November 2, 2023

40