<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KYHALLISTA JOHNSON, as Administrator for the Estate of Dion Harrell,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF NEW JERSEY, *et al.*,<br><br>Defendants. | Civil Action No. 18-11299 (GC) (JBD)<br><br>**MEMORANDUM OPINION** |

<u>**CASTNER, District Judge**</u>

**THIS MATTER** comes before the Court on a Motion for Summary Judgment brought by Defendants State of New Jersey (the State), the New Jersey State Police (NJSP), and John T. Nichols (collectively "the State Defendants"). The State Defendants seek summary judgment on the claims raised in Plaintiff's Second Amended Complaint. For the reasons set forth below, and other good cause shown, the State Defendants' Motion is **GRANTED** in part and **DENIED** in part.

## I.    <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

As explained in detail below, Dion Harrell was prosecuted, tried, and convicted for a 1988 sexual assault he did not commit. A jury convicted him in 1992 based on the victim's mistaken identification and forensic evidence that purportedly linked him to the crime. He served four years in prison for the rape and was required to register as a sex offender. Harrell's conviction was vacated in 2016 based on DNA evidence that excluded him as the assailant. He filed this civil action in July 2018 against the State, the NJSP, Nichols (a NJSP forensic scientist), the City of

Long Branch (hereafter, the "City Defendants"), and Brian O'Gibney (a Long Branch police officer).[1]

Defendant Nichols worked for the New Jersey State Police Crime Lab, issued the forensic report that purportedly linked Harrell to the sexual assault, and testified for the prosecution at Harrell's trial. The Second Amended Complaint alleges that Nichols violated Harrell's federal and state constitutional rights by fabricating evidence and failing to comply with *Brady v. Maryland*, 373 U.S. 83, 87 (1963), in connection with his forensic testing and report. The Second Amended Complaint also brings state law negligence claims against Nichols, the State, and NJSP. Harrell died on January 15, 2022, and his Administrator was substituted as Plaintiff on January 28, 2022.

### A.     The Sexual Assault

On September 18, 1988, between approximately 10:30 and 10:45 pm, a seventeen-year-old girl (the "victim"), was accosted by a man she had just walked past while walking home from work in Long Branch, New Jersey ("the assailant"). ("CSUMF" ¶ 1 (citing City SUMF ¶¶ 3-4, State SUMF ¶¶ 2-3).)[2] The assailant made a lewd comment, grabbed the victim from behind by her neck, and covered her mouth. (*Id.*) The assailant dragged the victim about seventy feet from the sidewalk into an empty parking lot. (*Id.*) The assailant pulled down the victim's pants and underwear and raped her until the victim told the assailant that her father was across the street.

---

[1]     Although the City of Long Branch ("City Defendants") served a motion for summary judgment on Plaintiff, they did not file their motion papers on the docket as directed by the Magistrate Judge. On November 13, 2024 the Magistrate Judge directed the City Defendants to file their summary judgment papers on the docket, and the City Defendants filed their motion on November 15, 2024. (ECF Nos. 142-143.) The Court will issue a separate opinion addressing the recently-filed summary judgment motion by the City Defendants.

[2]     "CSUMF" refers to Plaintiff's Counterstatement of Material Facts, "City SUMF" refers to the City Defendants' Statement of Undisputed Material Facts, and the "State SUMF" refers to the State Defendants' Statement of Undisputed Material Facts.

(*Id.* (citing Plaintiff's Ex. B at 78-80).)  When the assailant got off the victim, he snatched her purse.  The victim ran home and told her mother, and her mother called the police.  (*Id.* (citing City SUMF ¶ 6; State SUMF ¶ 4).)

When the police interviewed the victim, she provided a general description of the assailant – a light-skinned Black male, teens, early twenties, clean shaven, approximately five foot eight wearing a red, long-sleeved sweatshirt with white writing on the front, blue jeans and white sneakers.  (CSUMF ¶ 2 (citing State SUMF ¶ 5, Ex. B at 15).)  The victim did not know the assailant, but she said she had seen him about three weeks earlier at a McDonalds.  (*Id.* (citing City SUMF ¶ 7).)

The victim was taken to the emergency room at Monmouth Medical Center where she was examined by a doctor.  (CSUMF ¶ 3 (citing City SUMF ¶ 6).)  A "Sirchie Sex Crimes Kit" was performed.  (*See* DSUMF ¶ 6.)  Vaginal, anal, and oral swabs/slides were taken as well as pubic hair combings and fingernail scrapings.  (CSUMF ¶ 3 (citing City SUMF ¶ 6).)  The rape kit was turned over to police, refrigerated, and then transported to the New Jersey State Police East Regional Laboratory in Sea Girt, New Jersey for analysis.  (*Id.*)

Police also collected several other items of physical evidence: (i) the victim's clothing (slacks, blouse, sweater, underwear), (ii) the bag used to initially collect the victim's clothing at the Monmouth County Emergency Room, (iii) the paper bags where the victim's clothing was transferred to after the initial collection at the hospital, and (iv) hair and fibers from the victim's clothing.  (CSUMF ¶ 4 (citing Rickner Ex. 4).)

## B.    The Victim Identifies Harrell as her Assailant

Three days later, while the victim was working, she thought she saw her assailant who was wearing a white leather jacket.  The police arrived and arrested Harrell, who had a white leather jacket. (CSUMF ¶ 5 (citing State SUMF ¶ 7, City SUMF ¶ 8).)  Initially, Harrell was cooperative,

but when the police told him of the charges, he was shocked and told them he was innocent. He asked the officers to bring him to see the victim, thinking it would clear his name. (*Id.* (citing City SUMF ¶ 16).) At the police station, the victim observed Harrell and positively identified him as her attacker. (City SUMF ¶¶ 17-20; State SUMF ¶ 13.)

### C.    Defendant Nichols' Serology Report

On January 23, 1989, Defendant Nichols, a principal forensic scientist at the NJSP prepared a serology report[3] with respect to the specimens obtained from the victim's sexual assault kit. The victim's saliva sample detected Blood Group Substance H; the vaginal smear specimen detected the presence of spermatozoa; the vaginal swab specimen detected the presence of spermatozoa and also detected H for Blood Group Substances; and the victim's underwear detected the presence of seminal fluid, presumptive positive for blood, and H Blood Group Substance. (*See* State SUMF ¶ 14 (citing Ex. R, New Jersey State Police Biochemistry Report and associating laboratory documents prepared by Defendant Nichols).)

On the same date, Defendant Nichols requested submission of a dry saliva and whole blood sample from Harrell for comparison purposes. (*Id.*) On April 28, 1989, Defendant Nichols generated a serology report regarding Harrell's specimens that were submitted to the lab. Harrell's blood specimen was Blood Group O with Lewis Type AB+, and the saliva sample was Blood Group Substance H, the same as the victim's. (DSUMF ¶ 15 (citing Ex. R).)

It is undisputed that Nichols' report (Exhibit R) was discoverable and produced by the State prior to Harrell's trial. (*See* State SUMF ¶ 16; CSUMF ¶ 16.)

---

[3]    Forensic serology refers to the detection, identification, and (pre-DNA) genetic discrimination of potential sources of human body fluids such as blood, semen, and saliva using immunological (ABO) and protein-based analyses. (*See* Keel Report at ¶ 1 n.1.)

