**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KYHALLISTA JOHNSON, as Administrator for the Estate of Dion Harrell,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF NEW JERSEY, *et al.*,<br><br>Defendants. | Civil Action No. 18-11299 (GC) (JBD)<br><br>**OPINION** |

**CASTNER, District Judge**

    **THIS MATTER** comes before the Court on a Motion for Summary Judgment under Federal Rule of Civil Procedure (Rule) 56 filed by Defendants the City of Long Branch ("City") and Brian O'Gibney (collectively "City Defendants") (ECF No. 143 ("City Defendants' Motion")), and the Motion for Reconsideration and Second Motion for Summary Judgment pursuant to Local Civil Rule (Rule) 7.1(i) filed by Defendants the State of New Jersey ("State"), the New Jersey State Police ("NJSP"), and John T. Nichols (collectively "State Defendants") (ECF No. 147 ("State Defendants' Motion")). Plaintiff Kyhallista Johnson, acting as the Administrator for the Estate of Dion Harrell, opposed both the City Defendants' Motion (ECF No. 139) as well as the State Defendants' Motion (ECF No. 151-1). The City Defendants filed a reply brief in further support of their Motion. (ECF No. 144.) The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, the City Defendants' Motion is **GRANTED**, and the State Defendants' Motion is

**DENIED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[1]

As explained in detail below,[2] Harrell was prosecuted, tried, and convicted for a 1988 sexual assault he did not commit. A jury convicted Harrell in 1992 based on the victim's mistaken identification and forensic evidence that purportedly linked him to the crime. He served four years in prison for the rape and was required to register as a sex offender. Harrell's conviction was vacated in 2016 based on DNA evidence that excluded him as the assailant. He filed this civil action in July 2018 against the State, the NJSP, Nichols (a NJSP forensic scientist), the City and O'Gibney (a City of Long Branch police officer).

Nichols worked for the New Jersey State Police Crime Lab, issued the forensic report that purportedly linked Harrell to the sexual assault, and testified for the prosecution at Harrell's trial. The Second Amended Complaint alleges that Nichols violated Harrell's federal and state constitutional rights by fabricating evidence and failing to comply with *Brady v. Maryland*, 373 U.S. 83 (1963), in connection with his forensic testing and report. The Second Amended Complaint also brings a common law negligence claim under state law against the State

---

[1]     On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

[2]     In its November 13, 2024 Opinion, the Court summarized the evidence relevant to its disposition of the State Defendants' Motion for Summary Judgment. Specifically, the Court reviewed Nichols's serology report and analysis, Plaintiff's contentions challenging Nichols's expert analysis and reporting, Nichols's deposition testimony regarding his report, the evidence presented at the criminal trial in support of Harrell's alibi defense, Nichols's testimony at Harrell's trial and the closing arguments at Harrell's trial. *See Johnson v. New Jersey*, No. 18-11299, 2024 WL 4906034, at *2-9 (D.N.J. Nov. 27, 2024). The Court incorporates and presumes the reader's familiarity with that decision, which recites this case's full procedural history and factual background. The following summary focuses on facts specifically relevant to the Court's resolution of the pending Motions.

Defendants and a state law *Brady*/due process claim against the State and the NJSP. With respect to the City Defendants, the Second Amended Complaint asserts claims against O'Gibney for violating the federal and state constitutions by fabricating evidence and violating the United States Constitution by causing Harrell to be arrested, prosecuted, and convicted without probable cause. Finally, the amended pleading brings a common law malicious prosecution claim against the City Defendants and a state law *Brady*/due process claim against the City.

Harrell died on January 15, 2022, and his Administrator (Johnson) was substituted as Plaintiff on January 28, 2022.

The City Defendants and the State Defendants separately moved for summary judgment. On November 27, 2024, the Court granted in part and denied in part the State Defendants' summary judgment motion. On November 13, 2024, the Magistrate Judge directed the City Defendants to file their motion on the docket, which they did on November 15, 2024. The City Defendants' Motion is ready for disposition. In addition, on December 11, 2024, the State Defendants moved for reconsideration of the Court's ruling on their summary judgment motion.

## A.    The Sexual Assault

On September 18, 1988, between approximately 10:30 and 10:45 pm, a seventeen-year-old girl (the "victim"), was accosted by a man she had just walked past while walking home from work in Long Branch, New Jersey (the "assailant"). ("CSUMF" ¶ 1 (citing City SUMF ¶¶ 3-4; State SUMF ¶¶ 2-3).)[3] The assailant made a lewd comment, grabbed the victim from behind by her neck, and covered her mouth. (*Id.*) The assailant dragged the victim about seventy feet from

---

[3] "CSUMF" refers to Plaintiff's Counterstatement of Material Facts (ECF No. 140), "City SUMF" refers to the City Defendants' Statement of Undisputed Material Facts (ECF No. 143-2), the "State SUMF" refers to the State Defendants' Statement of Undisputed Material Facts (ECF No. 135-3), and "State Resp. to CSUMF" refers to the State Defendants' Response to the CSUMF (ECF No. 136-1).

the sidewalk into an empty parking lot. (*Id.*) The assailant pulled down the victim's pants and underwear and raped her until the victim told him that her father was across the street. (*Id.* (citing State Ex. B at 78-80).) When the assailant got off the victim, he snatched her purse. (*Id.*) The victim ran home and told her mother, and her mother called the police. (*Id.* (citing City SUMF ¶ 6; State SUMF ¶ 4).)

When the police interviewed the victim, she provided a general description of the assailant – a light-skinned Black male, teens, early twenties, clean shaven, approximately five foot eight wearing a red, long-sleeved sweatshirt with white writing on the front, blue jeans and white sneakers. (*Id.* ¶ 2 (citing State SUMF ¶ 5; State Ex. B (ECF No. 135-6) at 15).) The victim did not know the assailant, but she said she had seen him about three weeks earlier at a McDonalds where she worked. (*Id.* ¶¶ 2 (citing City SUMF ¶ 7), C7.) She claimed that she saw the assailant's face when she was on the street and during the assault and that she could recognize him because she had previously seen him at the McDonalds. (*Id.* ¶¶ C5, C7.)

The victim was taken to the emergency room at Monmouth Medical Center where she was examined by a doctor. (*Id.* ¶ 3 (citing City SUMF ¶ 6).) A "Sirchie Sex Crimes Kit" was performed. (*See id.* ¶ S6.) Vaginal, anal, and oral swabs/slides were taken as well as pubic hair combings and fingernail scrapings. (*Id.* ¶ 3 (citing City SUMF ¶ 6).) The rape kit was turned over to police, refrigerated, and then transported to the New Jersey State Police East Regional Laboratory in Sea Girt, New Jersey, for analysis. (*Id.*)

Police also collected several other items of physical evidence: (i) the victim's clothing (slacks, blouse, sweater, underwear), (ii) the bag used to initially collect the victim's clothing at the Monmouth County Emergency Room, (iii) the paper bags where the victim's clothing was transferred to after the initial collection at the hospital, and (iv) hair and fibers from the victim's

4

clothing. (*Id.* ¶ 4 (citing Pl. Ex. 4 (ECF No. 137-4)).)

**B.    The Victim Identifies Harrell as her Assailant and Harrell's Arrest**

Three days later, while the victim was working at McDonalds, she believed she saw her assailant, who was wearing a white leather jacket. (CSUMF ¶ C8.) The call from dispatch stated that a sexual assault victim recognized the man who raped her and he was out in front of McDonalds, and O'Gibney was told to look for a clean-shaven Black male wearing a white leather jacket. (*Id.* ¶ C9.) O'Gibney arrived at the McDonalds and found Harrell out in front of the restaurant handing a white leather jacket to a friend. (*Id.* ¶ C10.) O'Gibney waited outside with Harrell while Patrol Officer Charles Condone went into the McDonalds to speak with the victim. (*Id.* ¶ C11.) The victim was certain that Harrell was her assailant because she remembered his face from the sexual assault and the individual at the McDonalds had the same face. (*Id.* ¶ C12; *see also* ¶ C13 (O'Gibney noted in his report that the victim was very sure of herself and throughout the identification process she showed no sign of any hesitation in her naming Harrell as the assailant).)

Condone placed Harrell under arrest, O'Gibney read him his Miranda rights, and he was transported to police headquarters (where he again signed a notification of rights form). (*Id.* ¶¶ C14-C15.) Harrell was initially cooperative, but, when the police told him of the charges, he was shocked and said he was innocent. (¶ 5 (citing City SUMF ¶ 16).) He asked the officers to bring him to see the victim, thinking it would clear his name. (*Id.* ¶ 5.)