Relying on the Expert Report of Alan Keel ("Keel Report") and the NJSP Biochemistry Manual ("NJSP Manual") that governed testing at the New Jersey State Police East Laboratory where Nichols worked,[4] Plaintiff contends that Nichols' analysis and reporting was inaccurate, incomplete, and misleading in several ways. (*Id.* (citing Keel Report ¶¶ 38-42).) Nichols' report indicated that the blood type evidence in the victim's underwear was type O, that there was semen present, and that Harrell was type O and a secreter, meaning that his semen would contain detectible evidence of his blood type. (CSUMF ¶ 6 (citing Ex. R at 2 (indicating Harrell is O blood type and a secretor and 10, 22 ("SEMINAL STAIN ANALYSIS indicating that the semen sample has the O blood type and is a secretor).) Plaintiff contends that the report falsely gave the impression that Nichols had determined that the assailant's blood type was consistent with Harrell's, who had an O blood type and was a secretor, when the semen could have come from literally anyone.

According to Plaintiff's expert, Nichols failed to do a then-standard AP (acid phosphatase) or p30 test for the <u>quantitative</u> measurement of the amount of semen present in the evidence collected from the victim.[5] Nichols only performed a <u>qualitative</u> measurement. (CSUMF ¶ 8

---

[4]     Nichols agreed in his deposition that he recognized the lab manual that was in place from 1980-1991 and that he would consult this manual with regard to how to perform testing. (*See* Ex. K at 187:4-188:9.)

[5]     According to the Keel Report,

> Acid phosphatase is an enzyme present in high concentration in semen and much lower concentration in other human body fluids, such as vaginal fluid. This enzyme is the product of the same gene, whether male or female. Since AP is present in much higher concentration in semen than vaginal fluid its activity can indicate the presumptive presence of semen. P30 is a protease found in high concentration in semen and in relatively low concentration in other human body fluids. This protein was once thought to be specific to semen but is now known to not even be specific to males. The

(citing Keel Report ¶¶ 9-10).)  According to Keel, "[t]he NJSP lab system had two procedures in place in 1988-9 to measure the amount of p30 present in a sample, but neither was used in this case."  (Keel Report ¶ 9 (citing NJSP Manual: Identification of Semen Using Anti-p30, pgs. 398-403).)  Because Nichols performed a test showing that some semen was present, but not a test showing how much semen was present, Nichols "had no basis for an expectation of detecting any secreted blood group substance attributable to the semen." (*Id.* (citing Keel Report ¶11).)  Keel opines that because there was no basis for believing there was enough semen to detect blood type information, no one who could produce semen could be excluded, i.e., the semen detected could have come literally from anyone.  (*Id.*)  Keel further opines that any reasonably competent expert providing forensic serology testing had a duty to know this basic science.  (*Id.* (citing Keel Report ¶16 ("Any scientist in a position of public trust, doing this work and supervising others doing this work should have known and had a duty to know, the limitations of that work.  It was generally accepted in 1988 that, absent a quantitative showing of the presence of concentrated semen, only ABO antigens **foreign** to the source of the test sample, in this instance, the female victim, could be attributed to a semen donor.") (emphasis in Keel Report).)

Plaintiff also emphasizes that Nichols admitted in his deposition that he could not determine whether the blood type evidence he detected came from Harrell or the victim, or someone else entirely. (CSUMF ¶ 13 (citing Keel ¶ 30).)  In his deposition, Nichols agreed that the vaginal swab likely contained a mix of vaginal fluid and seminal fluid or spermatozoa and that the victim was also an O secretor.  (Ex. K at 144:12-145:6.)  Nichols further testified in his

---

microscopic observation of sperm is the only conclusive proof of the presence of semen.

(Keel Report at ¶ 8 n. 2.)

deposition that the H positive test on the vaginal swab "could possibly" have been contributed by the victim, but claimed that there was no way to determine one way or the other in 1988. (*Id.* at 145:7-18.) Nichols testified that blood was detected on the underpants and that it likely came from the victim since she was wearing a tampon. (*Id.* at 153:19-155-3.) He also testified that the p30 test was positive. (*Id.* at 156:5-7.) Nichols further testified that the p30 is a qualitative test and that he did not perform any testing that would show how much seminal fluid had been contributed. When asked if there is a p30 test that would be quantitative, he answered "Not that I know of." (*Id.* at 156:5-22.)

Nichols also agreed that the absorption-inhibition test produced an H result. The following exchange occurred:

> Q:    Now when you performed this test, were you able to determine whether or not that H result came from the victim's blood?
>
> A:    No.
>
> Q:    Were you able to tell whether that H result came from the victim's vaginal secretions?
>
> A:    No.
>
> Q:    Were you able to tell that the H result came from the seminal contribution?
>
> A:    No.
>
> [(*Id.* at 157:9-23.)]

Plaintiff's expert contends that Nichols should not have requested a sample from Harrell because there was no basis for believing that the semen in the evidence he examined was present in a sufficient quantity to provide blood type evidence, or be compared in any other way. (CSUMF ¶ 9 (citing Keel Report ¶ 12).) Plaintiff further contends that the request for a sample from Harrell

violated the NJSP Manual guidelines.  (*Id.* (citing Rickner Ex. 1, NJSP Manual: Identification of Semen Using Anti-p30, pgs. 398-403).)  The relevant portion of the NJSP Manual reads as follows:

> 5-2. The following guidelines must be adhered to before reporting results.
>
> A.    Inhibitions may be reported only:
>
> 1.    If you have control blood and saliva from the victim. You may report results without controls from the suspect but a concurrent request for suspect controls should be included in the report.
>
> 2.    When the blood group substances (BGS) corresponding with the victim's controls are the only BGS found in swabs or other specimens where we often cannot detect BGS of suspects, do not ask for suspect controls unless the PGM phenotype differs from that of the victim.

(Rickner Ex. 1, NJSP Manual, pgs. 131-132.)  Keel opines that this guideline recognizes those body fluid mixture situations (e.g. vaginal fluid/semen) in which a) no detected ABH blood group substance can be considered foreign to the victim, b) there is no quantitative basis to conclude any of the detected ABH blood group substance(s) can be attributed to another person, and c) no isoenzyme activity foreign to the victim is detected.  (*See* Keel Report ¶ 12.)  Thus, according to Plaintiff, Nichols violated lab protocols when he requested blood and saliva samples from Harrell for comparison because no one could be eliminated as a potential contributor.  (CSUMF ¶ 9 (citing Keel Report ¶12).)  Keel further opines that the collection of samples from Harrell was itself misleading because it gave the impression that there was affirmative genetic evidence linking Harrell to the crime, when, in fact, there was none.  (CSUMF ¶ 10 (citing Keel Report ¶15).)

In addition, Plaintiff contends that the NJSP Manual also required a specific explanation of inclusion and exclusion and population frequency statistics in a SP630 report.  (CSUMF ¶ 10 (citing Keel ¶ 13; Rickner Ex. 1).)  The April 28, 1989 Biochemistry Lab Report did not mention whether Harrell was compared to the earlier test results and eliminated as a possible semen source,

or, if included, what statistical weight the inclusion conveyed.  (*See id.*)  The NJSP Manual "Format for Reporting Results" section provided specific language for reporting inhibition results (ABH blood group substance test results) and stated as follows: "Sexual Assaults: Data will be reported on a Form SP3 (11-83) and interpretations or conclusions will be reported on Form SP630 (1-81)." (Rickner Ex. 1 at 422.)

It appears undisputed that Nichols did not create a Form SP630 report.  When asked in his deposition how the prosecutor and the police would know what the testing meant, Nichols testified that "[t]here was no specific conclusion we could reach. Therefore it was never put into the report." (Ex. K 182:12-183:8.)  Later in his deposition, Nichols appears to testify that he "forgot" to select a conclusion.  Nichols also answered "no" when asked if he was required to issue a conclusion in his reports, and "yes" when asked if it was up to his discretion to provide a final analysis.  (*See* Ex. K, 192:6-193:11.)