O'Gibney brought Harrell into a well-lit room and sat him approximately 10 feet away from the victim. (CSUMF ¶ C17.) Though not the typical procedure in this type of situation, the officer had allowed "face-to-face identifications" or "show-ups" in the past and witnessed other officers use the procedure. (*Id.* ¶ C18.) O'Gibney claimed he conducted the show-up because he

thought, if the victim got a good look at Harrell, she could say he was not the assailant. (*Id.*) According to O'Gibney's report and subsequent testimony from both the officer and the victim, the victim positively identified Harrell as the assailant—and exhibited no hesitation in making this identification. (City SUMF ¶¶ 19-20 (citing City Ex. D. at T13:21-14:18; City Ex. F at 21:17-20, 26:21-27:2; City Ex. H at T54:19-T55:13);[4] CSUMF ¶¶ 19-20.)

After writing his report, O'Gibney had no further involvement in Harrell's prosecution, apart from appearing as a witness at trial. (CSUMF ¶ C22.)

**C.    Swordsma's Note to Crumrine**

In his deposition, Nichols's supervisor Henry Swordsma testified that, when he looked at the records in this case, he noticed a handwritten comment in one of the margins. (CSUMF ¶ 14 (citing State Ex. M (ECF No. 135-17) at 27); Pl. Ex. 4 (ECF No. 137-4) at 4.) The note is not legible to the Court,[5] but Swordsma stated that the notation reminded him that he had told Detective Gregory Crumrine[6] that the serological testing was inconclusive. (*Id.* (citing State Ex. M at 27-29).)

Specifically, Swordsma testified that he "notice[d] that [he] made a note, on the bottom right hand corner" of the "request for examination of evidence." (State Ex. M at 26-27.) When asked at his deposition whether he told Crumrine that "due to both the victim and the suspect being substance H that you couldn't draw any conclusions?" Swordsma responded "[t]hat's correct." (*Id.* at 29.)

---

[4]    The City's exhibits were docketed at ECF No. 143-4.

[5]    The State Defendants have denied that the note is illegible, but they have not provided a legible copy to the Court. (*See* State Response to CSUMF ¶ 14.)

[6]    Crumrine was a Long Branch police officer in the Forensic Unit of the Detective Bureau. (CSUMF ¶ C30.) He died many years before Harrell's exoneration. (*Id.* ¶ 14 (citing City SUMF ¶ 33).)

### D.    The Trial Testimony

At Harrell's trial, the victim testified that she was able to see the person that grabbed her by the neck and that she "saw his face." (State Ex. B (ECF No. 135-6) at HARRELL 00548.) She stated that the assailant grabbed her around the neck with his forearm. (*Id.*) The victim further testified that she could see the assailant's face (*id.* at HARRELL 00558), and she positively identified Plaintiff in the courtroom (*Id.* at HARRELL 00566).

### E.    Post-Conviction Proceedings

It is undisputed that Harrell was convicted and sentenced to eight years in prison for the rape. (CSUMF ¶ 23 (citing Ex. T (ECF No. 135-24)).) At the time he was sentenced, he also pleaded guilty to stealing from a car and was given an additional four years of incarceration to run consecutively with his incarceration for the rape. (*Id.*)

### F.    Harrell is Exonerated and his Conviction is Set Aside

Harrell was released on parole after serving four years for the rape, and no time for the burglary charge. (CSUMF ¶ 23 (citing Pl. Ex. 5 (ECF No. 137-5) at 47).) Following his release, Harrell was required to register as a sex offender under Megan's Law, N.J. Stat. Ann. §§ 2C:7-1 through 2C:7-11. Further, he was arrested and re-imprisoned twice for violating Megan's Law, causing him to spend additional time incarcerated.[7] (CSUMF ¶ 24 (citing Pl. Ex. 5 at 18-19).)

In 2014, Harrell's case was taken on by the Innocence Project, who filed a motion to have the DNA evidence tested, which was not available when Harrell was prosecuted. (*Id.* ¶ 24 (citing Pl. Ex. 6 (ECF No. 137-6)).) Although the Monmouth County Prosecutor initially opposed the requested relief, the motion was granted on consent on February 13, 2015. (*Id.* (citing Pl. Ex. 7

---

[7]    The parties agree that Harrell was incarcerated for violating Megan's Law but dispute whether the registration requirement prevented Harrell from finding and maintaining employment. (*See* State Resp. to CSUMF ¶ 23.)

(ECF No. 137-7)).)  It is undisputed that DNA test results, documented in a July 13, 2016 report from Bode Cellmark Forensics, excluded Harrell as the assailant.  (*Id.* (citing Keel Report (ECF 138) ¶¶ 35-37); State Resp. to CSUMF ¶ 24.)

It is also undisputed that based upon the new DNA evidence, and upon the joint application of Harrell and the prosecution, the sexual assault conviction against Harrell, and the two Megan's Law violations, were vacated on August 3, 2016.  (*Id.* ¶ 25 (citing Pl. Ex. 8 (ECF No. 137-8); State Resp. to CSUMF ¶ 25.)

### G.    Relevant Procedural History

On July 2, 2018, Harrell filed a counseled civil rights complaint against the State and City Defendants, asserting constitutional claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. §§ 10:6-1, *et seq.*, as well as common law negligence claims.  (*See generally* ECF No. 1.)

In October 2020, Harrell filed an Amended Complaint, which added in relevant part, a new cause of action asserting a *Brady* claim against Nichols.  (ECF No. 49 ¶¶ 60–63.)  That claim, listed in the Amended Complaint as the second cause of action, was predicated on Nichols's alleged failure to call to the prosecution's attention exculpatory information relevant to his forensic testing so that it could be turned over to the defense.  (*See id.* ¶ 61.)

On February 10, 2023, Plaintiff filed a Motion to Amend, which all Defendants opposed. (ECF Nos. 86, 93-95.) The proposed Second Amended Complaint largely reiterates Plaintiff's *Brady* claim against Nichols and appears to add *Brady* claims against the City, the State, and the NJSP based on Swordsma's deposition testimony that he relayed Nichols's testing results to Crumrine who, Plaintiff alleges, likewise failed to inform the prosecution of its exculpatory

character.[8] (*See* ECF No. 103-1.)  After supplemental briefing, the Magistrate Judge granted the

Motion to Amend on June 12, 2023, and directed Plaintiff to file the Second Amended Complaint.

(ECF Nos. 102-05, 107-08.)  The Second Amended Complaint was filed on June 18, 2023.  (ECF

No. 108.)

The State Defendants filed a Motion for Summary Judgment on April 9, 2024.  (ECF No.

135.)  It appears that the City Defendants served their Motion for Summary Judgment on Plaintiff

in December 2023, and, on January 23, 2024, the Magistrate Judge granted the City Defendants'

motion for leave to file out of time.  (ECF No. 122.)  On April 15, 2024, Plaintiff filed a brief

opposing both the State Defendants' Motion as well as the City Defendants' Motion.  (ECF No.

139.)  The State Defendants filed a reply brief.  (ECF No. 136.)  On November 13, 2024, the

Magistrate Judge directed the City Defendants to file their Motion on the docket, and the City

Defendants' Motion was docketed on November 15, 2024.  (ECF Nos. 142-43.)  The City

Defendants' reply brief in further support of their Motion was filed on November 26, 2024.  (ECF

No. 144.)

On November 27, 2024, the Court granted in part and denied in part the State Defendants'

Motion for Summary Judgment. *Johnson*, 2014 WL 4906034; (ECF No. 146).  The Court granted

the State Defendants' summary judgment motion as to: (1) the NJCRA claims against the State

and NJSP, as alleged in Count Six of the Second Amended Complaint; and (2) the *Brady* claims

against Nichols under § 1983 and the NJCRA, as alleged in Count Six of the Second Amended

Complaint.  (ECF No. 146 at 1-2.)  The State Defendants' summary judgment motion was

otherwise denied.  (*Id.* at 2.)

On December 11, 2024, the State Defendants filed their Motion for Reconsideration and a

---

[8]    During supplemental briefing, Plaintiff filed a red-lined copy of the Second Amended Complaint.  (*See* ECF No. 103-1.)

Second Motion for Summary Judgment. (ECF No. 147.) Plaintiff opposed their Motion. (ECF No. 151-1.)