Plaintiff contends that Nichols' failures were exacerbated by the complete lack of oversight of his work. (CSUMF ¶ 11 (citing Keel Report ¶¶ 17-21, 39-42).)  Plaintiff emphasizes that Nichols' supervisor, Henry Swordsma, was not certified to conduct forensic serology testing.  (*Id.* (citing Keel Report ¶21).)  Moreover, the reports Nichols generated were missing key pieces of information regarding his testing (*id.* (citing Keel Report ¶19), and Nichols kept key information regarding his tests in a green binder, which was not provided to criminal defendants.  (*Id.*; Ex. K at 55.)  The NJSP Manual also required a supervisor to review notebooks, and Keel opines that Swordsma was not qualified to perform this task.  (*Id.* (citing Keel Report ¶¶ 20-21; Rickner Ex. 1).)

9

Plaintiff's expert contends that the relevant science was well established when Nichols prepared his reports and also emphasizes that codes of ethics made it clear that forensic examiners had a duty to be truthful and accurate in their work. (CSUMF ¶ 13 (citing Keel Report ¶¶ 24-25).)

### D.    Swordsma's Note to Crumrine

In his deposition, Nichols' supervisor Henry Swordsma testified that when he looked at the records, he noticed a handwritten comment in one of the margins. (CSUMF ¶ 14 (citing Ex. M at 27); Rickner Ex. 4 at 4).) The note is not legible to the Court,[6] but Swordsma testified that the notation reminded him that he had told Detective Gregory Crumrine that the serological testing was inconclusive.[7] (*Id.* (citing Ex. M at 27-29).)

Specifically, Swordsma testified that he "notice[d] that [he] made a note, on the bottom right hand corner" of the "request for examination of evidence." (Ex. M at 26-27.) When asked at his deposition whether he told Crumrine that "due to both the victim and the suspect being substance H that you couldn't draw any conclusions?" Swordsma responded "[t]hat's correct." (Ex. M at 29.)

### E.    The Trial Testimony

At trial, the victim testified that she was able to see the person that grabbed her by the neck and that she "saw his face." (Ex. B, HARRELL 00548.) The victim stated that the assailant grabbed her around the neck with his forearm. (*Id.*) She further testified that she could see the assailant's face (*id.* at HARRELL 00558), and she positively identified Plaintiff in the courtroom. (*Id.* at HARRELL 00566.)

---

[6]    State Defendants deny that the note is illegible, but they have not provided a legible copy to the Court.

[7]    Crumrine died many years before Harrell's exoneration. (*Id.* (citing City SUMF ¶ 33).)

Harrell also testified at trial and attempted to provide an alibi through his testimony and other witnesses. He testified that he was playing basketball with friends, including a police detective, until about 10:00 pm and that he returned home after playing basketball "close to 10:30." (Exhibit D, HARRELL 00659.) Harrell also testified that he took a shower and changed. (*Id.*) Harrell further testified that he then rode his bike to a friend's house, where he remained "until 12:00 going on 1 o'clock, 12:00 something, 1:00." (*Id.* at HARRELL 00660-00663.)

Nichols also testified at Harrell's trial. On direct examination, Nichols gave the following relevant testimony regarding the spermatozoa seminal fluid detected in the vaginal and underpants samples and whether Harrell could be linked to it:

> Q:     And did you get two positive responses [for seminal fluid] as part of your testing in this case?
>
> A:     Yes, we have positive responses on the vaginal swab and on the underpants.
>
> Q:     Okay. With respect to the vaginal swab, you found presence of spermatozoa?
>
> A:     Correct.
>
> Q:     Were you able to make any observations or further analysis with respect to that spermatozoa or its origin?
>
> A:     Not to the origin of the spermatozoa per se, but to the seminal fluid. The testing that was done was a test known [as] absorption inhibition. This test will determine whether a secreter deposited the seminal fluid or not.
>
> In this case, the blood group substance detected was a H 19 factor, which is [a] characteristic of somebody who is an O secretor. However, three of the genetic markers that we tested for, we did not receive any other reaction. This is on specimen 10 of the vaginal swab. So, the only testing that was performed, or the only positive tests on the vaginal swab was for the presence of spermatozoa and blood group substance H, which is characteristic of an O secretor.
>
> Q:     You say an O secreter, as opposed to an O non-secreting person?

11

A:      Correct. As I explained initially, this person who deposited the spermatozoa <u>if you can link the H factor to the spermatozoa</u>,[8] he would fall in that group of people which approximate 80 percent of the population.

Q:      Eighty?

A:      Correct.

Q:      And also the H would indicate an O secreter, as opposed to an A secreter or B secreter

A:      Correct.

Q:      or AB secreter?

A:      It would delineate to such that it is an O secreter.

Q:      Okay.

A:      On the underpants, which is my specimen number 14, the results for spermatozoa were negative. No spermatozoa was found on the slide that was made up by myself. However, the results for P30 were positive.

So, we have the preliminary test, which is the acid phosphatase was positive, a negative spermatozoa, a positive P30 test. Therefore, we continue the analysis on, to attempt to obtain a blood group substance and any other genetic markers. The results of that testing was that the underpants also reacted for a blood group substance H, which is indicative of an O secreter; however, the genetic markers of PGM and Peptidase A, there was no reaction to those two tests.

Q:      And were you able to tell the blood type with respect to the seminal material?

A:      Yes, the seminal material reacted for a group O secretor.

Q:      Did there also come a point in time when you made an

---

[8]      As explained below, in his deposition, Nichols testified that his trial testimony was a hypothetical based on his use of the word "if" in this phrase. (*See* Ex. M, 199:8-202:17 (emphasizing the following portion of his trial testimony: "this person who deposited the spermatozoa <u>if you can link the H factor to the spermatozoa</u>, he would fall in that group of people which approximate 80 percent of the population) (emphasis added).)

analysis of blood known to come from a Dion Harrell?

. . . .

Q:      Okay. And what did your analysis determine with respect to Mr. Harrell's blood?

A:      The whole blood of Dion Harrell, which is my specimen number 16, is a blood group O. Lewis type is A negative B positive, which is indicative of a secretor.  His saliva, which is my specimen number 17, reaction for blood group substance H, which is consistent with a person who is an O secreter.

Q:      So would he and [the victim] have the same blood type?

A:      They have the same blood type, and they are both secretors.

Q:      Would Mr. Harrell's blood type be consistent with both the spermatozoa and the seminal fluid that you found in connection with this analysis?

A:      Mr. Harrell is a male.  He is capable of generating spermatozoa.  So there is a link there, [h]e is an O secreter.  The two stains found on the vaginal swab and on the panties reacted also for a group O secreter.  He is consistent with those two characteristics.

Q:      You indicated earlier that 80 percent of the population are secretors?

A:      Correct.

Q:      Can you break that 80 percent down further by way of blood type?

A:      There's four basic blood types, as I mentioned before, group O, group A, B, AB. Population wise, 40 to 45 percent are O's, 40 to 45 percent A's, 15 to 20 percent are B's and then 3 to 5 percent AB's. In this situation, both the victim and the suspect are O's, so they would fall in line with approximately 40 to 45 percent of the population.