## II.    STANDARDS OF REVIEW

### A.    Summary Judgment

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (citing *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014)); *see also* Fed. R. Civ. P. 56(a).

It is well established that the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citation omitted). The moving party may also meet this burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (quotations and citations omitted).

Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (citation omitted). "If reasonable minds could differ as to the import of the

evidence," summary judgment is not appropriate. *Id.* at 250-51 (citing *Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1949)). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Nonetheless, summary judgment "cannot be avoided by resorting to speculation, or statements of personal opinion or mere belief; indeed, 'inference based on speculation or conjecture does not create a material factual dispute.'" *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 527 (D.N.J. 2013) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990), *aff'd*, 649 F. App'x 239 (3d Cir. 2016)); *see also Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) (noting that a party opposing summary judgment must rely on facts, not opinions or conclusions); *Rakowski v. Brigantine*, Civ. No. 19-21847, 2022 WL 326992, at *1 (D.N.J. Feb. 3, 2022) ("[M]ere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (citing *Orsatti v. N.J. State Pol.*, 71 F.3d 480, 484 (3d Cir. 1995)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

**B.    Reconsideration**

Although the Federal Rules of Civil Procedure do not expressly authorize motions for reconsideration, the Local Civil Rules permit such motions if the movant (1) files the motion "within 14 days after the entry" of the challenged order and (2) sets "forth concisely the matter or controlling decisions which the party believes the Judge has overlooked." L. Civ. R. 7.1(i).

Motions for reconsideration are "extremely limited procedural vehicle(s)" that are to be granted "very sparingly." *Clark v. Prudential Ins. Co. of Am.*, 940 F. Supp. 2d 186, 189 (D.N.J. 2013) (citations and quotation marks omitted). Such motions may be granted only if the moving party shows "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [reached its original decision]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011) (citations and emphasis omitted). They are "not a vehicle for a litigant to raise new arguments or present evidence that could have been raised prior to the initial judgment." *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 168 (D.N.J. 2013) (citation omitted). It is also improper to "ask the court to rethink what it ha[s] already thought through—rightly or wrongly." *Lynch v. Tropicana Prods., Inc.*, No. 11-7382, 2013 WL 4804528, at *1 (D.N.J. Sept. 9, 2013) (quoting *Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co. of Md.*, 744 F. Supp. 1311, 1314 (D.N.J. 1990)).

"The word 'overlooked' is the operative term in the Rule." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 130 F. Supp. 2d 610, 612 (D.N.J. 2001) (citation omitted). "Because the requirements are so stringent, motions for reconsideration typically are not granted." *CPS MedManagement.*, 940 F. Supp. 2d at 168. Therefore, "[u]nless a court has truly failed to consider pertinent authorities or evidence that could not with reasonable diligence have been presented earlier, a motion to reconsider a decision (even one that may contain an error) is generally futile." *Id.*

## III.    **DISCUSSION**

### A.    The § 1983 and NJCRA Claims Against O'Gibney

In Count One of the Second Amended Complaint, Plaintiff alleges violations of the Fourth,

Fifth, Sixth, and Fourteenth Amendments under § 1983[9] for fabrication of evidence against

O'Gibney. (ECF No. 108 at 10.) Specifically, Plaintiff alleges that O'Gibney "fabricated evidence

by creating a report with a false statement that the victim had clearly identified Harrell, when in

truth she had barely looked at him." (*Id.* ¶ 50.) In Count Two, Plaintiff claims that O'Gibney is

liable under the NJCRA[10] by infringing the due process and equal protection rights secured by the

United States Constitution and substantive rights guaranteed by the New Jersey Constitution when

he "fabricated evidence." (*Id.* ¶ 54.) Plaintiff further alleges in the Fifth Count a § 1983 claim for

prosecution without probable cause against O'Gibney. (*Id.* at 13.) According to the Second

Amended Complaint, "Defendant O'Gibney, acting under color of law, despite knowing that

probable cause did not exist to arrest and prosecute Harrell, caused Harrell to be prosecuted, and

convicted." (*Id.* ¶ 73.)

The City Defendants argue that O'Gibney is entitled to qualified immunity because "there

was clearly probable cause to arrest Harrell, the show-up identification made by [the victim] at the

police station was common and accepted at the time in 1988, and there is no evidence in the record

whatsoever that meets the standard for proving fabrication of evidence." (ECF No. 143-1 at 12.)

---

[9]    "To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution or the laws of the United States committed by a person acting under the color of state law." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 580–81 (3d Cir. 2003) (citation omitted).

[10]    The NJCRA protects federal rights and substantive rights under the New Jersey Constitution. *See Gormley v. Wood-El*, 218 N.J. 72, 97 (2014) ("Section 1983 applies only to deprivations of federal rights, whereas N.J.S.A. 10:6-1 to -2 applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws.").

An award of qualified immunity protects a government official from civil liability and suit "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[11] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). This inquiry is limited to the law at the time of the incident, as "an official could not be reasonably expected to anticipate subsequent legal developments." *Id.* at 818. To overcome a defendant's claim of qualified immunity, the court must determine: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818); *see also Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 557 (3d Cir. 2017) ("We first determine whether a right has been violated. If it has, we then must decide if the right at issue was clearly established when violated such that it would have been clear to a reasonable person that her conduct was unlawful." (citation omitted)). The two inquiries need not be addressed in sequence; instead, courts are entitled to "exercise their sound discretion" and decide which issue to first address. *Person v. Callahan*, 555 U.S. 223, 236 (2009). The defendant official is entitled to qualified immunity if either prong is not satisfied. *See id.* at 244-45.

Plaintiff does not respond to the City Defendants' legal arguments regarding the state and federal constitutional claims against O'Gibney. (*See generally* ECF No. 139.) In fact, Plaintiff only mentions O'Gibney by name twice in her brief (in the caption and in the footnote consenting to the dismissal of the negligence and malicious prosecution claims against the two City Defendants). (*Id.* at 1-2.) Likewise, the City Defendants' factual assertions regarding the show-up identification conducted by O'Gibney and the existence of probable cause are largely

---

[11]     The NJCRA is typically treated as the state court analog to § 1983, and defenses and immunities available under the federal statute (such as qualified immunity) apply to claims under the state analog. *See Kelley v. Reyes*, No. 19-17911, 2025 WL 618207, at *8 n.7 (D.N.J. Feb. 26, 2025)

undisputed, and Plaintiff's own factual assertions are either unsupported or insufficient to defeat

summary judgment on these claims. (*See generally* ECF No. 139; CSUMF.)  Considering this

evidence, the Court concludes that O'Gibney is entitled to qualified immunity under the first prong

of the immunity doctrine as to Counts One, Two, and Five.

### 1.    Fabrication of Evidence

In its November 27, 2024 Opinion, the Court explained the standards governing due

process claims for fabricated evidence:

> Thus, "if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment." *Mervilus v. Union Cnty.*, 73 F.4th 185, 193 (3d Cir. 2023) (quoting [*Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014)]. As explained by the Third Circuit, "[f]abricated evidence is an affront to due process of law, and state actors seeking to frame citizens undermine fundamental fairness and are responsible for 'corruption of the truth-seeking function of the trial process.'" *Black*, 835 F.3d at 370 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)); *see also Halsey*, 750 F.3d at 293 ("We emphatically reject the notion that due process of law permits the police to frame suspects.").  Whether a plaintiff is convicted or acquitted, he or she may have a claim based on fabrication of evidence. *Black*, 835 F.3d at 371.
>
> The Third Circuit has "cautioned . . . that there are 'hurdles facing a plaintiff alleging a due process violation for fabrication of evidence.'" *Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 69 (3d Cir. 2017) (quoting *Black*, 835 F.3d at 372).  "A plaintiff must demonstrate a 'meaningful connection' between the injury and the use of the fabricated evidence." *Id.* (quoting *Black*, 835 F.3d at 372).  "There is also a requirement that the evidence be 'so significant that it could have affected the outcome of the criminal case.'" *Id.* (quoting *Black*, 835 F.3d at 372).  That is, there must be a "reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted." *Halsey*, 750 F.3d at 294.
>
> Further, "the standard required to demonstrate that evidence is fabricated is a 'notable bar.'" *Id.* (quoting *Black*, 835 F.3d at 372). "[T]testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been

15

> wrong." *Halsey*, 750 F.3d at 295. Rather, a "fabrication-of-evidence claim requires persuasive evidence [the defendant] formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth." *Mervilus*, 73 F.4th 185, 194-95. Therefore, for Plaintiff to withstand the State Defendants' Motion for Summary Judgment, [she] must bring "persuasive evidence supporting a conclusion" that Nichols "was aware that evidence [wa]s incorrect or that [it was] offered in bad faith." *See Mervilus*, 73 F.4th at 194 (quoting *Black*, 835 F.3d at 372).