In this room here we would have, there's twenty people, 40 percent or 8 people would be O secretors, 8 people would be A secretors, two people would be B and 1 percent would be AB,

And we take the secretor factor, which is 80 percent, we multiply that by the lower numbers to make the numbers easier, it would be 32 percent of the population, 32, is that 20 -- no, that's 12 percent,

and then approximately 1 -- 2.4 percent. So, 32 percent of the population will fall into a group O secretor, 32 percent of the population would be a group A secretor, 12 percent would be a B secretor and 2.4 percent would be a B secretor.

Q:    Beyond that, if we're dealing with a male, would that affect the percentage?

A:    All right. If you're dealing with males, various females, then based upon the population structure of the United States or New Jersey, 51 percent I believe are females, 49 percent are males. You make the numbers easier if you just divide them by two. You have approximately 16 percent of the males would be O secretors, 16 percent of the females would be O secretors.

Q:    Would there be any further limitations on the population of, the percentage of the population capable of being responsible for this spermatozoa?

A:    If you're talking about specifically spermatozoa then you would have to exclude any prepubescent males probably under the age of 11 or 12, which would be, I don't know, I can't give you any numbers on that, and any males who cannot generate sperm or have a very low sperm count, and anybody who is impotent. So that would reduce that 16 percent maybe by a factor of one or two, possibly down to maybe 13 percent.

Q:    Any further limitations that you can tell us?

A:    Not based on this.

Q:    Thank you.

So it would be fair to say then, that the source of the seminal material and the spermatozoa that you found in connection with this investigation is capable of coming from only 16 percent or less of the population?

A:    You have to factor in you will also that the person is an O secretor. If you combine spermatozoa or seminal fluid, plus the person is an O secretor, then those numbers would be valid.

Q:    And that would be consistent with Mr. Harrell's blood type?

A:    Yes.

[(Ex. C at 76:5-81:8.)]

Nichols acknowledged on cross examination that DNA testing was not performed, that more specific information might have been available had it been performed, and that no one asked him to send the samples to an outside lab for DNA testing. (*Id.* at 83:13-86:9.) Nichols also admitted that the statistics he provided were just probabilities and that Nichols himself was also an O secretor. Nichols stated that he was including Harrell in the 16% of the male population who could have caused the stain. (*Id.* at 87:17-88:3.)

On redirect, the prosecutor asked Nichols a series of questions that further narrowed down the number of men who could have been the assailant based on the victim's identification of her assailant as a Black male:

> Q:    That 16 percent of the population, what you've done is you've excluded 84 percent of the population; is that correct?
>
> A:    It's 16 percent of the male population who are O secretors.
>
> Q:    Is that across the board male population, regardless of race?
>
> A:    The difference between white and black are within statistics over there.
>
> Q:    So that 16 percent includes whites and blacks?
>
> A:    Yes.
>
> Q:    And Hispanics?
>
> A:    Across the board.
>
> Q:    Everybody. If I were to tell you that the source of the seminal material and the spermatozoa that you detected in this case was from a black male, would you be able to refine that number any further?
>
> A:    I have no way of knowing that, based on my testing, that it is from a black or a white.
>
> Q:    I understand that, but if I were to tell you that it was a black male, even though you can't determine that from your testing, would you be able to break that number down further?

15

A:      Then you would have to take that 16 percent of the male O secreter population and multiply it by the number of blacks percentage wise in the country, which is approximately 12 percent.

Q:      Which would tell us what?

A:      Well you'd have to multiply 12 percent times 16 and come up with –

Q:      So it would be 12 of 16? Well, it would be 12 percent, not –

Q:      12 hundredths of 16? We're dealing with maybe –

Q:      I can't do the numbers, can you?

A:      Well, I used to be able to do them.

Q:      I'll give you a pen and piece of paper. If somebody has a calculator, maybe we get this over with.

Q:      The Judge is ahead of us.

A:      Probably about two percent, I would say.

THE COURT:            .193.

THE WITNESS:      Two percent.

THE COURT:      Two percent.

Q:      And let's say, if in addition to telling you that the donor was black, if I were to give you a physical description in terms of height, weight, age and build, would you be further able to limit that 1.97 percent of the population?

MRS. SAUTER:      Objection, Judge, I don't think secreter

THE COURT:      We're in expertise, and we're talking math now, which is better an argument made to the jury in summation.

MR. CUNNINGHAM:      I have no other questions.

MRS. SAUTER:      I have nothing further, Judge, thank you.

(*Id.* at 88:18-90:19.)  The objection from Harrell's defense counsel appears to mark the end of

Nichol's testimony.

Plaintiff emphasizes that Nichols did not explain to the jury that it was impossible to know whether the O blood-type evidence came from the collected semen or not. (*See* CSUMF ¶¶ 16-17 (citing Ex. C Tr. 70-88).) Plaintiff also contends that Harrell's defense attorney was not able to cross-examine Nichols on this vital limitation in his analysis because Nichols did not issue a SP630 report. (*Id.* (citing Ex. C, Tr. 81-88).) Plaintiff also contends that had Nichols issued the SP630 report as required under the NJSP Manual, it would have been obvious that he could not narrow down the results of the testing at trial to the purported 2% to which he testified. (CSUMF ¶ 18 (citing Keel ¶13).)

The State Defendants admit that Nichols testified that Harrell's blood type was consistent with the spermatozoa found on the victim's vaginal swab and underpants. (*See* State Response to CSUMF ¶ 16.) They deny, however, that Nichols had any obligation to answer questions not posed by the prosecutor and contend, without citation to the record, that Nichols answered the questions to the best of his knowledge. (*See id.*) The State Defendants also deny that Nichols testified at trial that 2% of the Black male population would be O secretors, but they appear to overlook Nichols' testimony on redirect. (*See* State Response to CSUMF ¶ 18.)

In his deposition for this lawsuit, Nichols testified that his trial testimony was based on a hypothetical in which he <u>assumed</u> that the H factor <u>could be</u> linked to the spermatozoa. (*See* Ex. M, 199:8-202:17 (emphasizing the following portion of his trial testimony: "this person who deposited the spermatozoa <u>if you can link the H factor to the spermatozoa</u>, he would fall in that group of people which approximate 80 percent of the population) (emphasis added).) In response to questions about his trial testimony, Nichols again acknowledged that he could not determine whether the seminal stain came from an O secretor, and he reiterated that his trial testimony hinged on a hypothetical:

Q: Right.  So you couldn't determine whether or not the seminal material was from a secretor or not, correct?

MR. O'BRIEN: Objection to Form. You may answer.

A:      We have a seminal stain, you've got an O secretor, it could have come from the victim, it could have come from the suspect, or from a non-secretor.

Q:      So it means you just couldn't tell?

A:      What was that? I'm sorry.

Q:      So what you're saying is, is you couldn't tell—your iPad fell over

MR. SIMMONS: Can you just repeat that question, Rob?

Q:      Is it correct to say that you couldn't tell whether or not the seminal material came from a secretor or a non-secretor?

A:      That's correct.

Q:      When you're providing your hypothetical, why didn't you say that?

MR. O'BRIEN: Objection to the form.  You may answer.

A:      I said if.

Q:      And –

A:      If is the hypothetical.

[(Ex. K at 206:14-207:17.)]

In his closing arguments, the prosecutor emphasized that Harrell's blood type matched the forensic evidence from the victim, with a 98% chance that Harrell was not excluded, i.e., a match. (CSUMF ¶ 21 (citing Rickner, Ex. 3, Tr. 43-47).)  And then the prosecutor suggested further narrowing down was possible:

over 98 percent of the population can be excluded. That's before we talk about people too old or two young to produce sperm. People that don't look like the rapist.  And that's before we talk about people that didn't have access to the crime scene at the time of the crime.