*Johnson*, 2024 WL 4906034, at *13-14 (footnote omitted).

In the Second Amended Complaint, Plaintiff alleges that O'Gibney fabricated evidence by creating a report falsely stating that the victim had clearly identified Harrell at the police station show-up, when in fact she had barely looked at him, had kept her head down, and merely nodded her head indicating "yes." (ECF No. 108 ¶¶ 24, 50.) In his report, O'Gibney stated that the victim looked at Harrell in "a cold and deliberate manner and said 'yes, that's him.'" (City SUMF ¶ 20) According to the report, the victim was asked if she was sure, she stared at Harrell again, and she said "Yes." (*Id.*) O'Gibney provided the same description of the identification in his trial testimony and likewise stated at his deposition in this case that the victim looked right at Harrell for several seconds and responded, "that's him." (*Id.* (quoting City Ex. F at 21:17-20, 26:21-27; City Ex. H at T:54:19-55:13).) The victim also testified at her deposition that she had no hesitation at the police station identifying Harrell as the man who attacked her. (*Id.* ¶ 19 (citing City Ex. D at T13:21-T14:18).)

While Plaintiff denies that the victim recognized her assailant and the accuracy of her identification "because Harrell was exonerated by DNA evidence" (*see* CSUMF ¶¶ 19-20), she does not point to any record evidence disputing the veracity of the report or sworn testimony regarding the victim's demeanor at the show-up. Furthermore, Plaintiff's bare allegation in the pleading that O'Gibney fabricated evidence is insufficient to raise a genuine issue of material fact.

16

*See Rakowski*, 2022 WL 326992, at *1 (stating that mere allegations will not defeat summary judgment).

Because Plaintiff does not present specific facts indicating that O'Gibney violated Harrell's constitutional rights by fabricating evidence, the Court concludes that O'Gibney is entitled to immunity under the first prong of the qualified immunity doctrine and grants summary judgment for O'Gibney on Counts One and Two.

### 2.  Probable Cause and the "Show-Up" Identification

The Fourth Amendment prohibits police from making an arrest except "upon probable cause, supported by Oath or affirmation." "Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).  Put another way, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti*, 71 F.3d at 483 (citing *United States v. Cruz*, 910 F.2d 1072, 1076 (3d Cir. 1990).  Importantly, "summary judgment for false arrest and false imprisonment is proper only if no reasonable juror could find a lack of probable cause for any of the charged crimes." *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020) (footnote omitted).

"To prove malicious prosecution under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Estate*

*of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (citing *Donahue v Gavin*, 280 F.3d 371, 379-80 (3d Cir. 2002)).

At the summary judgment stage, a court must assess probable cause based on the totality of the circumstances known by the officer at the time of the arrest, and those circumstances must be viewed in the light most favorable to the nonmoving party. *Harvard*, 973 F.3d at 200. "This totality-of-the-circumstances inquiry is 'necessarily fact-intensive' and thus 'it will usually be appropriate for a jury to determine whether probable cause existed.'" *Id.* at 200 (quoting *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016)). Nevertheless, a district court may conclude "that probable cause did exist as a matter of law if the evidence, viewed most favorably to the Plaintiff, reasonably would not support a contrary factual finding." *Estate of Smith*, 318 F.3d at 514 (quoting *Sherwood*, 113 F.3d at 401).

According to Plaintiff, the "one-witness identification [was] contaminated by the improper show-up procedure" at the police station. (CSUMF ¶ 5 (citing City SUMF ¶ 16).) The Supreme Court has established a two-prong test for ascertaining whether the suggestive nature of an identification requires the identification's suppression at trial. *See Blount v. Adm.'r N.J. State Prison*, No. 22-1793, 2024 WL 4678050, at *2 (3d Cir. Nov. 5, 2024) (non-precedential). Under the first step, the court must ask "whether the procedures were 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 196-97 (1972)). "If so, then courts consider 'whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive.'" *Id.* (quoting *Neil*, 409 U.S. at 199). Five factors inform the second step of the inquiry: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of

18

certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation." *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

"While assessing the totality of the circumstances for purposes of admissibility is a distinct inquiry, the factors identified in [*United States v. Brownlee*, 454 F.3d 131 (3d Cir. 2006),] provide guidance for evaluating the reliability of an identification when assessing probable cause to arrest." *Pinkney v. Meadsville, Pa.*, 648 F. Supp. 3d 615, 638 (W.D. Pa. Jan. 3, 2023) (citing *Morrison v. Schultz*, 270 F. App'x 111, 116 (3d Cir. 2008)), *aff'd*, 95 F.4th 743 (3d Cir. 2024).

Show-up identifications are typically impermissible and unnecessary, but they are not subject to *per se* exclusion. *See Johnson v. Johnson*, No. 15-8896, 2023 WL 4760537, at *24 (D.N.J. Jul. 25, 2023). "Instead, identifications are admissible if sufficiently reliable." *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 114-17 (1977)); *see also Morrison*, 270 F. App'x at 116 (applying totality-of-the-circumstances test to determine whether show-up identification was reliable for probable cause purposes).

"When a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause to arrest." *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) (citing *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir.1991); *Grimm v. Churchill*, 932 F.2d 674, 675 (7th Cir.1991)), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 195 (3d Cir. 2007). A victim's statements are generally sufficient to establish probable cause if there is an absence of independent exculpatory evidence or substantial evidence of the victim's unreliability that outweighs the probable cause that otherwise exists. *See Dempsey*, 834 F.3d at 477.

The Court concludes that the City Defendants are entitled to summary judgment with respect to Plaintiff's false arrest and malicious prosecution claims.

It is undisputed that, when the victim was interviewed by the police immediately after the

sexual assault, the victim provided a general description of the assailant. (CSUMF ¶ 2 (citing State SUMF ¶ S5; State Ex. B at 15).) The victim did not know the assailant, but she said she could recognize him because she had seen him about three weeks earlier at a McDonalds (where she worked). (*Id.* (citing City SUMF ¶ 7); City SUMF ¶ 7 (citing City Ex. A ¶ 16; City Ex. B at LB11; City Ex. C at HARRELL 001364; City Ex. F at 5:17-25, 15:23-16:15).) Acting on her own, the victim subsequently contacted the police, reporting that she believed she recognized her assailant at the McDonalds. (CSUMF ¶ C8.) At both the McDonalds and at the subsequent police station show-up, the victim indicated that she was certain Harrell was the man who sexually assaulted her. (City SUMF ¶¶ 12 (citing City Ex. D at T12:2-6), 19 (citing City Ex. D at T13:21-T14:18), 20 (citing City Ex. F at 21:17-20, 26:21-27:2; City Ex. H at T54:19-T55:13).) Finally, the McDonalds encounter and the police station show-up occurred three days after the sexual assault. (*See* CSUMF ¶ 5.)

In her opposition brief, Plaintiff does not specifically address the reliability of the show-up identification or the overall issue of whether there was probable cause to arrest Harrell. (*See generally* ECF No. 139.) According to Plaintiff's Statement of Material Facts, "this one witness identification contaminated by the improper show-up procedure was the only evidence against Harrell." (CSUMF ¶ 5 (citing City SUMF ¶ 16).) But, in support of this factual assertion regarding "contamination," Plaintiff cites an inapposite paragraph in the City Defendants' Statement of Material Facts stating that "Harrell insisted on a face-to-face with his accuser numerous times thinking it would clear his name and his request was eventually granted by Defendant O'Gibney." (City SUMF ¶ 16 (citing City Ex. A ¶ 20; City Ex. F at 21:7-11; City Ex. G at LB5; City Ex. H at T43;3-5, T47:2-25).) Plaintiff challenges the accuracy of the identification, stating, *inter alia*, that "the victim claimed she could identify her assailant," but "deny[ing] that she did because Harrell

20

was exonerated by DNA evidence." (CSUMF ¶ C7.) However, Harrell's DNA evidence was not tested until 2016 (using a test that was not available at the time Harrell was prosecuted). *See Harvard*, 973 F.3d at 200 (indicating that court must assess probable cause based on the totality of the circumstances known by the officer at the time of the arrest); (CSUMF ¶ 24). Plaintiff also does not cite to any evidence supporting the allegations in the Second Amended Complaint that "on information and belief, the victim never got a good look at her assailant, and when Harrell was arrested and prior to the show-up, the victim was equivocal and uncertain if Harrell was the assailant or someone she vaguely recognized from the part."[12] (ECF No. 108 ¶ 22); *see also Rakowski*, 2022 WL 326992, at *1 ("[M]ere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (citation omitted)).