18

[(*Id.* (citing Tr. 47).)]

After the trial, the prosecutor sent Nichols' supervisor a letter, thanking him and telling him that he would not have been able to secure Harrell's conviction without Nichol's testimony. (CSUMF ¶ 22 (citing Rickner Ex. 2).)  Specifically, the letter stated that:

> I am certain that the verdict was attributable solely to the scientific testimony presented by Theodore E. Mozer, III, and John T. Nichols, who were able to provide testimony which revealed that less than 1.97% of the population could have been responsible for this crime, and that this defendant was within that 1.97%." The effectiveness of their testimony was highlighted by the fact that both of these gentlemen were more than willing to spend their lunch hour with me reviewing the file and explaining the best way in which I could present their testimony.

[(Rickner Ex. 2.)]

### F.    Harrell is Exonerated and his Conviction is Set Aside

It is undisputed that Harrell was convicted and sentenced to 8 years in prison for the rape. (CSUMF ¶ 23 (citing Ex. T).)  At the time he was sentenced, he also pleaded guilty to stealing from a car and was given an additional 4 years of incarceration to run consecutively with his incarceration for the rape.  (*Id.*)  Harrell was released on parole after serving 4 years for the rape, and no time for the burglary charge.  (*Id.* (citing Rickner Ex. 5 at 47).)  Following his release, Harrell was required to register as a sex offender under Megan's Law, N.J.S.A. 2C:7-1 through 2C:7-11.  Further, he was arrested and re-imprisoned twice for violating Megan's Law, causing him to spend additional time incarcerated.[9]  (CSUMF ¶ 24 (citing *Id.* 18-19).)

In 2014, Harrell's case was taken on by the Innocence Project, who filed a motion to have the DNA evidence tested, which was not available when Harrell was prosecuted. (CSUMF ¶ 24

---

[9]    The parties agree that Harrell was incarcerated for violating Megan's Law but dispute whether the registration requirement prevented Harrell from finding and maintaining employment.

(citing Rickner Ex. 6).)  Although the Monmouth County Prosecutor initially opposed the requested relief, the motion was granted on consent on February 13, 2015.  (*Id.* (citing Rickner Ex. 7).)  It is undisputed that DNA test results, documented in a July 13, 2016 report from Bode Cellmark Forensics, excluded Harrell as the assailant.  (*Id.* (citing Keel ¶¶ 35-37; State Response to CSUMF ¶ 24).)

It is also undisputed that based upon the new DNA evidence, and upon the joint application of Harrell and the prosecution, the sexual assault conviction against Harrell, and the two Megan's Law violations, were vacated on August 3, 2016.  (CSUMF ¶ 25 (citing Rickner Ex. 8); State Response to CSUMF ¶ 25).)

### G.    Relevant Procedural History

On July 2, 2018, Harrell filed a counseled civil rights complaint against the State and City Defendants, asserting constitutional claims under § 1983 and the NJCRA, as well as common law negligence claims.  (*See* Generally, ECF No. 1.)

On August 31, 2018, the State Defendants filed a motion to dismiss in part, arguing that that the State of New Jersey and the New Jersey State Police were entitled to Eleventh Amendment immunity on Plaintiff's civil rights and state law negligence claims.  (ECF Nos. 12, 12-1.)  The State Defendants subsequently withdrew their motion to dismiss by Consent Order entered on November 9, 2018. (ECF No. 15.)  In relevant part, the Consent Order is signed by representatives for the parties and the Court and states that "the State Defendants consent to the jurisdiction for Plaintiff's claims and otherwise waive no defenses[.]"  (*Id.* at 1-2.)  The Answer to the original complaint generally lists jurisdiction and immunity as defenses but does not list sovereign or Eleventh Amendment immunity as a defense. (ECF No. 17.)

In October 2020, Harrell filed an Amended Complaint, which added in relevant part, a new cause of action asserting a *Brady* claim against Defendant Nichols.  (ECF No. 49, Am. Complaint

¶¶ 60–63.)  That claim, listed in the Amended Complaint as the second cause of action, was predicated on Nichols's alleged failure to call to the prosecution's attention exculpatory information relevant to his forensic testing so that it could be turned over to the defense.  (*See id.* ¶ 61.)  Although they previously consented to jurisdiction, the State Defendants raised Eleventh Amendment immunity as an affirmative defense in their Answer to the Amended Complaint; however, they did not move to dismiss on the basis of Eleventh Amendment immunity.  (ECF No. 53 at 14.)

Harrell subsequently died on January 15, 2021, and his Administrator was substituted as the Plaintiff on January 28, 2022.  (CSUMF ¶ 26 (citing ECF No. 74).)

On February 10, 2023, Plaintiff filed a Motion to Amend, which all Defendants opposed.  (ECF Nos. 86, 93-95.)  The proposed Second Amended Complaint largely reiterates Plaintiff's *Brady* claim against Nichols and appears to add *Brady* claims against Long Branch, the State, and the NJSP based on Swordsma's deposition testimony that he relayed Nichols's testing results to Crumrine who, Plaintiff alleges, likewise failed to inform the prosecution of its exculpatory character.[10]  (*See* ECF No. 103-1.)  After supplemental briefing, the Magistrate Judge granted the Motion to Amend on June 12, 2023, and directed Plaintiff to file the Second Amended Complaint.  (ECF Nos. 102-105, 107-108.)

The State Defendants filed their Motion for Summary Judgment on April 9, 2024. (ECF No. 135.)  Plaintiff opposed the Motion, and the State Defendants filed a reply brief.  (ECF Nos. 138-140, 136.)  The State Defendants' Motion is fully briefed and ready for disposition.

---

[10]    During supplemental briefing, Plaintiff filed a red-lined copy of the Second Amended Complaint it wished to file.  (*See* ECF No. 103-1.)

II.    **STANDARD OF REVIEW**

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (citing *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014)); *see also* Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quotations omitted); Fed. R. Civ. P. 56(a).

It is well established that the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323 (internal citation omitted).  The moving party may also meet its burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (quotations and citations omitted).

Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  "If reasonable minds could differ as to the import of the evidence," summary

22

judgment is not appropriate.  *See id.* at 250-51.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor."  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.    DISCUSSION

### A.    The Federal Claims

#### 1.    *The NJCRA Claims against the State and the NJSP Alleged in Count Six*

The State Defendants argue that they are entitled to summary judgment on the § 1983 and NJCRA claims against the State of New Jersey, the NJSP, and Nichols in his official capacity for damages.  Plaintiff responds that the Second Amended Complaint does not assert any § 1983 or NJCRA claims against the State of New Jersey, the NJSP, or Nichols in his official capacity for damages (ECF No. 139, Brief at 13), and that the Second Amended Complaint sues Nichols in his individual capacity for fabrication of evidence and *Brady* violations in connection with his forensic reports.  (*Id.* at 14.)  The Court agrees that the Second Amended Complaint does not allege § 1983 or NJCRA claims for fabrication of evidence against the State of New Jersey, the NJSP, or Nichols in his official capacity for damages.[11]  The Court need not grant summary judgment on claims Plaintiff does not raise in his Second Amended Complaint.

---

[11]    The Court addresses separately the negligence claims alleged in Count Three.