Given the totality of the evidence known at the time regarding the reliability of the victim's identification, the Court concludes that probable cause existed as a matter of law because "the evidence, viewed most favorably to the Plaintiff, reasonably would not support a contrary factual finding," *Estate of Smith*, 318 F.3d at 514 (citation omitted). Because Plaintiff cannot show a constitutional violation, O'Gibney is entitled to qualified immunity and summary judgment is granted in O'Gibney's favor on Count Five.

### B.    The Common Law Claims against the City Defendants

The City Defendants move for summary judgment on Counts Three (common law negligence) and Four (common law malicious prosecution). (ECF No. 143-1 at 27-39.) Plaintiff states that she is "not pursuing the negligence and malicious prosecution claims against Defendant Brian O'Gibney, and the City of Longbranch [sic], and consents to their dismissal." (ECF No. 139

---

[12] Plaintiff further alleges that the show-up was "against protocol and proper procedure." (ECF No. 108 ¶ 21.) Nonetheless, it is undisputed that, although atypical, O'Gibney had allowed a "face-to-face" between the victim and the suspect numerous times in the past and that he witnessed other officers perform similar identifications. (CSUMF ¶ C18.)

at 2 n.1.)  Accordingly, the Court grants the City Defendants' Motion as to Counts Three and Four.

### C.    The Brady Claim

In Count Seven,[13] Plaintiff alleges a state law claim for *Brady* and due process violations against the State, the NJSP, and the City.  (ECF No. 108 at 14.)  Crumrine allegedly violated Harrell's due process rights by failing "to document his conversation with Swordsma, where he learned that the serology testing was inconclusive, and there is no evidence he ever told the prosecution [about this exculpatory evidence]" and, as a direct and proximate result of this failure, Harrell was wrongly convicted and imprisoned.  (*Id.* ¶¶ 84-85.)  Allegedly, "the City, as Crumrine's employer, is vicariously liable under respondeat superior for O'Gibney's actions."  (*Id.* ¶ 86.)

The City Defendants argue that Plaintiff's *Brady* claim against the City fails as a matter of law because respondeat superior liability is not permitted for claims under the New Jersey Constitution and the NJCRA and Plaintiff has not made any showing of a city custom, policy, or practice for purposes of establishing municipal liability under *Monell v. Department of Social Security*, 436 U.S. 658 (1978).  (ECF No. 143-1 at 16, 40-42.)  Plaintiff asserts that the City Defendants misstate her *Brady* claim against the City.  (ECF No. 139 at 25.)  According to Plaintiff, she has not "brought a NJCRA claim against the City" but instead seeks a remedy "derived directly from the New Jersey state constitution."  (*Id.* at 26.)  Plaintiff states that, "[a]s discussed in Plaintiff's motion for leave to file the Second Amended Complaint, the New Jersey Supreme Court has not opined on the availability of a private damages remedy against a municipality arising from

---

[13]    There are two Count Sixes in the Second Amended Complaint: (1) "SIXTH CLAIM FOR RELIEF: *BRADY* VIOLATIONS UNDER 42 U.S.C. § 1983 AGAINST NICHOLS;" and (2) "SIXTH CLAIM FOR RELIEF: *BRADY*/DUE PROCESS VIOLATIONS UNDER THE NEW JERSEY CONSTITUTION AGAINST NEW JERSEY, STATE POLICE, AND THE CITY." (ECF No. 108 at 13-14 (emphasis omitted).)  For purposes of this Opinion, the Court refers to the second "Sixth Claim for Relief" as Count Seven.

a violation of the state constitution by one of its agents or employees." (*Id.* at 27.) She further notes that it is undisputed that the New Jersey Constitution provides due process protections concerning the disclosure of favorable evidence in criminal prosecutions. The City Defendants purportedly have not opposed this particular theory of liability or cited any authority stating that this remedy is unavailable. (*Id.* at 26-27.) Plaintiff asserts that Count Seven should survive because the City Defendants thereby have "not actually moved to dismiss it." (*Id.* at 27.) In their reply brief, the City Defendants deny that they misstate the claim by construing it as a *Monell* or NJCRA claim. (ECF No. 144 at 3.)

## 1. Count Seven and Private Rights of Action under the New Jersey Constitution

The Court agrees with the City Defendants that Count Seven constitutes a claim under the NJCRA. In fact, in its prior Opinion disposing of the State Defendants' Motion for Summary Judgment, the Court construed Count Seven as alleging *Brady* claims against the State and the NJSP under the NJCRA:

> In Count [Seven], the Second Amended Complaint does allege *Brady* claims against the State and the NJSP arising under the NJCRA. (SAC at 14.) Like § 1983, the plain language of the NJCRA imposes liability on any "person" who violates a plaintiff's civil rights under color of law. In particular, the NJCRA provides in relevant part that:
>
>> Any person who has been deprived of any . . . rights . . . secured by the Constitution or laws of the United States, or . . . by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
>
> N.J.S.A. § 10:6–2(c). The Third Circuit has squarely held that the

> State of New Jersey and state entities are not "persons" for purposes
> of the NJCRA. *Didiano v. Balicki*, 488 F. App'x 634, 638-39 (3d
> Cir. 2012); *see also Gonzalez v. New Jersey Department of Children
> and Families*, 545 F. Supp. 3d 178, 226 (D.N.J. 2021) ("The Third
> Circuit has thus concluded that the New Jersey Civil Rights Act does
> not grant a cause of action against New Jersey or arms of the state.").
> To the extent Plaintiff has not withdrawn the NJCRA claims against
> the State and the NJSP, they are dismissed because the State and
> State entities, such as the NJSP, are not "persons" subject to suit
> under § 1983 or the NJCRA.

*Johnson*, 2024 WL 4906034, at *12.[14]  In Count Seven, Plaintiff alleges that, like Crumrine,

Nichols deprived Harrell of due process by failing to document the exculpatory fact that the

serology testing was inconclusive.  (ECF No. 108 ¶ 83.)  Similarly, like the City (Crumrine's

employer) "New Jersey and the State Police, as Nichols' employer, are [allegedly] vicariously

liable under respondeat superior for Nichols' actions." (*Id.* ¶ 87.)  There is no apparent reason to

construe Count Seven any differently based on which public employer (the City or the State/NJSP)

is named as the Defendant.

Furthermore, the Court refrains from construing Count Seven as seeking a remedy "derived

directly" from the New Jersey Constitution because "it is not likely under the legislative scheme

that an additional remedy may be inferred under the New Jersey Constitution for the circumstances

of this case," *K.J. ex rel. Lowry v. Div. of Youth & Fam. Servs.*, 363 F. Supp. 2d 728, 747 (D.N.J.

2005).

Plaintiff acknowledges that the New Jersey Supreme Court has not opined on the

availability of a private damages remedy against a municipality arising from a violation of the New

Jersey Constitution by a municipal employee, or, as she phrased the question more broadly in her

---

[14]     The Court referred to "Count Six" but also noted that Count Six is listed twice in the Second
Amended Complaint. *Johnson*, 2024 WL 4906034, at *12 & n.12.  Because the first "Count Six"
only names Nichols as a Defendant (ECF No. 108 at 13), it is clear that the Court meant the second
"Count Six," *i.e.,* Count Seven.

brief in support of the motion to amend, whether there is a private right of action against the State or the municipality under the state constitution.  (ECF No. 88 at 10-11; ECF No. 139 at 27.) However, Plaintiff also cites to District of New Jersey case law indicating that no such private right of action exists.  (ECF No. 88 at 11 & n.3 (citing *Lowry*, 363 F. Supp. 2d at 745-46; *Thomas v. E. Orange Bd. of Educ.*, 998 F. Supp. 2d 338, 354 (D.N.J. 2014)).