23

In Count Six,[12] the Second Amended Complaint does allege *Brady* claims against the State and the NJSP arising under the NJCRA.  (SAC at 14.)  Like § 1983, the plain language of the NJCRA imposes liability on any "person" who violates a plaintiff's civil rights under color of law. In particular, the NJCRA provides in relevant part that:

> Any person who has been deprived of any . . . rights . . . secured by the Constitution or laws of the United States, or . . . by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J.S.A. § 10:6–2(c).  The Third Circuit has squarely held that the State of New Jersey and state entities are not "persons" for purposes of the NJCRA.  *Didiano v. Balicki*, 488 F. App'x 634, 638-39 (3d Cir. 2012); *see also Gonzalez v. New Jersey Department of Children and Families*, 545 F.Supp.3d 178, 226 (D.N.J. 2021) ("The Third Circuit has thus concluded that the New Jersey Civil Rights Act does not grant a cause of action against New Jersey or arms of the state.").  To the extent Plaintiff has not withdrawn the NJCRA claims against the State and the NJSP, they are dismissed because the State and State entities, such as the NJSP, are not "persons" subject to suit under § 1983 or the NJCRA.

### 2.    *Nichols is Not Entitled to Summary Judgment on the Fabrication of Evidence Claims arising under § 1983 and the NJCRA as alleged in Counts One & Two*

The Court next addresses the fabrication of evidence claims against Nichols in his individual capacity, which are brought under the Fourteenth Amendment and the NJCRA.[13]  In

---

[12]    Count Six is listed twice in the Second Amended Complaint.  (*See* Am. Complaint at 13-14.)

[13]    The NJCRA protects federal rights and substantive rights under New Jersey's Constitution. *See Gormley v. Wood-El*, 218 N.J. 72, 97 (2014) ("Section 1983 applies only to deprivations of

their moving brief, the State Defendants argue only that the fabrication of evidence claim fails because Nichols is absolutely immune for his trial testimony.  (*See* ECF No. 135-2 at 17-22.) Plaintiff counters that the State Defendants misconstrue Plaintiff's fabrication of evidence claim against Nichols.  According to Plaintiff, Nichols is liable for forwarding reports containing false evidence and not for his trial testimony.  (*See* ECF No. 139 at 13-14.)

It is true that witnesses are generally immune from suit based on their testimony in court. *See Briscoe v. Lahue*, 460 U.S. 325, 328 (1983) (police officers as well as lay witnesses—are absolutely immune from civil liability based on their testimony in judicial proceedings").  This immunity, however, does not extend to the fabrication of evidence prior to trial, even where the prosecution relies on that evidence during trial.  *See, e.g., Halsey v. Pfeiffer*, 750, F.3d 273, 295 (3d Cir. 2014) (permitting fabrication of evidence claim where police fabricated a confession that was used to secure a conviction at trial); *Black v. Montgomery*, 835 F.3d 358, 370 (3d Cir. 2016) (finding that "no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence").

Thus, "if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment."  *Mervilus v. Union Cnty.*, 73 F.4th 185, 193 (3d Cir. 2023) (quoting *Halsey*, 750 F.3d at 294).  As explained by the Third Circuit, "[f]abricated evidence is an affront to due process of law, and state actors seeking to frame citizens undermine fundamental fairness

---

federal rights, whereas N.J.S.A. 10:6-1 to -2 applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws.").  The NJCRA is typically treated as the state court analog to § 1983.  With respect to Nichols, the parties have not argued that the § 1983 and NJCRA claims should be treated differently so the Court considers them together.

and are responsible for 'corruption of the truth-seeking function of the trial process.'" *Black*, 835 F.3d at 370 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)); *see also Halsey*, 750 F.3d at 293 ("We emphatically reject the notion that due process of law permits the police to frame suspects."). Whether a plaintiff is convicted or acquitted, he or she may have a claim based on fabrication of evidence. *Black*, 835 F.3d at 371.

The Third Circuit has "cautioned . . . that there are 'hurdles facing a plaintiff alleging a due process violation for fabrication of evidence.'" *Boseman v. Upper Providence Twp*., 680 F. App'x 65, 69 (3d Cir. 2017) (quoting *Black*, 835 F.3d at 372). "A plaintiff must demonstrate a 'meaningful connection' between the injury and the use of the fabricated evidence." *Id.* (quoting *Black*, 835 F.3d at 372). "There is also a requirement that the evidence be 'so significant that it could have affected the outcome of the criminal case.'" *Id.* (quoting *Black*, 835 F.3d at 372). That is, there must be a "reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted."[14] *Halsey*, 750 F.3d at 294.

Further, "the standard required to demonstrate that evidence is fabricated is a 'notable bar.'" *Id.* (quoting *Black*, 835 F.3d at 372). "[T]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Halsey*, 750 F.3d at 295. Rather, a "fabrication-of-evidence claim requires persuasive evidence [the defendant] formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth." *Mervilus*, 73 F.4th 185, 194–95. Therefore, for Plaintiff to withstand the State Defendants' Motion

---

[14] The State Defendants do not argue in their moving brief that Nichols' methods, testing, report, and testimony did not affect the outcome of Harrell's case, and a jury could reasonably find that they did. Nichols' testing and report purportedly linked Harrell to the semen recovered from the victim. And, as the prosecutor explained in his letter, Nichols' trial testimony regarding his forensic testing and reports narrowed down the potential suspects to just two percent of the male population. Moreover, the prosecutor was "certain that the verdict was attributable solely to the scientific testimony presented by Theodore E. Mozer, III, and John T. Nichols[.]"

for Summary Judgment, he must bring "persuasive evidence supporting a conclusion" that Nichols "was aware that evidence [wa]s incorrect or that [it was] offered in bad faith." *See Mervilus*, 73 F.4th at 194 (quoting *Black*, 835 F.3d at 372).

Plaintiff contends that this case is remarkably similar to the Third Circuit's recent decision in *Mervilus v. Union County*, 73 4th 185 (3d Cir. 2023), which "clarif[ied] the state of mind necessary to sustain" a fabrication of evidence claim. *Id.* at 193-195 (holding that a "fabrication-of-evidence claim requires persuasive evidence [the defendant] formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth"). There, an investigator gave the suspect Mervilus a polygraph test using unreliable methods, and the polygraph results were admitted by stipulation at trial through the polygraph examiner's testimony. *Id.* at 190. The Third Circuit held that Mervilus' fabrication of evidence claim survived summary judgment because there was sufficient evidence that the polygraph examiner defendant 1) knew that polygraph science was suspect and that the method he utilized was especially so; 2) failed to adhere to accepted practices in the field to avoid bias against innocent suspects and "false positives"; and 3) acted in bad faith when he reported that Mervilus was lying because neither the plaintiff nor the defense expert agreed with the investigator's conclusion that the data reflected deception. *See id.* As Third Circuit explained:

> [c]onsidering the evidence holistically, we hold Mervilus brought sufficient evidence that Kaminskas fabricated his polygraph examination. This is so because, viewing the evidence in the light most favorable to Mervilus, Kaminskas had reason to doubt his method's validity and reliability, used biased techniques to examine Mervilus, and rendered a conclusion not compelled by the data.

*Id.*

The Third Circuit also determined that the polygraph examiner was not entitled to qualified immunity:

The right at issue is the due process protection against criminal investigators' fabrication of inculpatory evidence against a defendant. Prior to the events in question, that right had long been recognized by the Supreme Court and Courts of Appeal, including this one. *Pyle v. Kansas*, 317 U.S. 213, 216, 63 S. Ct. 177, 87 L. Ed. 214 (1942); *Mooney v. Holohan*, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935) (per curiam); *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014); *U.S. ex rel. Moore v. Koelzer*, 457 F.2d 892, 893 (3d Cir. 1972); *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001); *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000); *Ricciuti v. NYC Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988); *Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir. 1985). Thus, because a jury may find that Kaminskas fabricated the polygraph evidence, we cannot conclude he is immune from suit.