In *Lowry*, the court examined the question of "whether a private right of action for damages exists under the State Constitution for a violation of an individual's due process rights by the State government." *Lowry*, 363 F. Supp. 2d at 745.  The *Lowry* court explained that "[f]ew cases directly address implying a private right of action for a due process violation of an individual's rights under the New Jersey Constitution." *Id.* at 745.  Specifically:

> Those cases permitting a private right of action for a violation of an individual's rights under the New Jersey Constitution appear to be limited to employment discrimination under equal protection. *See, e.g., Peper v. Princeton Univ. Bd. of Trs.*, 77 N.J. 55, 389 A.2d 465 (1978). *Cf. Cooper v. Nutley Sun Printing Co.*, 36 N.J. 189, 175 A.2d 639 (1961) (providing an equitable remedy).  In these cases, the New Jersey courts permit an implied private right of action for violations of individual rights under State due process.  It is not clear whether the New Jersey Supreme Court would also infer a private cause of action against the State government.

*Id.*  A bill was introduced in 2002 "to close the gaps in state law by providing remedies for violations of an individual's state and federal constitutional rights," and the NJCRA, which was "[m]odeled after Section 1983," was "passed in September of 2004." *Id.* (citing A-2073/S-1558 (N.J. 2002); New Jersey Civil Rights Act, N.J. Stat. Ann. §§ 10:6-1 and 10:6-2 (2004)).  The *Lowry* plaintiffs also had remedies under the NJTCA and the Child Placement Bill of Rights Act. *Id.* at 747.  In the end, the court concluded that an additional cause of action "could not be inferred under the New Jersey Constitution," and that the plaintiffs provided "insufficient justification" for this requested remedy:

> As discussed in this opinion, the New Jersey Tort Claims Act and the Child Placement Bill of Rights Act both provide remedies against the State. Thirty years ago, the legislature opened the State to suit under a tort claims act. In response to inaction under the State laws, the legislature provided a specific bill of rights act to address the rights of children within the State surrogate care system. Recently, the legislature enacted a civil rights act to provide additional remedies under the New Jersey Constitution.
>
> Because these remedies are available, it is not likely under the legislative scheme that an additional remedy may be inferred under the New Jersey Constitution for the circumstances of this case. The court must conclude that insufficient justification has been offered to provide the requested remedy against the State government at this time. Counts Four and Five are dismissed.

*Id.* at 747.

The ruling and reasoning in *Lowry* have been applied in subsequent case law concluding that the New Jersey Constitution does not create a private right of action for due process violations. For example, in *Thomas*, the court held that "the New Jersey Constitution does not provide a private right of action for violations of an individual's due process or, except for in the employment context, equal protection rights." *Thomas*, 998 F. Supp. 2d at 354 (citing *Lowry*, 363 F. Supp. 2d at 745-47).

Likewise, in *Crane v. Sussex County Prosecutor's Office*, No. 08-1641, 2009 WL 192567 (D.N.J. Jan. 27, 2009), the court observed that *Lowry* "confronted the question of whether or not the state constitution permits a private a right of action when the government violates a person's due process rights" and "held that it did not," *id.* at *7 (citing *Lowry*, 363 F. Supp. 2d at 745-47). According to *Crane*, "[t]he court canvassed the New Jersey legislative scheme in reaching this conclusion, and held that it was "not likely . . . that an additional remedy may be inferred under the New Jersey Constitution for the circumstances of this case.'" *Id.* (quoting *Lowry*, 363 F. Supp. 2d at 747). This Court is inclined to agree with the *Lowry* court's thoughtful analysis and conclude

that there is no private right of action directly under the due process clause of the state constitution. *Id.* (footnote omitted).

In fact, the court in *Crane* considered this issue of a private right of action in more detail in its discussion of the plaintiffs' claim of an illegal search under the state analog to the Fourth Amendment:

> Suffice it is to say here that state courts across the country have generally been unwilling to recognize a due process clause private right of action under their state constitutions. Until the New Jersey Supreme Court rules on the issue, out of an abundance of caution and under principles of comity, it would not be prudent to recognize such a right at this time.

*Id.* at *7 n.5.

In its discussion of the illegal search claim, the *Crane* court acknowledged that it may seem "counterintuitive" to recognize that a private right of action exists for an illegal search but not for due process (and, except in the employment context, equal protection) violations. *Id.* at *8. It nonetheless observed that cases in this District have implicitly acknowledged a right of action in the illegal search context. *Id.* In addition, other state supreme courts, based on policy considerations and common law principles, have distinguished between private causes of action for violating the respective state constitution's due process and equal protection provisions (which they refuse to recognize) and private rights of action for illegal searches and seizures (which they permit). *Id.; see also Jones v. Ewing Twp. Bd. of Educ.*, No. 09-3536, 2010 WL 4669875, at *12 (D.N.J. Nov. 9, 2010) (relying on *Lowry* to hold that there is no private right of action under the New Jersey Constitution).

Plaintiff argues that the *Lowry* court did not reach the question of what the state supreme court may do if faced with a due process cause of action under the New Jersey Constitution and failed to certify the question to the New Jersey Supreme Court. (ECF No. 88 at 11.) According

to Plaintiff, the *Lowry* court found that alternative avenues of relief were sufficient, leaving the question unsettled, while the subsequent cases merely cited to *Lowry* without providing any analysis of what the state supreme court would do when faced with this question. (*Id.* at 11 & n.3.) However, the *Lowry* court explicitly concluded that, given the other remedies available to the plaintiffs, "insufficient justification has been offered to provide the requested remedy against the State government at this time." *Lowry*, 363 F. Supp. 2d at 747. The court in *Crane* considered decisions construing the constitutions of other states, *Crane*, 2009 WL 192567, at *8 & n.5.

In the end, "[b]ecause . . . remedies are available [to Plaintiff]," including causes of action under the NJTCA as well as a *Monell* claim under the NJCRA[15] (and § 1983), the Court concludes that "[i]t is not likely under the legislative scheme that an additional remedy may be inferred under the New Jersey Constitution" and "insufficient justification has been offered to provide the requested remedy" against the City "at this time," *Lowry*, 363 F. Supp. 2d at 747. In fact, since it went into effect over twenty years ago, the NJCRA has been recognized as "the vehicle" for state constitutional claims.[16] *See, e.g., Matrix Distribs., Inc. v. Nat'l Ass'n of Bds. of Pharm.*, No. 18-

---

[15]    N.J. Stat. Ann. § 10:6-2(c) explicitly provides that any person who has been deprived of any substantive rights, privileges, or immunities secured by the Constitution or laws of New Jersey "may bring a civil action for damages and for injunctive or other appropriate relief."

[16]    Although not cited by Plaintiff, the Court further notes that there are decisions indicating that a private right of action may exist under the New Jersey Constitution. *See Joyce v. City of Sea Isle City*, No. 04-5345, 2008 WL 906266, at *21 (D.N.J. Mar. 21, 2008) (concluding that, "[u]nlike violations of the United States Constitution, which are actionable through § 1983, the New Jersey Constitution itself provides a remedy for violations of its provisions," (citing *Scully v. Borough of Hawthorne*, 58 F. Supp. 2d 435, 459 (D.N.J. 1999))), *reconsideration on other grounds granted in part & denied in part*, 2008 WL 2875456 (D.N.J. Jul. 23, 2008); *Scully v. Borough of Hawthorne*, 58 F. Supp. 2d 435, 459 (D.N.J. 1999) ("The New Jersey Supreme Court has held that the Constitution of the State of New Jersey may provide a private cause of action premised upon alleged violations of the State constitution." (citing *Peper*, 77 N.J. at 55, 76-80)), *reconsideration on other grounds granted in part & denied in part*, No. 04-5345, 2008 WL 2875456 (D.N.J. Jul. 23, 2008). However, the Court is persuaded by the *Lowry* line of decisions that no such right of action exists in the present circumstances.

17642, 2020 WL 7090688, at *13 (D.N.J. Dec. 4, 2020) (citing *O'Toole v. Klingen*, No. 14-6333, 2017 WL 132840, at *5 (D.N.J. Jan. 13, 2017)), *aff'd in part, rev'd in part & remanded on other grounds*, 34 F.4th 190 (3d Cir. 2022). Accordingly, Plaintiff does not have a private right of action under the New Jersey Constitution, and the Court construes Count Seven as a claim under the NJCRA.