[*Mervilus*, 73 F.4th at 196.]

The State Defendants, in their opening brief, argue that Nichols is entitled to qualified immunity only with respect to the *Brady* claim and do not argue that he is entitled to qualified immunity as to the fabrication of evidence claim. They argue belatedly in their reply brief that Nichols is entitled to qualified or "good faith" immunity on the fabrication of evidence claim as well. (*See* ECF No. 136 at 11-13 (referring to "good faith" immunity under § 1983 and under state law). It is axiomatic that a party "may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *Witt v. City of Vineland*, No. 20-14678, 2024 WL 1928213, at *6 (D.N.J. Apr. 30, 2024) (quoting *D'Allessandro v. Bugler Tobacco Co.*, No. 05-5051, 2007 WL 130798, at *2 (D.N.J. Jan. 12, 2007); *Int'l Raw Materials, Ltd. V. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir. 1992)); *see also Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015). Thus, a court cannot grant summary judgment on a basis raised for the first time in a reply brief to which Plaintiff had no prior opportunity to respond. *Alston v. Forsyth*, 379 F. App'x 126, 129 (3d Cir. 2010) ("Fundamental fairness demands that [Plaintiff receive] notice and a meaningful opportunity to respond prior to the award of summary judgment on grounds raised for the first time in [State Defendants'] reply brief.") As such, the Court denies

summary judgment to the extent State Defendants' claim that Nichols is entitled to qualified immunity on the fabrication of evidence claim under § 1983 and the NJCRA because he acted in good faith.[15]

Moreover, the Court finds that there is sufficient record evidence from which a jury could find that Nichols "was aware that evidence [in his report was] incorrect or that [it was] offered in bad faith." *See Mervilus*, 73 F.4th at 194 (quoting *Black*, 835 F.3d at 372). In his deposition testimony, Nichols admits several times that he could not determine whether the H factor result that purportedly identified the semen as coming from an O secretor (thus linking Harrell to the crime) came from the victim or the suspect and that he could not determine whether the seminal stain came from an O secretor.[16]

Nichols also claims that he did not record these conclusions because he either "forgot" or was not required to select a conclusion. Plaintiff, however, has provided evidence from the NJSP Manual and his expert showing that Nichols was not supposed to obtain a sample from Harrell unless foreign blood evidence was detected, and that Nichols was required to issue a conclusion in the form of a SP630 report. Plaintiff's expert also opines that there was no basis for Nichols to believe that the semen in the evidence he examined was present in a sufficient quantity to provide

---

[15]    The Court does not determine that Defendants waived qualified immunity as a defense, and they may raise this issue at trial, if appropriate. *See Sharp v. Johnson*, 669 F.3d 144, 158 (3d Cir. 2012) ("A party may raise qualified immunity as a defense at trial, especially where the facts are not clear.").

[16]    The parties agree that Nichols is immune for his trial testimony. During his deposition, Nichols strained to justify his misleading trial testimony and claimed it was based on a hypothetical that <u>assumed</u> the semen came from an O secretor, like Harrell. His deposition testimony on this point—which is separate from his trial testimony—also suggests that Nichols knew his report was missing crucial information, i.e., that his testing could not determine that the semen came from an O secretor in the first place.

blood type evidence or be compared in any other way, and that any reasonable forensic scientist would have known this basic fact. The State Defendants have not submitted an expert report challenging this proposition.

Under these circumstances, a reasonable jury could find that Nichols knowingly made material omissions and submitted incomplete reports in violation of lab protocols and "in effect falsified" the report. *See Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015) (holding in the context of a fabrication of evidence claim that there was "no plausible legal distinction between misstatements and omissions that [the court] can perceive in this context," and "conclud[ing] that it was not "objectively legally reasonable" for the defendants in this case to believe that it was permissible for them to knowingly make material omissions in the creation of the billing summaries, thereby knowingly altering evidence during a criminal investigation"), *cert. denied*, 580 U.S. 824 (2016). Although Nichols denies knowing that a quantitative test for semen existed and claims that he either forgot to issue a report and/or was not required to do so, his credibility on these issues is a question for a jury to decide.

Plaintiff's expert also opines that Nichol's methods and reporting were unreliable and violated basic forensic principles in the 1988-89 timeframe, and this evidence is unrebutted. In the context of a fabrication of evidence claim, the Sixth Circuit has held that expert testimony that a forensic examiner issued a grossly deficient report that violated lab protocols and was "far afield of what any reasonable forensic examiner would find from the evidence" may be used by the jury to determine whether the forensic examiner fabricated her report. *See Gregory v. City of Louisville*, 444 F.3d 744 (6th Cir. 2006). Here too, a reasonable jury could find that based on Nichols' deposition testimony, Plaintiff's expert opinion, and the NJSP Manual protocols that Nichols failed

to follow, Nichols had reason to know his methods and reporting were incorrect and that his report was so deficient and misleading that it was not just wrong but fabricated.

In sum, viewing the evidence holistically and in the light most favorable to Plaintiff, a reasonable jury could find that Nichols had reason to know that his report was incorrect and lacked crucial information—namely that the results were meaningless because Nichols could not determine whether the semen came from a O secretor, like Harrell, and that the assailant could actually be any semen-producing male.  A jury could also find from the record evidence that Nichols acted in bad faith or with a reckless disregard for the truth when he failed to include this conclusion or information in his report.  As such, Nichols is not entitled to summary judgment on the fabrication of evidence claim brought pursuant to § 1983 and the NJCRA.

### 3. *Nichols is entitled to Qualified Immunity on the Brady Claim Alleged in Count Six*

Plaintiff also brings a separate *Brady* claim against Nichols under § 1983 and the NJCRA and contends that Nichols also violated Harrell's constitutional rights by failing to disclose to the prosecution the limitations and irrelevance of his forensic testing, which was *Brady* material.  State Defendants argue that Nichols did not violate *Brady*, and that Nichols is entitled to qualified immunity on the *Brady* claim.  The Court agrees with State Defendants that Nichols is entitled to qualified immunity on the *Brady* claim.

An award of qualified immunity protects a government official from civil liability and suit "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  This inquiry is limited to the law at the time of the incident, as "an official could not be reasonably expected to anticipate subsequent legal developments."  *Harlow*, 457 U.S. at 818.  To overcome a defendant's claim of qualified

31

immunity, the court must determine: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (cleaned up); *see also Williams v. Secretary Pennsylvania Department of Corrections*, 848 F.3d 549, 557 (3d Cir. 2017) ("We first determine whether a right has been violated.  If it has, we then must decide if the right at issue was clearly established when violated such that it would have been clear to a reasonable person that her conduct was unlawful."). Pursuant to the Supreme Court's explanation in *Pearson v. Callahan*, those inquiries need not be addressed in sequence; instead, courts are entitled to "exercise their sound discretion" and decide which issue to first address.  *See* 555 U.S. 223, 236 (2009).  The defendant official is entitled to qualified immunity if either prong is not satisfied.  *See id.* at 244-45.

For purposes of qualified immunity, however, "the right must be defined beyond a high level of generality," *Thomas v. City of Harrisburg*, 88 F.4th 275, 284 (3d Cir. 2023) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)), but there need not be "a case directly on point for a right to be clearly established." *Id.* (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 142 S. Ct. 4, 7–8 (2021)). In order for the right to be clearly established, however, "[then-]existing precedent must have placed the . . . constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741; *see also Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."  *Harlow*, 457 U.S. at 818–19.