### 2.    *Monell* Liability

To find a municipality liable under *Monell*, the plaintiff must prove the existence of a policy or custom that resulted in a constitutional violation. *See Monell*, 436 U.S. at 694-95. Liability "must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citing *Monell*, 436 U.S. at 691-95). A plaintiff can show the existence of a policy when a decisionmaker with final

---

The Court observes that Plaintiff has not cited to any case law indicating that, even if she has not cited to any case law indicating that, even if she has a private right of action under the New Jersey Constitution, she may hold the municipality liable for its employee's unconstitutional actions under respondeat superior principles. On the contrary, the court in *Joyce* noted that *Monell* has been adopted for claims under the state constitution. *Joyce*, 2008 WL 906266, at *13 (citing *Lloyd v. Borough of Stone Harbor*, 179 N.J. Super. 496 (Ch. Div. 1981)); *see also L.S. v. Mt. Olive Bd. of Educ.*, 765 F. Supp. 2d 648, 663 (D.N.J. 2011) ("In analyzing municipal liability for claims under the New Jersey Constitution, courts have specifically adopted the *Monell* standard applied in the context of claims under Section 1983. *Lloyd*, [179 N.J. Super. 496, 517], *overruled on other grounds by Fuchilla v. Layman*, [109 N.J. 319] (1988)."). Under *Monell*, "[a] municipality cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior*." *Thomas*, 749 F.3d at 222 (citing *Monell*, 436 U.S. at 691 ). In *Ingram v. Township of Deptford*, 911 F. Supp. 2d 289 (D.N.J. 2012), the court acknowledged the existence of prior decisions indicating that a respondeat superior claim may be alleged under the state constitution, *id.* at 297 (citing *Perry v. Bruns*, No. 11-2840, 2012 WL 395495, at *4 (D.N.J. Feb. 6, 2012); *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, No. 02-5470, 2009 WL 900854, at *4 (D.N.J. Mar. 31, 2009)). The *Ingram* court was "unpersuaded that the *Gibson* holding reflects the present approach of New Jersey courts in interpreting the state laws and state constitution" because the only New Jersey case cited by *Gibson* decided an issue expressly governed by the NJTCA (which is inapplicable to constitutional claims) and *Perry* solely relied on *Gibson* (and ultimately dismissed the respondeat superior claim on its merits). *Id.* at 299. Based on *Joyce*, *Ingram*, and *Lloyd*, the Court concludes that Plaintiff fails to present a sufficient justification for this Court to hold that a municipal defendant may be held liable on a respondeat superior theory under the state constitution.

authority "issues an official proclamation, policy, or edict." *Id.* (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).  Custom may be established by showing that a "given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.*  A plaintiff must also "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

Alternatively, a plaintiff may proceed on a municipal liability cause of action under a failure to supervise, train, or discipline theory of liability.  To make out such a claim, the plaintiff must show that "the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact."  *Thomas*, 749 F.3d at 222 (citation omitted). "Additionally, 'the identified deficiency . . . must be closely related to the ultimate injury;' or in other words, 'the deficiency [must have] actually caused' the constitutional violation."  *Id.* (alteration in original) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).

According to the City Defendants, "Plaintiff has not made any showing of a custom, policy, or provided any evidence that the Long Branch Police Department had an official policy of withholding exculpatory information."  (ECF No. 143-1 at 42.)  The Court agrees.  There is no evidence of a municipal policy, practice, or custom of withholding exculpatory information.  In addition, there is no indication that Crumrine was a policymaker, and Plaintiff does not suggest any deficiencies with respect to the City's training, disciplining or supervision of police officers. Accordingly, the Court grants the City Defendants' Motion with respect to Count Seven.[17]

---

[17]    Because the Court concludes that Count Seven fails under *Monell*, it need not (and does not) consider the City Defendants' alternative argument that Crumrine did not violate *Brady*.  (*See* ECF No. 143-1 at 42-48.)

### D.    The State Defendants' Motion for Reconsideration and Second Motion for Summary Judgment

#### 1.    The Constitutional Claims

The State Defendants assert that reconsideration is warranted because they did, in fact, argue in their initial moving brief that Nichols was entitled to qualified immunity for actions taken in the course of the criminal investigation, including his alleged fabrication of evidence. (ECF No. 147-1 at 12-15.)   The moving brief purportedly included "a full-throated qualified immunity defense to plaintiff's fabrication of evidence claim, at Point III(D), albeit under a point heading that misleadingly referenced only plaintiff's *Brady* claim" (and the State Defendants apologize for this mis-labeling).  (*Id.* at 13.)  The heading of Point III of the moving brief stated the following: "INDIVIDUAL CAPACITY CLAIMS AGAINST DEENDANT NICHOLS BASED UPON *BRADY* VIOLATIONS SHOULD BE DISMISSED BECAUSE NICHOLS DID NOT VIOLATE *BRADY*, AND IS OTHERWISE ENTITLED TO QUALIFIED IMMUNITY." (ECF No. 135-2 at i.) Point III.D. stated: "Nichols Is Entitled to Qualified Immunity Because No Clearly Established Law at the Time of Plaintiff's 1992 Trial Obligated Nichols to State in His Report that the Results of the Serology Testing Were 'Inconclusive.'" (*Id.* at ii.) The State Defendants assert that a review of the brief shows that the section expressly asserted that Nichols was entitled to qualified immunity for the issuance of the serology report, which was the crux of the fabrication claim, and concluded by stating that "Nichols is entitled to qualified immunity and Counts *One*, *Two,* Six and Seven should be dismissed.[18]  (ECF No. 147-1 at 13-14 (emphasis in original) (quoting ECF No. 135-2 at 34).)

Standing by their already-raised qualified immunity argument, "[i]n their reply brief, . . .

---

[18]    Count One alleges constitutional violations under § 1983 for fabrication of evidence, and Count Two consists of a NJCRA claim against Nichols for fabricating evidence and failing to turn over evidence favorable to the defense. (ECF No. 108 at 10-11.)

the State Defendants sought to explain why the cases relied upon by plaintiff in opposition to that

argument – cases where the courts, in distinguishable factual contexts, *rejected* qualified immunity

defenses to fabrication claims – were inapposite and sought to show why, contrary to those cases,

qualified immunity *does* apply" here.  (*Id.* at 14.)  The State Defendants then discuss the Court's

November 27, 2024 Opinion, contending that the Court did not examine or identify any clearly

established law that Nichols violated when he issued his report, and attempts to explain why

Nichols should be granted immunity under the "clearly established law" prong of the qualified

immunity doctrine.  (*Id.* at 14-24.)

Plaintiff responds that the State Defendants never moved for summary judgment on

qualified immunity grounds with respect to the fabrication of evidence claims.  (ECF No. 151-1 at

1-4.)  According to Plaintiff, it is obvious that the State Defendants only requested qualified

immunity on the *Brady* claims.  (*Id.*)  The Court agrees with Plaintiff and concludes that the State

Defendants fail to satisfy the stringent standards for obtaining reconsideration under Rule 7.1(i).

Initially, as the State Defendants note (ECF No. 147-1 at 9-10), this Court reviewed the

contents of the moving and reply briefs filed by the State Defendants in support of their summary

judgment motion and concluded that they did *not* properly raise the issue of qualified immunity

on the fabrication claim:

> The Court next addresses the fabrication of evidence claims
> against Nichols in his individual capacity, which are brought under
> the Fourteenth Amendment and the NJCRA.  In their moving brief,
> the State Defendants argue only that the fabrication of evidence
> claim fails because Nichols is absolutely immune for his trial
> testimony.  (*See* ECF No. 135-2 at 17-22.)  Plaintiff counters that
> the State Defendants misconstrue Plaintiff's fabrication of evidence
> claim against Nichols.  According to Plaintiff, Nichols is liable for
> forwarding reports containing false evidence and not for his trial
> testimony.  (*See* ECF No. 139 at 13-14.)
>
> . . . .

32

The State Defendants, in their opening brief, argue that Nichols is entitled to qualified immunity only with respect to the *Brady* claim and do not argue that he is entitled to qualified immunity as to the fabrication of evidence claim. They argue belatedly in their reply brief that Nichols is entitled to qualified or "good faith" immunity on the fabrication of evidence claim as well. (*See* ECF No. 136 at 11-13 (referring to "good faith" immunity under § 1983 and under state law). It is axiomatic that a party "may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *Witt v. City of Vineland*, No. 20-14678, 2024 WL 1928213, at *6 (D.N.J. Apr. 30, 2024) (quoting *D'Allessandro v. Bugler Tobacco Co.*, No. 05-5051, 2007 WL 130798, at *2 (D.N.J. Jan. 12, 2007); *Int'l Raw Materials, Ltd. V. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir. 1992)); *see also Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015). Thus, a court cannot grant summary judgment on a basis raised for the first time in a reply brief to which Plaintiff had no prior opportunity to respond. *Alston v. Forsyth*, 379 F. App'x 126, 129 (3d Cir. 2010) ("Fundamental fairness demands that [Plaintiff receive] notice and a meaningful opportunity to respond prior to the award of summary judgment on grounds raised for the first time in [State Defendants'] reply brief.") As such, the Court denies summary judgment to the extent State Defendants' claim that Nichols is entitled to qualified immunity on the fabrication of evidence claim under § 1983 and the NJCRA because he acted in good faith.

*Johnson*, 2024 WL 4906034, at *14.

The State Defendants fail to establish that reconsideration must be granted to correct a clear error of law or fact, prevent manifest injustice, or because the Court overlooked a potentially dispositive matter. *See Blystone,* 664 F.3d at 415; *Bowers*, 130 F. Supp. 2d at 612. On the contrary, the State Defendants' Motion provides additional support for this Court's assessment of their fabrication of evidence argument. For instance, the State Defendants acknowledge that, in Point II of the moving brief, they argued that the § 1983 claim against Nichols for fabricating evidence during his testimony at Plaintiff's trial was barred by absolute immunity. (ECF No. 147-1 at 5 (quoting ECF No. 135-2 at i).) It is also undisputed that Point III.D. was "mis-labeled" under

*Brady.* (*Id.* at 13.)

The State Defendants indicate that the Court should have inferred from the references to the alleged failure to generate a report and to Counts One and Two under Point III.D. that they were attempting to raise a qualified immunity defense to the fabrication claims. But "[j]udges are not like pigs, hunting for truffles buried in the record." *United States v. Shulick*, 18 F.4th 91, 113 (3d Cir. 2021) (quoting *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006)). In this specific context, "[t]he party asserting the affirmative defense of qualified immunity" bears the burden of persuasion on both prongs at summary judgment, and the State Defendants failed to properly "assert" qualified immunity as an affirmative defense to the fabrication claims in their prior briefing.[19] *Mack v. Yost*, 63 F.4th 211, 227 (3d Cir. 2023) (citing *Halsey*, 750 F.3d at 288)

In fact, although they now claim that they raised a "full-throated" qualified immunity defense under Point III.D., the State Defendants did not cite to any "fabrication of evidence" case law (such as the Third Circuit's ruling in *Mervilus*), or couch their sub-point in "fabrication" terms (e.g., whether the defendant was aware the evidence was incorrect or that it was offered in bad faith, *Mervilus*, 73 F.4th at 194). (*See* ECF No. 135-2 at 31-34.) Instead, they relied on *Brady* case law. (*See id.* at 32 ("However, at the time of Plaintiff's trial in 1992, there was no clearly established law entitling Plaintiff to receive such a report as a matter of constitutional due process. *See Gibson v. Superintendent of New Jersey Dep't of Law and Public Safety*, 411 F.3d 427, 443-

---

[19]    Furthermore, the fact that the moving brief was filed by the State Defendants' prior counsel (*see* ECF No. 147-1 at 8) does not justify reconsideration. *See New Falls Corp. Soni Holdings, LLC*, No. 19-449, 2020 WL 9211146, at *7 (E.D.N.Y. Sept. 30, 2020) (stating that a party does not get the proverbial second bit at the apple simply by obtaining new counsel), *R&R adopted by* 2021 WL 855939 (E.D.N.Y. Mar. 5, 2021), *aff'd*, No. 21-865, 2022 WL 2720517 (2d Cir. Jul. 14, 2022).

44 (3d Cir. 2005)."), 33 ("More importantly, the related duty of the police to disclose information to the prosecutor was not addressed until later." (citing *Gibson*, 411 F.3d at 444)).) Such citations provide further support for the limited scope of the qualified immunity argument. The Court agreed with the State Defendants' *Brady* argument, stating that, "[b]ecause *Gibson* is the controlling law on this issue, the Court finds that it was not clearly established at the time of Harrell's trial in 1992 that Nichols was required to inform the prosecution of the *Brady* material."[20] *Johnson*, 2024 WL 4906034, at *18.

Accordingly, given their failure to raise a qualified immunity defense to the fabrication claims, the Court concludes that the State Defendants fail to meet their heavy burden to obtain reconsideration under the Local Civil Rules.

---

[20]    The State Defendants assert that Plaintiff understood that they were raising a secondary qualified immunity defense to the fabrication claims because, in their brief responding to the summary judgment motion, Plaintiff relied upon cases "in which courts **rejected** qualified immunity defenses raised in opposition to a 'fabrication of evidence' claim." (ECF No. 147-1 at 3 (emphasis in original).) However, neither Plaintiff nor this Court addressed the question (raised for the first time in the State Defendants' reply brief and reiterated in their present Motion) that Nichols's alleged conduct fabricating evidence was contrary to clearly established law. Instead, the Court merely agreed with Plaintiff that there was sufficient record evidence to support a fabrication claim, and the Court and Plaintiff noted that the Third Circuit in *Mervilus* denied qualified immunity. (ECF No. 139 at 14-17); *Johnson*, 2024 WL 4906034, at *13-16. Furthermore, to the extent that the State Defendants indicate that Plaintiff had an obligation to "protest" that they were raising a new issue in their reply brief, the Court rejects this contention as legally unsupported. (ECF No. 147-1 at 8-9.)

Plaintiff argues that, if the Court does grant reconsideration, it should reject the qualified immunity defense on the merits on the grounds that it can never be a defense to a fabrication claim given the nature and history of such claims (dating back to Magna Carta) and the troubling background of, and justifications for, the qualified immunity doctrine and preclude the State Defendants from raising the defense at trial. (ECF No. 151-1 at 4-6.) Because the Court denies the State Defendants' Motion, it does not reach the merits of the parties' qualified immunity arguments concerning the fabrication claims. The State Defendants "may raise this issue at trial, if appropriate." *Johnson*, 2024 WL 4906034, at *14 n.15 (citing *Sharp v. Johnson*, 669 F.3d 144, 158 (3d Cir. 2012)).

2.    **State Law**

The State Defendants argue that, if Nichols prevails on qualified immunity grounds on the fabrication claims, the remaining state law claims should be dismissed under the provisions of the NJTCA providing for good-faith immunity for public employees and stating that a public entity cannot be held liable where the employee is not liable. (ECF No. 147-1 at 24-25.) According to them, if the Court does not grant reconsideration with respect to qualified (and objective good-faith) immunity issues, summary judgment should be entered in the NJSP's favor on the negligence claim in Count Three of the Second Amended Complaint because the Court effectively converted this count into a claim of willful misconduct and, under N.J. Stat. Ann. § 59:2-10, a public entity cannot be held liable for the willful misconduct of its employees. (*Id.* at 25-26.)

For the same reasons that the Court denies reconsideration on the qualified immunity issue, it further denies reconsideration with respect to the objective good-faith immunity defense under the NJTCA. *See Wildoner v. Borough of Ramsey*, 162 N.J. 375, 387 (2000) ("The same standard for objective reasonableness that applies in Section 1983 actions also governs the questions of good faith arising under the Tort Claims Act." (citations omitted)). The State Defendants also do not provide any basis for the Court to "rethink" its denial of summary judgment as to Count III, *Lynch*, 2013 WL 4804528, at *1 (quoting *Oritani Sav. & Loan Ass'n*, 744 F. Supp. at 1314). The Court merely determined that the State Defendants did not meet their burden of showing that Nichols was entitled to immunity under the NJTCA because the statute does not provide immunity if the misconduct was willful and "a reasonable jury could conclude that Nichols was more than negligent" in his serology analysis and reporting. *Johnson*, 2024 WL 4906034, at *18. Furthermore, the State Defendants did not cite § 59:2-10 in their prior summary judgment

briefing.[21]  (*See generally* ECF Nos. 135-2, 136.)

## IV.    <u>CONCLUSION</u>

For the reason set forth above, and other good cause shown, the City Defendants' Motion is **GRANTED**, and the State Defendants' Motion is **DENIED**.  Plaintiff's claims against the City Defendants are dismissed with prejudice.  An appropriate Order follows.

GEORGETTE CASTNER
United States District Judge

Dated: June 24 2025

---

[21]    The State Defendants filed a "Motion for Reconsideration and Renewed Motion for Summary Judgment" (ECF No. 147-1), which was docketed as a "MOTION for Reconsideration" and "Second MOTION for Summary Judgment."  To the extent the State Defendants have filed a "Second" or "Renewed Motion for Summary Judgment," the Motion is denied because the Court denied their first Motion for Summary Judgment and the deadline for filing another summary judgment motion has expired (*see* ECF No. 116).