For qualified-immunity purposes, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'"  *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (citation omitted); *see Wesby*, 583 U.S. at 63 (to be clearly established, a legal principle must

"be dictated by controlling authority or a robust consensus of cases of persuasive authority"). Courts "first look to factually analogous precedents of the Supreme Court and the Third Circuit." *See James v. New Jersey State Police*, 957 F.3d 165, 170 (3d Cir. 2020) (citing *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247–48 (3d Cir. 2016)). Courts next examine persuasive authorities, such as nonprecedential opinions within this circuit and decisions from other Courts of Appeals. *See id.*

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process." 373 U.S. 83, 87 (1963). This duty to disclose applies "irrespective of the good faith or bad faith of the prosecution." *Id.* The Supreme Court has held that the duty to disclose such evidence is applicable even though there has been no request by the accused. *United States v. Agurs*, 427 U.S. 97, 107 (1976). The Supreme Court has also held that the duty encompasses impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. "Moreover, the rule encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433–434 (1995)).

The right at issue is Harrell's right at the time of his trial in 1992 to have Nichols turn over the conclusions (or disclose the limitations and irrelevance) of his report to the prosecution as *Brady* material. In *Gibson v. Superintendent of N.J. Dep't of Law and Public Safety*, 411 F.3d 427, 443 (3d Cir. 2005), the Third Circuit held that "police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor" ("Although *Brady* places the ultimate duty of disclosure on the prosecutor, it would be anomalous to say that police officers are not liable when they affirmatively conceal material evidence from the prosecutor.").

Thus, the Third Circuit joined numerous other circuits in recognizing that a plaintiff states "an actionable § 1983 claim" against police officers for interference with his Fourteenth Amendment rights by alleging that the police officers failed to disclose material exculpatory information to the prosecutor. *Id.*

In addressing qualified immunity, the court in *Gibson* relied on *Kyles*, *supra*, and squarely held that a police officer's duty to inform the prosecutor of *Brady* material was not clearly established at the time of Gibson's conviction in 1994. *Id.* at 444, *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181, 188 (3d Cir. 2010). Thus, the officer defendants in *Gibson* were entitled to qualified immunity with regard to their failure to inform the prosecutor of the *Brady* material. The Third Circuit explained its reasoning as follows:

> Although this Court held in *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991), that evidence in the hands of the police could be imputed to the prosecutor, the Supreme Court did not settle this matter until 1995 when it decided *Kyles v. Whitley*, 514 U.S. at 437, 115 S. Ct. 1555 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). More importantly, the related duty of the police to disclose information to the prosecutor was not widely addressed until later. Even in 2000, this Court was only able to assume that police officers "have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists." *Smith v. Holtz*, 210 F.3d 186, 197 n. 14 (3d Cir. 2000).

> [*Id.* at 443–44.]

This Court is bound by the Third Circuit's decision in *Gibson* in deciding whether the right at issue was clearly established and whether Nichols, a forensic scientist employed by the NJSP, is entitled to qualified immunity. Courts in this circuit have continued to apply *Gibson* when assessing qualified immunity for *Brady* claims. *See Kamienski v. Ford*, 844 F. App'x. 520, 524 (3d Cir. 2021) (relying on *Gibson* and finding that the investigators were entitled to qualified immunity for their conduct at the time of the 1988 trial); *Thomas v. City of Philadelphia*, 290 F.

34

Supp.3d 371, 385 (E.D. Pa. 2018) (addressing whether police officers (as opposed to prosecutors) have clearly established *Brady* duties in 1993 and rejecting the plaintiff's arguments that the court should not follow *Gibson's* holding that police officers' *Brady* obligations were "not clearly established . . . in 1994."). Although Plaintiff cites to out of circuit decisions, Plaintiff does not address or distinguish *Gibson* or explain how it could be clearly established in 1992 that a NJSP forensic scientist must turn over exculpatory or impeaching evidence to the prosecution when it was not clearly established in 1994 that police officers had that obligation.

Because *Gibson* is the controlling law on this issue, the Court finds that it was not clearly established at the time of Harrell's trial in 1992 that Nichols was required to inform the prosecution of the *Brady* material, and he is entitled to qualified immunity on the *Brady* claim. Accordingly, the Court grants summary judgment in favor of Nichols on the *Brady* claim.

### B.    The State Law Negligence Claims Alleged in Count Three

In Count Three, Plaintiff also asserts negligence claims against Nichols, the State, and the NJSP. The State Defendants seek summary judgment on these claims.

Defendants argue that Nichols is entitled to good faith defense under N.J. Stat. Ann. 59:3-3, which provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." The State Defendants have the burden of proving they are entitled to the good faith defense. *See Toto v. Ensuar*, 196 N.J. 134, 146 (2008). A public employee can satisfy the good faith requirement either by demonstrating "objective reasonableness," or that the public employee behaved with "subjective good faith." *Alston v. City of Camden*, 168 N.J. 170, 186 (2001). The NJTCA, however, does not provide immunity if the conduct at issue "constituted a crime, actual fraud, actual malice or willful misconduct." *See Est. of Vargas v. Cnty. of Hudson*, No. 2:14-cv-01048, 2020 WL 3481774, at *10 (D.N.J. June 26, 2020) (citing N.J. Stat. Ann. 59:3-14). "Willful misconduct 'is not immutably defined but takes its meaning from the context and

purpose of its use,'" *id.* (citing *Fielder v. Stonack*, 141 N.J. 101, 124 (1995)), and "falls somewhere 'between simple negligence and the intentional infliction of harm.'" *Id.* (quoting *Foldi v. Jeffries*, 93 N.J. 533, 549 (1983)). While willful misconduct "need not involve the actual intent to cause harm, there must be some knowledge that the act is wrongful." *Id.* A defendant is not entitled to immunity under N.J. Stat. Ann. 59:3-3, if there is a "showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Est. of Vargas*, 2020 WL 3481774, at *10 (quoting *Berg v. Reaction Motors Div., Thiokol Chem. Corp.*, 37 N.J. 396, 414 (1962)).

Here, the Court has determined that Plaintiff's fabrication of evidence claim against Nichols survives summary judgment as a reasonable jury could conclude that Nichols was more than negligent, but acted recklessly in his analysis and reporting of the evidence. Therefore, Nichols has not shown that he is entitled to good faith immunity on the state law negligence claim. Summary judgment is denied as to the negligence claim against Nichols.

The State Defendants also argue that the State of New Jersey and NJSP are entitled to sovereign immunity on Plaintiff's negligence claim, but they overlook the fact that they withdrew their motion to dismiss for lack of jurisdiction, which was based on sovereign immunity, and consented to jurisdiction on November 9, 2018. (*See* ECF No. 15.) Their original Answer does not raise Eleventh Amendment immunity as a defense (*see* ECF No. 17), and the State Defendants have not explained why they would be permitted to raise it now after initially appearing to waive it. For these reasons, the Court also denies summary judgment on the state law negligence claims against the State and the NJSP.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 135) is **GRANTED** in part and **DENIED** in part. The Motion for Summary Judgment is granted as to the

NJCRA claims against the State and NJSP, as alleged in Count Six, and the *Brady* claims against

Defendant Nichols arising under § 1983 and the NJCRA, as also alleged in Count Six. The Motion

for Summary Judgment is otherwise **DENIED**. An appropriate Order follows.


Dated: November 27, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE